KEKER & VAN NEST, LLP
DARALYN J. DURIE - #169825
MARK A. LEMLEY - #155830
ASIM M. BHANSALI - #194925
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188
E-Mail:  ddurie@kvn.com
         mlemley@kvn.com
         abhansali@kvn.com

Attorneys for Defendant
IMPAX LABORATORIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ASTELLAS PHARMA INC. and BOEHRINGER INGELHEIM PHARMACEUTICALS INC., <br><br> Plaintiffs, <br><br> v. <br><br> IMPAX LABORATORIES, INC., <br><br> Defendant. | Case No. 5:08-CV-03466 JW <br><br> **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Date:     August 25, 2008 <br> Time:     9:00 a.m. <br> Dept:     Courtroom 8 <br> Judge:    Honorable James Ware <br><br> Date Comp. Filed:     July 18, 2008 <br><br> Trial Date:  None Set |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   FACTS ....................................................................................................................4

    A.    History of the Relevant Patents and the Tamsulosin Product.................4

    B.    *Astellas v. Ranbaxy* ................................................................................5

    C.    Procedural History ...................................................................................6

III.  LEGAL STANDARD...............................................................................................6

IV.   ARGUMENT ...........................................................................................................7

    A.    Six Claims of the '063 Patent are Invalid on the Grounds of Double Patenting ..................................................................................................7

        1.    The Law Against Double Patenting..............................................7

        2.    Claims Relevant to the Double Patenting Analysis .....................9

        3.    Claim 4 of the '106 Patent Invalidates Claim 14 of the '063 Patent.........................................................................................12

        4.    Claim 3 of the '106 Patent Invalidates Claims 1, 4, 8 and 10 of the '063 Patent ........................................................................13

        5.    Claim 2 of the '063 Patent is an Obvious Variation of the Invention Claimed in Claim 3 of the '106 Patent .....................17

        6.    The *Ranbaxy* Decision Was Wrongly Decided Then And Should Not Be Dispositive Now.................................................19

    B.    Impax's ANDA Does Not Infringe the Remaining Claims of the '063 Patent.....................................................................................................21

        1.    The tamsulosin compound contains neither the "lower alkyl group" that Claim 3 requires, nor the "lower alkoxy group" that Claim 5 requires...................................................................22

        2.    Tamsulosin is not any of the specific compounds claimed in Claims 15-19...........................................................................22

        3.    Tamsulosin, as a (-) isomer, cannot infringe Claims 6, 7, 9, 11, 12 or 13 because each claims either a (+) isomer or a racemic compound...................................................................................23

        4.    Plaintiffs cannot base their infringement case on the doctrine of equivalents. ...............................................................................23

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.    If Summary Judgment Is Not Entered in Impax's Favor, It Should Be Entered Against Impax ...................................................................................24

V.    CONCLUSION..........................................................................................25

421966.01

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MPA
CASE NO. 5:08-CV-03466 JW

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Andrx Pharms., Inc. v. Biovail Corp. International*,
 256 F.3d 799 (D.C. Cir. 2001) ............................................................3

*Astellas v. Ranbaxy*,
 2007 WL 576341 (D.N.J. Feb. 21, 2007) ..................................... *passim*

*Asyst Techs. v. Emtrak, Inc.*,
 402 F.3d 1188 (Fed. Cir. 2005)..........................................................24

*In re Baranauckas*,
 228 F.2d 413 (C.C.P.A. 1955) ......................................................13, 15

*Bayer AG. v. Biovail Corp.*,
 279 F.3d 1340 (Fed. Cir. 2002)............................................................6

*In re Berg*,
 140 F.3d 1428 (Fed. Cir. 1998)..........................................7, 8, 15, 21

*Boehringer Ingelheim Int'l GMBH v. Barr Labs., Inc.*,
 __ F. Supp.2d __, 2008 WL 2553237 (D. Del. June 26, 2008) ..................... *passim*

*In re Braat*,
 937 F.2d 589 (Fed. Cir. 1991)............................................................21

*Brenner v. Manson*,
 383 U.S. 519 (1966)..........................................................................18

*In re Christmann*,
 128 F.2d 596 (C.C.P.A. 1942) ..............................................................9

*Eli Lilly & Co. v. Barr Labs.*,
 251 F.3d 955 (Fed. Cir. 2001) ................................................... *passim*

*Eli Lilly & Co. v. Medtronic, Inc.*,
 496 U.S. 661 (1990)............................................................................3

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
 349 F.3d 1373 (Fed. Cir. 2003)........................................8, 9, 15, 19, 20

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
 195 F.3d 1322 (Fed. Cir. 1999)............................................................7

*In re Goodman*,
 11 F.3d 1046 (Fed. Cir. 1993)..........................................7, 8, 15, 20

*Hydranautics v. FilmTec Corp.*,
 204 F.3d 880 (9th Cir. 2000) ..............................................................6

421966.01

*In re Lonardo,*
    119 F.3d 960 (Fed. Cir. 1997)............................................................20

*In re Metoprolol Succinate Patent Litig.,*
    494 F.3d 1011 (Fed. Cir. 2007)................................................ *passim*

*Molinaro v. Fannon/Courier Corp.,*
    745 F.2d 651 (Fed. Cir. 1984)...............................................................6

*Perricone v. Medicis Pharm. Corp.,*
    432 F.3d 1368 (Fed. Cir. 2005).............................................................7

*Pfaff v. Wells Electrics, Inc.,*
    5 F.3d 514 (Fed. Cir. 1993) ...................................................6, 11, 13

*Pfizer Inc. v. Ranbaxy Labs. Ltd.,*
    457 F.3d 1284 (Fed. Cir. 2006)...........................................................23

*Planet Bingo, LLC v. Gametech International, Inc.,*
    472 F.3d 1338 (Fed. Cir. 2006)....................................................24, 25

*In re Rosicky,*
    276 F.2d 656 (C.C.P.A. 1960) ........................................................9, 18

*Texas Instrs. Inc. v. ITC,*
    988 F.2d 1165 (Fed. Cir. 1993)...........................................................7

*In re Van Ornum,*
    686 F. 2d 937 (C.C.P.A. 1982) ...........................................................15

*In re Vogel,*
    422 F.2d 438 (C.C.P.A. 1970) ............................................................12

*Weatherhead v. Drillmaster Supply Co.,*
    227 F.2d 98 (7th Cir. 1955) .................................................................9

*Wolverine World Wide, Inc. v. Nike, Inc.,*
    38 F.3d 1192 (Fed. Cir. 1994)........................................................7, 23

## FEDERAL STATUTES

21 U.S.C. 355(j)(5)(B)(iii)..................................................................25

35 U.S.C.
    § 101 (2000) ...........................................................................................7
    § 156.......................................................................................................5
    § 271(e)(4)(c)......................................................................................25

Fed. R. Civ. P. 56(b) ............................................................................6

Fed. R. Evid. 801(d)..............................................................................6

iv

421966.01

1

# MISCELLANEOUS

2

A DICTIONARY OF SCIENCE 580 (5TH ED. 2005) ..........................................................11

3

MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS
 587 & 1199 (6th ed. 2003) ......................................................................................11

4

MANUAL OF PATENT EXAMINING PROCEDURE
 802.01(II) ...............................................................................................................20

5

REMINGTON'S PHARMACEUTICAL SCIENCES 179, *Atomic and Molecular
Structure and the States of Matter* (15th ed. 1975).........................................11

6

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
 621, 1301, 1584 & 1870 (1971).............................................................................11

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

421966.01

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that on August 25, 2008, at 9:00 a.m., or as soon thereafter as

3   the matter may be heard, in the courtroom of the Honorable James Ware, United States District

4   Court, 280 South First Street, San Jose, CA 95113, Defendant Impax Laboratories, Inc.

5   ("Impax") will move the court for an order granting summary judgment on the grounds that

6   Claims 1, 2, 4, 8, 10 and 14 of U.S. Patent No. 4,703,063 (the "'063 patent") are invalid by

7   reason of nonstatutory double patenting, and on the grounds that Impax's filing of an

8   Abbreviated New Drug Application ("ANDA") for a proposed generic product did not infringe

9   the remaining claims of the patent.

10          Impax requests entry of judgment in its favor or, in the alternative, entry of judgment in

11   favor of Plaintiffs should the Court find the asserted patent to be valid and infringed.

12                          **STATEMENT OF ISSUES TO BE DECIDED**

13          1.      Where the patentee has an earlier patent claiming processes for producing various
               specific compounds, does the doctrine of nonstatutory double patenting invalidate
14             the patentee's later claims to the compounds themselves?

15          2.      Could a reasonable fact-finder find that Impax's ANDA infringed certain claims
               of the '063 patent where Impax's proposed generic drug product fails to meet the
16             specific limitations of those claims?

17                          **MEMORANDUM OF POINTS AND AUTHORITIES**

18                              **I.      INTRODUCTION**

19          The central issue in this motion is simple:  Can an inventor first choose to patent a

20   process for producing a specified compound and later separately patent the compound itself,

21   thereby extending the first patent's effective term through the lifetime of the second?  Because

22   the doctrine of nonstatutory double patenting prohibits exactly this result, summary judgment

23   should be entered in Impax's favor.

24          In this action, plaintiffs Astellas Pharma Inc. ("Astellas") and Boehringer Ingelheim

25   Pharmaceuticals Inc. ("Boehringer") accuse Impax of infringing the '063 patent by filing an

26   Abbreviated New Drug Application to manufacture and market a generic version of the branded

27   drug Flomax®, which contains the active ingredient tamsulosin hydrochloride ("tamsulosin").

28   As to six claims of this patent, the infringement question is already resolved:  Impax concedes

---

1

1   that Claims 1, 2, 4, 8, 10 and 14 of the '063 patent cover Impax's proposed tamsulosin product.

2   These claims are, however, invalid because a now-expired predecessor patent—a patent owned

3   by Astellas and issued *more than twenty-five years ago*—already claimed the processes for

4   producing the compounds (specifically including tamsulosin) covered by the '063 patent.

5   Because the claims of the earlier patent disclosed the very subject matter that the '063 patent

6   purports to protect, these six claims are invalid on the grounds of nonstatutory double patenting.

7       It is true that one year ago a District of New Jersey trial court reached the opposite

8   conclusion in a case Plaintiffs filed against a different ANDA applicant, based on the same

9   branded drug and the same patent.  That result, however, was inconsistent with the law at the

10  time, and is even more clearly incorrect in light of subsequent cases.  Five months after that

11  decision, the Federal Circuit made clear that where a patent's claims disclosed a particular

12  element, a second, later-filed patent could not claim that element as a separate invention because

13  such a result would effectively extend the first patent's term.  *See In re Metoprolol Succinate*

14  *Patent Litig.*, 494 F.3d 1011, 1017 (Fed. Cir. 2007).  And just last month the District of Delaware

15  applied the same reasoning in finding against Boehringer in a different case, invalidating a patent

16  claiming a certain class of compounds in light of an earlier patent for a method of using those

17  compounds.  *See Boehringer Ingelheim Int'l GMBH v. Barr Labs., Inc.*, __ F. Supp.2d __, 2008

18  WL 2553237 at *14 (D. Del. June 26, 2008).  Indeed, the following words of the *Boehringer*

19  court can be applied almost verbatim to this case:  "Allowing Boehringer to secure a new patent

20  on a compound which was itself specifically identified in the earlier method claims of the '086

21  patent is *precisely the type of monopolistic conduct the doctrine of nonstatutory double patenting*

22  *was designed to prevent*."  *Id.* at *16 (emphasis added).

23      Any attempt by Plaintiffs to base any part of their infringement action on the remaining

24  thirteen claims of the '063 patent must fail.  Plaintiffs' previous admissions establish that none of

25  those claims cover tamsulosin.

26      Although summary judgment is unusual at this stage, it is warranted here.  The disputed

27  issues are few, and the most significant is a pure question of law that Plaintiffs and the District of

28  New Jersey have already addressed.  The remaining infringement issues—which may or may not

1  even exist, depending on Plaintiffs' arguments—are also ripe for resolution as a matter of law

2  because of Plaintiffs' statements to the District of New Jersey and to the United States Patent and

3  Trademark Office ("Patent Office").  Under these atypical circumstances, continued litigation

4  would constitute a needless waste of the Court's and the parties' resources.  Moreover, in this

5  case time is of the essence—any delay translates into an effective victory for Plaintiffs,

6  regardless of the actual outcome of the case.  The '063 patent, which Plaintiffs have unlawfully

7  relied upon to exclude generic tamsulosin products from the market for over a decade, expires in

8  just 15 months.  If Impax is to reap any benefit from challenging Plaintiffs' flimsy patent, or

9  from the considerable work Impax has invested in developing its generic product and securing

10  regulatory approval for it, this case must be resolved, including any necessary appeals, before the

11  patent expires.  A resounding litigation defeat for Plaintiffs will mean nothing if, by then, they

12  have already enjoyed all or most of the benefits of their wrongfully-acquired patent.

13       Swift resolution of this case would also advance the public interests underlying the

14  Hatch-Waxman Act (the "Act"), under which this case arises.  That Act was promulgated in

15  large part to reduce the high price of prescription drugs by speeding the introduction of generic

16  substitutes.  *See Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990); *Andrx Pharms.,*

17  *Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 809 (D.C. Cir. 2001) ("Congress sought to get generic

18  drugs into the hands of patients at reasonable prices--fast") (citation omitted).  The Act seeks to

19  balance the public benefit provided by lower-priced generic products against the *legitimate*

20  intellectual property rights of branded pharmaceutical companies.  No public benefit is served by

21  allowing those companies to block competition with invalid patents or spurious infringement

22  claims, and therefore the sooner meritless patent infringement claims are rejected and generic

23  drugs permitted to reach the market, the better the goals of the Act will be served.

24       Impax believes it is now entitled to entry of summary judgment in its favor, as all of the

25  disputed issues in this case can and should be decided as a matter of law.  By the same token,

26  however, if the Court resolves the disputed issues against Impax, it should enter judgment in

27  Plaintiffs' favor, as further proceedings in the trial court cannot assist in resolving the case.

28

## II.    FACTS

### A.    History of the Relevant Patents and the Tamsulosin Product

In the late 1970s, scientists at Yamanouchi Pharmaceutical Company ("Yamanouchi") began working on a class of compounds called sulfamoyl-substituted phenethylamines. Declaration of Asim M. Bhansali ("Bhansali Decl."), Ex. A (Plaintiffs' Statement of Material Facts from *Astellas v. Ranbaxy* ("Plfs' Stmt.") at ¶ 2.[1]   In 1981, Yamanouchi applied for a patent covering these compounds, pharmaceutical compositions containing the compounds and processes for producing the compounds. *Id.* at ¶¶ 10-11; Ex. B ('106 file history at 6721-27). The United States Patent and Trademark Office ("Patent Office") responded to the application by rejecting the compound and pharmaceutical composition claims on prior art grounds. Ex. B ('106 file history at 6737, 6759-61, 6772-73). Yamanouchi cancelled those claims and proceeded to prosecute only the process claims, which issued in 1983 as U.S. Patent No. 4,373,106 (the "'106 patent"). *See id.* at 6773; Ex. C ('106 patent). The '106 patent expired in 2001. Exs. A (Plfs' Stmt. at ¶ 20) & C ('106 patent).

As the patent specification makes clear, the significance of the inventions claimed in the '106 patent was not some aspect of the claimed process itself, but rather the compounds that those processes produced. The specification repeatedly refers to the "novel" products produced by the claimed inventions, and goes on at length about the properties of and potential medical uses for those compounds. *See* Ex. C ('106 patent at 1:8-15; 2:19-25; 3:3-10 (noting that the compounds' α-adrenergic blocking property make them useful in treating hypertension, congestive heart failure, angina pectoris, lower urinary tract dysfunction and other conditions)). Although the specification also discussed the claimed processes, the processes themselves are never described as novel. Instead, they are described as the "process for producing the above-described pharmaceutically useful compounds." *Id.* at 2:26-28.

---

[1] All referenced exhibits are attached to the Declaration of Asim M. Bhansali filed herewith.

421966.01

1    After securing the patent for producing these compounds, Yamanouchi continued to seek

2  protection for the compounds themselves by re-filing the compound claims cancelled from its

3  first application in a series of divisional and continuation applications.  It finally succeeded with

4  a continuation application filed in 1985, which resulted in the issuance of the patent at issue in

5  this case.  Ex. D ('063 patent).  The '063 patent names the same inventors and assignee as the

6  '106 patent and includes a nearly identical specification.

7    In April 2005, Yamanouchi merged with Fujisawa Pharmaceutical Company, and the

8  merged entity became plaintiff Astellas Pharma Inc.  Exs. E (Complaint at ¶ 10) & A (Plfs' Stmt.

9  at ¶ 1).  For convenience this motion will refer to Astellas and its predecessor Yamanouchi as

10  "Astellas," collectively.  Plaintiff Boehringer Ingelheim Pharmaceuticals Inc. ("Boehringer") is

11  Astellas' marketing partner in the United States, Ex. A (Plfs' Stmt. at ¶ 39), and holds an

12  approved new drug application ("NDA") for a tamsulosin product that Boehringer markets under

13  the name "Flomax®."  Ex. E (Complaint ¶ 7).  In light of the length of the Flomax® approval

14  process, Astellas successfully requested a five-year extension for the term of the '063 patent

15  pursuant to 35 U.S.C. § 156, and that patent now expires on October 27, 2009.  Ex. F ('063 file

16  history at 6997-7025).

17  **B.    *Astellas v. Ranbaxy***

18    Three years ago, Plaintiffs filed a patent infringement action against Ranbaxy Inc.

19  ("Ranbaxy") on the grounds that Ranbaxy's filing of an ANDA to market a generic version of

20  Flomax® infringed the '063 patent.  *See* Ex. G (Complaint in *Astellas v. Ranbaxy*).  Formal and

21  informal stipulations by the parties narrowed the disputed issues in that case to the single legal

22  question of whether nonstatutory double patenting invalidated six claims in the '063 patent—

23  Claims 1, 2, 4, 8, 10 and 14.  The parties filed cross-motions for summary judgment on the issue,

24  which the court resolved in Plaintiffs' favor.  *See Astellas v. Ranbaxy* ("*Ranbaxy*"), 2007 WL

25  576341 (D.N.J.  Feb. 21, 2007).  (A copy of the summary judgment papers each side submitted is

26  attached to the Request for Judicial Notice filed herewith.)  Ranbaxy filed a notice of appeal, but

27  the parties settled before the appeal was heard.  Ex. H (*Ranbaxy* docket).

28    Although, as this brief will discuss, subsequent legal developments make clear that

1    *Ranbaxy* was wrongly decided, that action is still relevant for two reasons.  First, Plaintiffs are

2    collaterally estopped from challenging any of the findings that the *Ranbaxy* court relied upon in

3    reaching its ultimate decision, including that court's claim construction.[2]  *See Pfaff v. Wells*

4    *Elecs., Inc.*, 5 F.3d 514, 518 (Fed. Cir. 1993); *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651,

5    654 (Fed. Cir. 1984).  The *Ranbaxy* case is also relevant to these proceedings because the

6    admissions Plaintiffs made in that case are admissible evidence here.  *See* Fed. R. Evid. 801(d).

7    **C.    Procedural History**

8          In this action, Plaintiffs assert the same patent that they asserted in *Ranbaxy* against a

9    different ANDA applicant, this time Impax.  Plaintiffs filed their complaint on July 18, 2008.  On

10   July 22, 2008, Impax filed an answer which narrowed the disputed issues to the sole questions of

11   whether the six patent claims asserted in *Ranbaxy* are invalid on the grounds of nonstatutory

12   double patenting and whether Impax's ANDA infringes the remaining claims of the '063 patent.

13   Ex. I.  Because these two issues are ripe for resolution as a matter of law, this summary judgment

14   motion should result in the entry of judgment in favor of one set of parties or the other.

**III.    LEGAL STANDARD**

16         Federal Rule of Civil Procedure 56 explicitly permits defendants to move for summary

17   judgment "at any time."  Fed. R. Civ. P. 56(b).  Such a motion should be granted whenever

18   "based on the record, no genuine issue exists as to any material fact, and the moving party is

19   entitled to judgment as a matter of law."  *Eli Lilly & Co. v. Barr Labs.*, 251 F.3d 955, 962 (Fed.

20   Cir. 2001) (citing Fed. R. Civ. P. 56(c)).

21         In a patent infringement case, summary judgment based on invalidity is generally

22   appropriate when the defendant is able to show clear and convincing evidence of invalidity.  *Id.*

---

[2] In a patent case, whether collateral estoppel applies depends on the law of the circuit in which
the district court sits.  *See Bayer AG. v. Biovail Corp.*, 279 F.3d 1340, 1345 (Fed. Cir. 2002).  In
the Ninth Circuit, collateral estoppel applies where: "(1) the issue necessarily decided at the
previous proceeding is identical to the one which is sought to be relitigated; (2) the first
proceeding ended with a final judgment on the merits; and (3) the party against whom collateral
estoppel is asserted was a party or in privity with a party at the first proceeding."  *Hydranautics
v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000).  It is clear that all three of these
preconditions for estoppel are satisfied here—the validity issues are identical, the *Ranbaxy*
decision resolved the case via summary judgment, and the same plaintiffs brought both cases.

1  The ultimate determination of double patenting is a question of law, however, *Georgia-Pacific*

2  *Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1326 (Fed. Cir. 1999); *Texas Instrs. Inc. v. ITC*, 988

3  F.2d 1165, 1179 (Fed. Cir. 1993), and is thus particularly well-suited for summary resolution.

4  Summary judgment of non-infringement is appropriate if no reasonable fact-finder could find

5  that infringement occurred.  *See Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1196

6  (Fed. Cir. 1994).

## IV.    ARGUMENT

**A.    Six Claims of the '063 Patent are Invalid on the Grounds of Double Patenting**

### 1.    The Law Against Double Patenting

10       The prohibition against double patenting exists to ensure that inventors cannot exclude

11  others from using their inventions for longer than the term of a single patent.  This prohibition

12  takes two forms.  The first, typically referred to as "statutory" or "same invention" double

13  patenting, is based on the language in § 101 of the Patent Act mandating "a patent" for any new

14  and useful invention and addresses situations where two patents claim the exact same invention.

15  *See Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1372-73 (Fed. Cir. 2005); 35 U.S.C. §

16  101 (2000); *see also In re Goodman*, 11 F.3d 1046, 1052 (Fed. Cir. 1993) ("If the claimed

17  inventions are identical in scope, the proper rejection is under 35 U.S.C. § 101 because an

18  inventor is entitled to a single patent for an invention.") (Citations omitted).  This form of double

19  patenting does not apply in this case.

20       The other form of double patenting, known as "nonstatutory" or "obviousness-type"

21  double patenting, addresses claimed inventions that are not identical in scope, yet are too closely

22  related to warrant a second patent.  Courts created this doctrine to preclude "claims in separate

23  applications or patents that do not recite the 'same' invention, but nonetheless claim inventions

24  so alike that granting both exclusive rights would effectively extend the right of patent

25  protection."  *Metoprolol*, 494 F.3d at 1016.  *See also In re Berg*, 140 F.3d 1428, 1432 (Fed. Cir.

26  1998) (purpose of the doctrine "is to prevent an unjustified extension of the term of the right to

27  exclude granted by a patent by allowing a second patent claiming an obvious variant of the same

28  invention to issue to the same owner later").  Where, as here, the earlier patent in the double

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MPA
CASE NO. 5:08-CV-03466 JW

1  patenting analysis has already expired, a nonstatutory double patenting finding invalidates the

2  affected claims in the later patent.  *See Eli Lilly*, 251 F.3d at 968 n.5.

3       The nonstatutory double patenting analysis consists of comparing the properly-construed

4  claims of the earlier and later patents to determine whether the later claims are "patentably

5  distinct" from the earlier ones.  *See Eli Lilly*, 251 F.3d at 968.  A later claim is not patentably

6  distinct if it is either "obvious over" or "anticipated by" the earlier claim.  *Id.*

7       Although courts do not necessarily specify whether their nonstatutory double patenting

8  analyses are based on the stricter principles of anticipation or on more general obviousness

9  principles, it is clear that both are proper bases for double patenting findings. Courts have drawn

10 upon the extensive caselaw discussing anticipation in the § 102 context in determining what

11 constitutes anticipation for double patenting purposes, *see, e.g., Eli Lilly*, 251 F.3d at 970;

12 *Goodman*, 11 F.3d at 1053 & n.4, and have found double patenting on similar grounds.  For

13 instance, courts have stated that a double patenting problem exists where an earlier claim

14 "discloses every limitation of the claimed invention either explicitly or inherently," *Eli Lilly*, 251

15 F.3d at 970, or where an earlier claim discloses a subset of a later generic claim.  *See Geneva*

16 *Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1385 (Fed. Cir. 2003); *Berg*, 140 F.3d at

17 1431; *Goodman*, 11 F.3d at 1053.

18      When couching their analyses in the language of obviousness, courts have found claims

19 to be merely "obvious variations" of earlier ones in a range of situations, including ones that

20 would also qualify under anticipation.  *Metoprolol* recognized and resolved an inconsistency in

21 existing precedents and clarified that nonstatutory double patenting precludes the patenting of

22 any invention disclosed by an earlier patent claim.  494 F.3d at 1017 (rejecting cases holding

23 there to be "no double patenting because an earlier claim to a combination sets forth a later

24 claimed element").  Applying this rationale, the court held that a patent claiming "metoprolol

25 succinate" was invalid because an earlier claim for a pharmaceutical composition had

26 specifically listed that compound as a possible active ingredient.  *Id.* at 1014.

27      *Boehringer* illustrated that a mere difference in statutory class—whether a claim is

28 framed as one for a compound, a process of making the compound, or a method of using the

compound—is not enough to render a later claim nonobvious.  The court found that earlier claims directed to a method of using a certain set of compounds precluded the later patenting of those compounds because they were already disclosed in the earlier claims.  *Boehringer*, 2008 WL 2553237 at *14 ("The earlier '086 patent is directed to methods of treatment using tetrahydrobenzthiazoles.  Tetrahydrobenzthiazoles are the compounds claimed in the later '812 patent.  In fact, the compounds claimed in claim 3 of the '812 patent are identical to the compounds used in the method described in claim 23 of the '086 patent.").

Courts have also found claims to be obvious where, although they added new or different matter, they still offered no inventive advance over earlier claims.  For example, courts have found claimed inventions obvious where they do nothing more than incorporate a previously-patented compound into a standard pharmaceutical product, *see In re Rosicky*, 276 F.2d 656, 660 (C.C.P.A. 1960), or omit one or more elements in an earlier claimed invention.  *See Metoprolol*, 494 F.3d at 1017; *Geneva Pharms.*, 349 F.3d at 1382-83; *In re Christmann*, 128 F.2d 596 598-600 (C.C.P.A. 1942).

In any case, whether the analysis takes the form of an "obviousness" or "anticipation" inquiry, the fundamental issue is still the same:  To avoid double patenting, the later patent's claims "must show an invention beyond the claim . . . of the first."  *Weatherhead v. Drillmaster Supply Co.*, 227 F.2d 98, 102 (7th Cir. 1955); *see also Eli Lilly*, 251 F.3d at 970 ("[A] later patent claim that fails to provide novel invention over an earlier claim is not patentably distinct from the earlier claim").  Without offering an inventive advance, a later set of claims by the same patentee cannot survive the earlier ones.

**2.    Claims Relevant to the Double Patenting Analysis**

Two claims from the earlier '106 patent are relevant to the double patenting analysis:

**Claim 3:**  A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula

wherein $R_1$ represents an amino group or a mono-or di-lower alkylamino group; $R_2$ represents a hydroxy group, a lower alkyl group or a lower alkoxy group; $R_3$ represents a hydrogen atom or a lower alkyl group, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent and reducing the halogenated product.

**Claim 4:** The process as defined in claim 3 for the preparation of 5-[2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl]-2-methoxybenzenesulfonamide.

The six claims in the '063 patent that these earlier claims invalidate are:

**Claim 1:** Sulfamoyl-substituted phenethylamine derivatives represented by the general formula



wherein $R_1$ represents an amino group or a mono-or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a lower alkoxy group or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom, and the salts thereof.

**Claim 2:** A pharmaceutical composition containing an effective α-adrenergic antagonistic amount of a compound of claim 1 and a pharmaceutically acceptable excipient.

**Claim 4**: The compound of claim **1** wherein $R_3$ is a hydrogen atom and the salts thereof.

**Claim 8:** The compound of claim **1** which is an optically active isomer.

**Claim 10:** The isomer of claim **8** which is the (-) isomer.

421966.01

**Claim 14:**  The compound of claim **1** which is 5-{ 2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide.

These claimed inventions are related in the following ways:

- Claim 3 in the earlier '106 patent covers processes for producing many of the compounds later claimed in Claim 1 of the'063 patent. *See infra* § IV.A.4.

- Claim 2 of the '063 patent covers pharmaceutical compositions combining an effective amount of a compound in Claim 1 with an excipient *i.e.,* an inactive ingredient.  Because Claim 2 incorporates Claim 1, the claimed pharmaceutical compositions in Claim 2 also include many of the compounds disclosed in Claim 3 of the earlier '106 patent.

- Claims 4, 8 and 10 of the '063 patent each claim some subset of the Claim 1 compounds, again including many of the compounds disclosed in Claim 3 of the earlier patent.

- Claim 4 of the '106 patent covers a process for producing the specific compound claimed in Claim 14 of the '063 patent.

Because Impax chooses to accept the *Ranbaxy* court's claim constructions and Plaintiffs are collaterally estopped from challenging them, no claim construction is necessary in this case. *See Pfaff*, 5 F.3d at 518.  Each of those claim constructions will be set forth in the claim-by-claim discussion to follow.

By way of background, Claims 8 and 10 of the '063 patent claim certain "optically active isomers" and "(-) isomers."  These terms refer to a chemical phenomenon known as "optical isomerism."  Optical isomers are molecules that are asymmetric mirror images of one another. These molecules either rotate light clockwise, *i.e.*, to the right, or counterclockwise, *i.e.*, to the left.  The molecules that rotate light clockwise are called "(+) isomers" and those that rotate light counterclockwise are "(-) isomers."  Molecules that exhibit this ability to rotate light are described as "optically active."  A mixture of equal amounts of (-) isomers and (+) isomers does not rotate light in either direction and is described as "racemic," or a "racemic compound."  *See* A DICTIONARY OF SCIENCE 580 (5TH ED. 2005), attached as Ex. J; Eric Lien et al., *Atomic and Molecular Structure and the States of Matter, in* REMINGTON'S PHARMACEUTICAL SCIENCES 179 (15th ed. 1975), attached as Ex. K; *WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY* 621, 1301, 1584 & 1870 (1971), attached as Ex. L; MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 587 & 1199 (6th ed. 2003), attached as Ex. M.

1    It is clear that the compound or compounds referenced in each claim of the two patents

2  include all forms of the compounds—their (-) isomers, (+) isomers, and racemates—unless the

3  claims otherwise indicate.  Both patent specifications state that "since the compounds of this

4  invention can readily form the salts thereof and contain asymmetric carbon atom(s), the

5  compounds of this invention include the salts thereof, the racemic compounds thereof, a mixture

6  of the racemic compounds, and each optically active substance."  Exs. C ('106 patent at 2:65- 3:2

7  & D ('063 patent) at 2:66- 3:4.  *See In re Vogel*, 422 F.2d 438, 442 (C.C.P.A. 1970) (looking

8  portion of specification that supported claims in double patenting analysis); *Ranbaxy*, 2007 WL

9  576341 at *3 n.3 (noting that it was undisputed that the processes claimed in the '106 patent

10  produce isomers).  Thus, Claims 3 and 4 of the '106 patent and Claims 1, 2, 4 and 14 of the '063

11  patent include all three forms of the compounds recited therein, while Claim 8 of the '063 patent

12  covers only "an optically active isomer" (*i.e.*, (-) and (+) isomers separately) and Claim 10 of the

13  '063 patent covers only the (-) isomer of the compounds.

14      **3.     Claim 4 of the '106 Patent Invalidates Claim 14 of the '063 Patent**

15    The claimed invention in Claim 14 of the later patent is nothing more than the product of

16  the process claimed in Claim 4 of the earlier patent:

| **'106 Patent Claim 4:**  The process as defined in claim 3 for the preparation of | **'063 Patent Claim 14:**  The compound of claim 1 which is |
|---|---|
| **5-[2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl]-2-methoxybenzenesulfonamide**. | **5-{ 2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide.** |

21    Indeed, this is exactly the conclusion that the *Ranbaxy* court reached in its claim

22  construction, which is binding on Plaintiffs here.  *See Pfaff*, 5 F.3d at 518.  The court construed

23  Claim 4 of the '106 patent as "a claim for a process to make the named compound, 5-[2-[2-(2-

24  ethoxyphenoxy)ethylamino]-2-methylethyl]-2-methoxybenzenesulfonamide," and construed

25  claim 14 of the '063 patent to be a claim "for the compound sulfamoyl-substituted

26  phenethylamine derivative," *i.e.*, a claim for the described compound.  2007 WL 576341 at *4.

27  Put simply, the *Ranbaxy* court construed Claim 4 as the process for making the compound of

28  Claim 14.

1    After *Metoprolol* and *Boehringer* there can be no doubt that double patenting occurs

2  whenever an earlier claim specifically identifies a later-claimed compound.  *Metoprolol*, 494

3  F.3d at 1017-18; *Boehringer*, 2008 WL 2553237 at *14.  This rule reinforces *Eli Lilly*'s general

4  statement that nonstatutory double patenting bars claims that are "anticipated by" earlier ones,

5  251 F.3d at 968, and is entirely consistent with the longstanding anticipation principle that "a

6  reference which clearly names a compound or identifies it by structural formula constitutes a full

7  anticipation of a claim to that compound."  *In re Baranauckas*, 228 F.2d 413, 415 (C.C.P.A.

8  1955).  In other words, Claim 4 identifies by chemical name the compound in Claim 14 and

9  thereby fully anticipates it.

10    The compound in Claim 14 is not only anticipated by the earlier process claim, but is also

11  obvious in light of it.  Although the two claims fall into different statutory classes, that fact alone

12  is not enough to make the compound claim patentable over a process claim that discloses it.  *See*

13  *Boehringer*, 2008 WL 2553237 at *14.  In fact, it is clear that there is nothing new about the

14  compound claim, as compared to the process claim.  A person who performs the process claimed

15  in the earlier patent will already possess the product claimed in the later one, and therefore gains

16  nothing, knowledge-wise, by being "given" that compound again.  *See Eli Lilly*, 251 F.3d at 970

17  (later patent must provide "novel invention"); *Boehringer,* 2008 WL 2553237 at *14 (later claim

18  obvious because one cannot practice the earlier claim without necessarily forming the later

19  claimed compound).

20    Thus, Claim 4 of the earlier patent invalidates Claim 14 of the asserted patent, based on

21  both anticipation and obviousness principles.

22    **4.    Claim 3 of the '106 Patent Invalidates Claims 1, 4, 8 and 10 of the '063 Patent**

23    As the court and the parties accepted in *Ranbaxy*, the compounds discussed in the two

24  patents are effectively the same.  *See Ranbaxy*, 2007 WL 576341 at *3; Exs. A (Plfs' Stmt. at ¶¶

25  8-10, 13, 18, 24-25, 28); N (Plaintiffs' Opposition to Defendant Ranbaxy's Motion for Summary

26  Judgment in *Ranbaxy* at 7-10).  At no point in Plaintiffs' hard-fought opposition to Ranbaxy's

27  motion did they argue that the earlier patent did *not* disclose compounds covered by the asserted

28  claims.  *See* Ex. N.

The text of the claims shows why any such argument was impossible.

| **'106 patent Claim 3**: A process for producing **sulfamoyl-substituted phenethylamine derivatives represented by the formula** | **'063 patent Claim 1: Sulfamoyl-substituted phenethylamine derivatives represented by the general formula** |
|---|---|
|  |  |
| **wherein $R_1$ represents an amino group or a mono-or di-lower alkylamino group; $R_2$ represents** a hydroxy group, **a lower alkyl group or a lower alkoxy group; $R_3$ represents a hydrogen atom or a lower alkyl group, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom** or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, **or the salts thereof** which comprises reacting a compound represented by the formula  wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent and reducing the halogenated product. | **wherein $R_1$ represents an amino group or a mono-or di-lower alkylamino group; $R_2$ represents** a hydroxyl group, **a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom,** a lower alkoxy group **or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom, and the salts thereof.** |
| | **Claim 4:** The compound of claim **1** wherein $R_3$ is a hydrogen atom and the salts thereof. |
| | **Claim 8:** The compound of claim **1** which is an optically active isomer. |
| | **Claim 10:** The isomer of claim **8** which is the (-) isomer. |

Claim 3 of the earlier patent and Claim 1 of the asserted patent each describe a class of compounds that share the same chemical structure, shown by the same diagram in each claim. The claims describe the different members of each class by listing the atoms or molecules that are permitted at each of 10 positions in that structure, which the patents designate as $R_1$-$R_{10}$.

14

1      The bold text in the chart above shows the overlap between the two claims.  As

2  evidenced by the plain language of the claims, most of the compounds described in these two

3  claims are the same.  They are compounds where:

4      • $R_1$ represents an amino group or a mono-or di-lower alkylamino group;

5      • $R_2$ represents a lower alkyl group or a lower alkoxy group;

6      • $R_3$ represents a hydrogen atom or a lower alkyl group,

7      • $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group;

8      • $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group, and

9      • Y represents an oxygen atom.

10  *See also Ranbaxy,* 2007 WL 576341 at *3 n.3 ("The parties do not dispute the process claimed in

11  the '106 patent, when practiced, will produce tamsulosin, as well other compounds within the

12  class of sulfamoyl-substituted phenethylamines"—including many of the compounds claimed in

13  those later claims.")

14      Because Claim 3 of the earlier patent specifically discloses most of the compounds

15  claimed in Claim 1 of the later patent, it anticipates that claim.  *See Metoprolol*, 494 F.3d at

16  1017-18; *Boehringer*, 2008 WL 2553237 at *14; *see also Baranaukas*, 228 F.2d at 415.  The fact

17  that Claim 3 of the earlier patent does not disclose all of the later-claimed compounds is

18  immaterial, because disclosure of a subset of a later genus claim still invalidates the later claim

19  under anticipation principles.  *See Geneva Pharms.*, 349 F.3d at 1385; *Berg*, 140 F.3d at 1431;

20  *Goodman*, 11 F.3d at 1053; *In re Van Ornum*, 686 F. 2d 937, 944 (C.C.P.A. 1982).

21      With regard to Claim 4 of the asserted patent, it is clear that Claim 3 anticipates it.  Claim

22  4 covers those compounds in Claim 1 of the '063 patent where $R_3$ is a hydrogen atom.  As Claim

23  3 of the earlier patent clearly states, the compounds it produces include ones where $R_3$ is a

24  hydrogen atom.  Thus, because Claim 3 discloses a subset of the compounds in Claim 4 of the

25  '063 patent, it also anticipates and invalidates that claim.

26      With regard to Claims 8 and 10, as discussed in section IV.A.2, the process of Claim 3 of

27  the '106 patent is understood to produce sulfamoyl-substituted phenethylamine derivatives in all

28  forms, including optically active isomers—both (-) and (+) isomers—and optically inactive

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MPA
CASE NO. 5:08-CV-03466 JW

1   racemates.  *See* Exs. C ('106 patent at 2:65- 3:2 ("[T]he compounds of this invention include . . .

2   the racemic compounds . . . and each optically active substance.")).   Thus Claim 3 discloses the

3   only elements added by claim 8 ("optically active isomer") and Claim 10 ("(-) isomer").

4        Moreover, even if Claim 3 of the earlier patent did not anticipate Claims 1, 4, 8 and 10, it

5   would still render them obvious because, as the *Ranbaxy* court found, "the process claimed in the

6   '106 patent, when practiced, will produce tamsulosin, as well other compounds within the class

7   of sulfamoyl-substituted phenethylamines."  2007 WL 576341 at *3.  Again, because the process

8   claims already put the compounds in the public's possession, the later claims for the compounds

9   themselves provide no "novel invention," and therefore are invalid.  *Eli Lilly*, 251 F.3d at 970;

10  *see also Boehringer,* 2008 WL 2553237 at *14.

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

421966.01

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MPA
CASE NO. 5:08-CV-03466 JW

### 5. Claim 2 of the '063 Patent is an Obvious Variation of the Invention Claimed in Claim 3 of the '106 Patent

| | |
|---|---|
| **'106 patent Claim 3**: A process for producing **sulfamoyl-substituted phenethylamine derivatives represented by the formula** | **'063 patent Claim 1: Sulfamoyl-substituted phenethylamine derivatives represented by the general formula** |

$$R_2 \text{—} \underset{SO_2R_1}{\bigcirc} \text{—} \underset{R_3}{\overset{}{C}} H \text{—} \underset{R_5}{\overset{R_4}{C}} \text{—} \underset{R_6}{\overset{}{N}} \text{—} \underset{R_8}{\overset{R_7}{C}} \text{—} \underset{R_9}{\overset{}{C}} H \text{—} Y \text{—} \bigcirc \text{—} R_{10}$$

$$R_2 \text{—} \underset{SO_2R_1}{\bigcirc} \text{—} \underset{R_3}{\overset{}{C}} H \text{—} \underset{R_5}{\overset{R_4}{C}} \text{—} \underset{R_6}{\overset{}{N}} \text{—} \underset{R_8}{\overset{R_7}{C}} \text{—} \underset{R_9}{\overset{}{C}} H \text{—} Y \text{—} \bigcirc \text{—} R_{10}$$

| | |
|---|---|
| wherein $R_1$ represents an amino group or a **mono-or di-lower alkylamino group; $R_2$ represents** a hydroxy group, **a lower alkyl group or a lower alkoxy group; $R_3$ represents a hydrogen atom or a lower alkyl group, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom** or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, **or the salts thereof** which comprises reacting a compound represented by the formula | wherein **$R_1$ represents an amino group or a mono-or di-lower alkylamino group; $R_2$ represents** a hydroxyl group, **a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom,** a lower alkoxy group **or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom, and the salts thereof.** |

$$R_2 \text{—} \underset{SO_2R_1}{\bigcirc} \text{—} \underset{OH}{\overset{R}{C}} \text{—} \underset{R_5}{\overset{R_4}{C}} \text{—} \underset{R_6}{\overset{}{N}} \text{—} \underset{R_8}{\overset{R_7}{C}} \text{—} \underset{R_9}{\overset{}{C}} H \text{—} Y \text{—} \bigcirc \text{—} R_{10}$$

| | |
|---|---|
| wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent and reducing the halogenated product. | |
| | **'063 Patent Claim 2:** A pharmaceutical composition containing an effective α-adrenergic antagonistic amount of a compound of claim **1** and a pharmaceutically acceptable excipient. |

Unlike the other claims of the '063 patent, Claim 2 is not a claim to a chemical compound, but instead covers pharmaceutical compositions containing one of the compounds covered by Claim 1. *Ranbaxy* construed this claim "as a claim for a pharmaceutical composition of the named compound, having the stated pharmaceutical properties." 2007 WL 576341 at *4.

This claim differs from the compound claims in only two respects, neither of which overcomes the double patenting bar. First, the claimed pharmaceutical compositions are the

421966.01

result of combining the compounds with "a pharmaceutically acceptable excipient" (*i.e.*, an inactive ingredient). The addition of an excipient is an obvious modification, as it is well established that where one patent's claimed inventions already disclose the therapeutic properties of a compound, it would be obvious to incorporate that compound into a pharmaceutical composition. *See Rosicky,* 276 F.2d at 660 (obvious to formulate pharmaceutical compositions containing certain amounts of a previously-disclosed therapeutic compound). Indeed, even the patent specifications describe the addition of an excipient as "conventional." Ex. D ('063 patent at 9:29-33) ("The compounds of this invention may be formulated into ordinary dosage forms . . . the medicaments can be prepared *by conventional methods with conventional pharmaceutical excipients.*") (emphasis added); Ex. C ('106 patent at 9:10-14) (same).

The second difference is Claim 2's specific reference to the compounds' α-adrenergic antagonist property. This fact also fails to establish a patentable distinction, for two independent reasons. Under the principle of inherency, the "inherent characteristics," including the "natural result" of a given chemical compound when administered as a drug, are patentably indistinguishable from the compound itself. *Eli Lilly*, 251 F.3d at 970 (earlier patent contemplating administration of fluoxetine hydrochloride invalidates later patent claiming the blocking of serotonin using that compound because serotonin inhibition is an inherent characteristic of the drug). Here it is clear from the specification that the compounds exhibit α-adrenergic blocking action. Ex. C ('106 patent at 1:8-15; 2:19-25; 3:3-10). As in *Eli Lilly*, a compound's pharmacological effect is an inherent characteristic of the compound, and therefore cannot be considered the inventive aspect of a later claim including that compound.

In addition, because utility is a necessary precondition for patentability,[3] courts have

---

[3] In the chemical field, a process is not patentably useful simply because it produces the chemical compound described in the claim—the specification must also show that the compound produced is useful for some specific purpose. *See Brenner v. Manson*, 383 U.S. 519 (1966). The Supreme Court explained that this stringent requirement was necessary to ensure that the public received a concrete benefit in exchange for the grant of a patent monopoly:

The basic *quid pro quo* contemplated by the Constitution and the Congress for granting a patent monopoly is the benefit derived by the public from an invention with substantial utility. Unless and until a process is refined and developed to this point—where specific benefit exists in currently available form—there is

consistently held that the properly defined scope of a claimed invention necessarily includes its disclosed utility, wherever in the patent it may appear. In *Geneva Pharms.*, the Federal Circuit held that an earlier patent for a compound disclosed to have a single use precluded a later method claim for that use, even if the statement of utility in the earlier patent only appeared in the specification. 349 F.3d at 1384-86. As the court noted, it was necessary to look to the utility recited in the specification to ascertain the scope of the claimed invention because the claim "[s]tanding alone. . . does not adequately disclose the patentable bounds of the invention." *Id.* at 1385. The court adopted the reasoning of earlier cases stating that the "'disclosure of usefulness did not constitute separate invention, *but an essential part of a single invention*.'" *Id.* at 1386 (emphasis added, citations omitted). In this case, the '106 patent specification disclosed that the compounds produced by the patented processes "exhibit a strong α-adrenergic blocking action." Ex. C ('106 patent) at 1:13-14, and that disclosed utility is therefore part of the claimed invention.

Because neither the inclusion of an excipient nor the reference to the compound's α-adrenergic antagonist property renders Claim 2 of the '063 patent patentably distinct from Claim 4 of the '106 patent, Claim 2 is also invalid on the grounds of nonstatutory double patenting.

### 6. The *Ranbaxy* Decision Was Wrongly Decided Then And Should Not Be Dispositive Now

Although *Ranbaxy* directly addressed the double patenting issues in this case and resolved them in Plaintiffs' favor, that decision should not influence the outcome here because it conflicted not only with existing precedent, but also with subsequent cases, including controlling authority from the Federal Circuit.

The Federal Circuit's subsequent *Metoprolol* decision resolved a conflict in prior caselaw and rejected the line of cases that had concluded, like *Ranbaxy*, that there could be "no double patenting [simply] because an earlier claim to a combination sets forth a later claimed element."

---

insufficient justification for permitting an applicant to engross what may prove to be a broad field.

*Id.* at 534.

421966.01

494 F.3d at 1017; *compare Ranbaxy*, 2007 WL 576341 at *5. Notably, *Ranbaxy* settled shortly after the *Metoprolol* decision issued.

The *Ranbaxy* decision also improperly relied on the difference in the statutory classes of the claims, in essence holding that a process claim could never invalidate a product claim because they were not the "same invention." 2007 WL 576341 at *7-8. As *Metoprolol* reiterated, though, "same invention" is the standard for statutory—not nonstatutory—double patenting, and applying that test in a nonstatutory context eviscerates the doctrine altogether. *See* 494 F.3d at 1018-19. Moreover, cases before and after *Ranbaxy* showed that claims in different classes are capable of invalidating one another. *Geneva Pharms.*, 349 F.3d at 1385-86 (later method of use claim obvious over earlier compound claim); *In re Lonardo*, 119 F.3d 960, 967-68 (Fed. Cir. 1997) (later method of use claim obvious over earlier product claim); *Boehringer*, 2008 WL 2553237 at *14 (later compound claim obvious over earlier method of use claim).

*Ranbaxy* also improperly relied on the guidelines the Patent Office follows in deciding whether jointly-submitted claims in an application qualify as "patentably distinct" for restriction purposes, implying that the same guidelines apply when assessing separately-filed claims for double patenting. *See* 2007 WL 576341 at *8. The two analyses are not, however, necessarily the same. In the restriction context, the Patent Office should enter a restriction requirement if *either one* of the claims at issue is obvious over the other. *See* MANUAL OF PATENT EXAMINING PROCEDURE 802.01(II) (claims are "distinct" for purposes of applying restriction requirement if "at least one invention is PATENTABLE (novel and nonobvious) OVER THE OTHER") (emphasis in original), attached as Ex. O. For separately-filed claims, though, the *order* of the claims is critical. In general, double patenting exists only where the *later-issued* claim is obvious over, or anticipated by, the earlier one. *See, e.g., Eli Lilly*, 251 F.3d at 968; *Goodman*, 11 F.3d at 1052-53. Thus, two claims that might have been susceptible to restriction by the Patent Office if jointly-submitted are not for that reason automatically immune from a double patenting challenge if they appear in different applications—whether or not double patenting

1    occurs often depends on the order in which the applicant chooses to pursue the claims.[4]

2    **B.    Impax's ANDA Does Not Infringe the Remaining Claims of the '063 Patent**

3    In *Ranbaxy* Astellas indicated that it was not asserting thirteen of the claims in the '063

4    patent (Claims 3, 5-7, 9, 11-13 and 15-19).  Ex. P (Ranbaxy's Memorandum of Points and

5    Authorities in Support of Ranbaxy's Motion for Summary Judgment at 1 n.1)  Although Astellas

6    has not made a similar concession in this case, it is clear that any attempt to base infringement on

7    these remaining claims fails at the outset.

8    Astellas has previously acknowledged to the Patent Office that none of these thirteen

9    claims cover the tamsulosin compound.  In applying to extend the term of the '063 patent based

10   on its NDA for Flomax®, Astellas was required to list the claims of that patent that cover

11   tamsulosin, and listed none of the thirteen.  Ex. F ('063 file history at 7003-04) ("The applicable

12   patent claims which read on the approved product are Claims 1, 2, 4, 8, 10 and 14.").  Since the

13   thirteen claims at issue do not cover the tamsulosin compound, they *necessarily* do not cover

14   Impax's ANDA for tamsulosin.  Plaintiffs cannot claim otherwise.  As demonstrated below, the

15   plain text of those claims, taken in conjunction with Plaintiffs' concrete admissions, conclusively

16   establish that none of the thirteen claims cover tamsulosin, and therefore cannot have been

17   infringed by Impax's ANDA.

18

19

20   _____

[4] There is one instance in which analysis for separately-filed and jointly-filed claims are the

21   same.  Although this exception is not applicable in this case, it underscores the importance of
     applying for claims in the correct order.  Where a challenged claim was issued after, *but applied*

22   *for before*, the allegedly invalidating patent, and the challenged patent's delayed issuance was
     attributable to the Patent Office rather than to the patentee, courts apply a "two-way"

23   obviousness analysis, only invalidating the later-issued patent if *both* patents are obvious over
     one another.  *See Eli Lilly*, 251 F.3d at 968 n.7.  This "two-way" test is effectively the same as

24   the Patent Office's restriction analysis.  It is clear that the courts created this exception to avoid
     penalizing applicants who submitted their claims in the correct order—prioritizing the broader,

25   dominant claim—and who were not to blame for the patents issuing in reverse order.  *See id.*; *In*

26   *re Braat,* 937 F.2d 589, 594 (Fed. Cir. 1991) ("Philips filed the Braat and Dil applications so as
     to maintain proper inventorship, with claims directed to Braat's 'subcombination' invention in

27   the first application and claims directed to both Dil's 'subcombination' invention and to the
     'combination' invention in the second application. . . .It is not Philips' fault that the combination

28   claims in the Dil patent issued first."); *Berg*, 140 F.3d at 1434-35 (discussing significance of how
     applicant chose to file claims).

1    **1.    The tamsulosin compound contains neither the "lower alkyl group" that Claim 3 requires, nor the "lower alkoxy group" that Claim 5 requires.**

2

3    Astellas has previously acknowledged that tamsulosin does not meet certain elements of

4    Claims 3 and 5 of the '063 patent. Each of those claims specifies that $R_3$ of the

5    compound structurally depicted as:

6



10    must take a particular form. For Claim 3, $R_3$ must be "a lower alkyl group or a lower alkoxy

11    group." For Claim 5, $R_3$ must be "a lower alkyl group and the salts thereof." As Astellas

12    informed the Patent Office, however, $R_3$ in tamsulosin is a hydrogen atom. Ex. F ('063 file

13    history at 7003 & 7004). Neither Claim 3 nor Claim 5 thus covers tamsulosin.

14    **2.    Tamsulosin is not any of the specific compounds claimed in Claims 15-19.**

15    Plaintiffs state that tamsulosin is the (-) optically active isomer of the compound

16    identified in Claim 14 of the '063 patent. Ex. A (Plfs' Stmt. at ¶ 38) ("Claim 14 is a dependent

17    claim—also dependent on claim 1—that covers a specific chemical compound, which includes

18    the (-) optically active isomer of that compound, tamsulosin"); *see also* Ex. E (Complaint ¶ 8).

19    Claims 15-19 each specify a compound other than the one in Claim 14. Where Claim 14

20    claims "5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-

21    methoxybenzenesulfonamide," Claims 15-19 lay claim to the following other compounds:

22    •    Claim 15: '2-methoxy-5-{2-[2[(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide";

23

24    •    Claim 16: "5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl)-2-methyl benzenesulfonamide";

25    •    Claim 17: "5-{2-[2-(2-methoxyphenoxy)ethylamino]ethyl]-2-methylbenzenesulfonamide";

26

27    •    Claim 18: "2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N methylbenzenesulfonamide"; and

28

- Claim 19: "2-methoxy-5-{2-[2-(-methoxyphenoxy)theylamino]-2-methylethyl}N,N-dimethylbenzenesulfonamide."

Ex. D ('063 patent).  The patent specification makes clear that these other compounds not only have entirely different chemical structures, but also radically different physiochemical properties.  *See* Ex. D ('063 patent: compare Example 20, regarding compound described in claim 14 with Examples 16, 25, 11, 4, and 5, regarding compounds identified in Claims 15 through 19, respectively).  Tamsulosin thus does not meet the required claim elements of Claims 15-19.

### 3. Tamsulosin, as a (-) isomer, cannot infringe Claims 6, 7, 9, 11, 12 or 13 because each claims either a (+) isomer or a racemic compound.

Claims 6, 7, 9 and 12 each cover either a (+) isomer, a racemic compound, or a mixture of racemic compounds.  Plaintiffs have admitted, though, that tamsulosin is a (-) isomer.  *See* Ex. A (Plfs. Stmt. at ¶ 38).  As discussed in section IV.A.2, (+) isomers rotate light clockwise, (-) isomers rotate light counterclockwise, and racemic compounds do not rotate light in any direction.  Thus, Claims 6, 7, 9 and 12 cannot cover tamsulosin because the fact that those claims are limited to (+) isomers and racemic compounds means that the scope of each excludes (-) isomers.

Claim 11-13 are dependent claims that incorporate the requirements of Claim 7.  Because non-infringement of a claim automatically results in non-infringement of any claim that depends on it, *see Wolverine World Wide*, 38 F.3d at 1199, Claims 11-13 also cannot cover tamsulosin.[5]

### 4. Plaintiffs cannot base their infringement case on the doctrine of equivalents.

Under the "all elements rule" a product does not infringe under the doctrine of

---

[5] Plaintiffs may argue that Claim 11 is not actually a subset of Claim 7.  Claim 11 covers the "optically active isomers" of the compounds in Claim 7, but Claim 7 only covers "a mixture of racemic compounds," which, by definition, are not optically active.  *See* Ex. D ('063 Patent, Claims 7, 11).  This mistake is fatal because improper drafting of a dependent claim automatically invalidates it.  *See Pfizer Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006).  Even if the claim was valid, however, it would not be necessary to resolve the appropriate interpretation because Plaintiffs cannot prove their case based on any conceivable interpretation.  If Claim 11 covers a null set, in that no compound can satisfy its requirements, Impax clearly has not infringed it.  If it covers racemates or (+) isomers, Impax does not infringe it for the same reasons applicable to Claims 6, 7, 9 and 12.  If Claim 11 covers (-) isomers, then it is invalidated by the same arguments that apply to Claim 10.  *See supra* § IV.A.4.

421966.01

1   equivalents if such an application of the doctrine would "vitiate an entire claim limitation," for

2   instance by forcing a claim to encompass the opposite of a specified limitation. *Asyst Techs. v.*

3   *Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005). The related "specific exclusion" principle

4   dictates that where a patentee has chosen to draft a narrow claim, the doctrine of equivalents

5   cannot be used to expand its scope to include matter clearly excluded by that narrow drafting.

6   *See id.* (holding that a claim containing the term "mounted" specifically excludes objects that are

7   "unmounted"); *Planet Bingo, LLC v. Gametech Int'l, Inc.*, 472 F.3d 1338, 1344 (Fed. Cir. 2006)

8   ("Here, the patents contain a distinct limitation, which was part of the bargain when the patent

9   issued. This court cannot overlook that limitation or expand the doctrine of equivalents beyond

10  its purpose to allow recapture of subject matter excluded by a deliberate and foreseeable claim

11  drafting decision.").

12        Each of the remaining thirteen claims either describes a specific compound that is not

13  tamsulosin (Claims 15-19), specifies a (+) isomer or racemic compound where tamsulosin is a (-)

14  isomer (Claims 6, 7, 9, 11-13), or requires a specific chemical structure that tamsulosin does not

15  have (Claims 3 and 5). Tamsulosin is, however, clearly covered by counterparts to each of these

16  dependent claims (*see* Claims 4, 8, 10 and 14). Given Astellas' deliberate choice to draft its

17  dependent claims narrowly to carve out certain subsets of its claimed inventions, it cannot now

18  rely on the doctrine of equivalents to expand the scope of some dependent claims to include

19  subject matter specifically reserved for the others.

20  **C.     If Summary Judgment Is Not Entered in Impax's Favor, It Should Be Entered
         Against Impax**

21

22        Although the foregoing arguments demonstrate that Impax is entitled to summary

23  judgment in its favor, should the Court disagree with Impax's view of the applicable law, Impax

24  respectfully requests entry of summary judgment for Plaintiffs. As previously discussed, all

25  liability issues are ripe for resolution as a matter of law. If the Court resolves those issues in

26  Plaintiffs' favor, the appropriate remedy is clear as a matter of law. Impax concedes that

27  Plaintiffs are entitled to the requested injunctive relief if they prevail on liability. Ex. E

28  (Complaint at 6:5-13). Although the Complaint also requests damages "for any commercial

1  activity constituting infringement of the '063 patent," *id.* at 6:14-15, no such damages exist.

2  Under 35 U.S.C. § 271(e)(4)(c), damages are recoverable "only if there has been commercial

3  manufacture, use, or sale of an *approved* drug."  (Emphasis added.)  At this point, Impax's

4  proposed product is not an approved drug.  Furthermore, this litigation automatically delays the

5  effective date for that approval.  *See* 21 USC 355(j)(5)(B)(iii) (mandating 30-month delay for

6  effective ANDA approval date, given timely instigation of litigation by patentee).

7          In fact, this statutory delay is why timing is of particular concern in these ANDA cases.

8  In other contexts, a company that truly believed that its product would not infringe a

9  competitor's patent, or that the patent was invalid or unenforceable, would be free to go to

10  market and risk an infringement suit.  ANDA applicants, however, do not have that option, and

11  thus may be held back by the automatic 30-month stay of its ANDA approval by even the most

12  meritless infringement claims until those claims are thoroughly litigated.

13          Unless Impax fully vindicates its position in this litigation before Plaintiffs' patent

14  protection ends, it will have fought this battle in vain.  Impax can only benefit from challenging

15  Plaintiffs' baseless assertion of the '063 patent by succeeding in that challenge before the patent

16  ceases to have effect, and therefore requests that the Court enter judgment in favor of one set of

17  parties or the other, in order to allow for any necessary appeals before the asserted patent expires.

18                           **V.     CONCLUSION**

19          For all the foregoing reasons, Impax respectfully requests entry of judgment in its favor,

20  on the grounds that Claims 1, 2, 4, 8, 10 and 14 of the '063 are invalid on the basis of

21  nonstatutory double patenting, and on the grounds that the accused product does not infringe the

22  remaining claims of the '063 patent.  Should the Court disagree that Impax is entitled to such

23  relief, Impax respectfully requests entry of judgment in favor of Plaintiffs.

24  Dated:  July 25, 2008                          KEKER & VAN NEST, LLP

25

26                                          By:  /s/ Asim M. Bhansali_____
                                                 DARALYN J. DURIE
27                                               ASIM M. BHANSALI
                                                 Attorneys for Defendant
28                                               IMPAX LABORATORIES, INC.,