1   Michael K. O'Neill, SB# 155937
    FITZPATRICK, CELLA, HARPER
2     & SCINTO
    650 Town Center Drive, Suite 1600
3   Costa Mesa, CA 92626
    Telephone: (714) 540-8700
4   Facsimile: (714) 540-9823
    mo'neill@fchs.com
5   Attorney for Plaintiffs
    Astellas Pharma Inc., and
6   Boehringer Ingelheim Pharmaceuticals Inc.

7   Robert L. Baechtold (*pro hac vice* to be filed)
    Simon D. Roberts (*pro hac vice* to be filed)
8   FITZPATRICK, CELLA, HARPER
      & SCINTO
9   30 Rockefeller Plaza
    New York, NY 10112-3801
10  Telephone: (212) 218-2100
    Facsimile: (212) 218-2200
11  rbaechtold@fchs.com
    sroberts@fchs.com

12

13

14                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
15                      SAN JOSE DIVISION

16

17  - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
    ASTELLAS PHARMA INC., and BOEHRINGER            :  Case No. 08-03466 JW
18  INGELHEIM PHARMACEUTICALS INC.                  :
                                                    :
19                              Plaintiffs,         :  DECLARATION OF TODD
                                                    :  NOSHER IN SUPPORT OF
20                       v.                         :  PLAINTIFFS' OPPOSITION
                                                    :  TO SHORTEN TIME
21  IMPAX LABORATORIES, INC.                        :
                                                    :
22                              Defendant.          :
23  - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

24

25

26

27

28

    DECLARATION OF TODD NOSHER
    IN SUPPORT OF PLAINTIFFS'
    OPPOSITION TO SHORTEN TIME

1    I, Todd Nosher, declare:

2

3        1. I am a member of the bar of the State of New York, and an associate at Fitzpatrick,

4    Cella, Harper & Scinto, counsel to Plaintiffs' Astellas Pharma Inc. ("Astellas") and Boehringer

5    Ingelheim Pharmaceuticals Inc. ("BIPI") in this matter.

6        2. I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion to

7    Shorten Time. I have personal knowledge of the facts set forth herein, and if called upon to

8    testify, I would testify completely to the statements made herein.

9        3. Attached at Exhibit 1 hereto is a true and correct copy of U.S. Patent No.

10   4,703,063 ("the '063 patent").

11       4. Attached at Exhibit 2 hereto is a true and correct copy of U.S. Patent No. 4,373,106

12   ("the '106 patent").

13       5. Attached at Exhibit 3 hereto is a true and correct copy of Judge Mary L. Cooper's

14   February 21, 2007 opinion on summary judgment in *Astellas Pharma Inc., et al., v. Ranbaxy Inc.,*

15   *et al.*, Civil Action No. 05-2563 (MLC).

16       6. Attached at Exhibit 4 hereto is a true and correct copy of Impax's June 5, 2008 Notice

17   Letter to Plaintiffs.

18       7. U.S. Patent No. 4,703,063 issued on October 27, 1987.

19       8. On April 15, 1997, tamsulosin hydrochloride obtained U.S. FDA approval.

20   Attached at Exhibit 5 hereto is a true and correct copy of a printout from the U.S. FDA web page

21   for the electronic Orange Book query for tamsulosin.

22       9. Generic companies seeking to challenge the '063 patent were permitted to do so on or

23   after April 15, 2001, the date which was four years after initial U.S. FDA approval of tamsulosin

24   (21 U.S.C. § 355 (j)(5)(F)(ii)).

25       10. On April 6, 2005, Ranbaxy Pharma sent its notice letter to Plaintiffs, challenging the

26   '063 patent. Attached at Exhibit 6 hereto is a true and correct copy of the Ranbaxy's notice

27   letter.

28

DECLARATION OF TODD NOSHER
IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO SHORTEN TIME                    - 1 -

1    11.   As a result of this notification, Plaintiffs sued Ranbaxy in the District of New Jersey

2    on May 13, 2005.  Attached at Exhibit 7 hereto is a true and correct copy of the Complaint in that

3    action.

4    12.   After mutual discovery in the foregoing litigation, Ranbaxy moved for summary

5    judgment of invalidity on June 9, 2006, and based its motion on double patenting.

6    13.   Discovery was subsequently conducted on Ranbaxy's summary judgment motion.

7    14.   On February 2, 2007, summary judgment arguments were heard before Judge

8    Cooper.

9    15.   Judge Cooper issued her decision on February 21, 2007, denying Ranbaxy's motion

10   and granting Plaintiffs' cross motion.

11   16.   A day later, Ranbaxy filed their Notice to Appeal Judge Cooper's decision.

12   17.   On August 8, 2007, the Ranbaxy appeal was argued before the United States Court of

13   Appeals for the Federal Circuit.

14   18.   As a result of settlement, Ranbaxy's appeal was dismissed and Judge Cooper vacated

15   her judgment on November 7, 2007.

16   19.   On June 5, 2008, Impax Laboratories sent Plaintiffs a notice letter stating that it had

17   filed a new application for U.S. FDA approval, alleging that the '063 patent was invalid based on

18   the same grounds that Ranbaxy unsuccessfully argued before Judge Cooper.

19   20.   Plaintiffs filed a complaint for patent infringement in this Court on July 18, 2008.

20   21.   Seven days later, Impax filed its summary judgment motion -- which as it states

21   "largely reprises the summary judgment arguments in *Ranbaxy*."

22   22.   These foregoing dates are set forth in the table below:

23

24

25

26

27

28

DECLARATION OF TODD NOSHER
IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO SHORTEN TIME          - 2 -

| Date | Event |
|---|---|
| October 27, 1987 | U.S. Patent No. 4,703,063 ("the '063 patent") issued |
| April 15, 1997 | Tamsulosin hydrochloride obtained approval by the U.S. FDA |
| April 15, 2001 | Generic companies may begin to challenge the '063 patent |
| April 6, 2005 | Ranbaxy Pharma sends its notice letter to Plaintiffs, challenging the '063 patent |
| May 13, 2005 | Plaintiffs sue Ranbaxy in the District of New Jersey |
| June 9, 2006 | Ranbaxy moves for summary judgment of invalidity |
| February 2, 2007 | Argument on summary judgment before Judge Cooper |
| February 21, 2007 | Judge Cooper issues her opinion denying Ranbaxy's motion and granting Plaintiff's cross motion |
| February 22, 2007 | Ranbaxy files Notice of Appeal |
| August 8, 2007 | Argument before the Federal Circuit involving Ranbaxy's appeal |
| November 7, 2007 | Case settled and appeal dismissed, Judge Cooper vacates her judgment |
| June 5, 2008 | Impax sends its notice letter to Plaintiffs, challenging the '063 patent |
| July 18, 2008 | Plaintiffs file suit against Impax in the Northern District of California |
| July 25, 2008 | Impax files motion for Summary Judgment of invalidity |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

Executed this 4th day of August 2008 in New York, New York.

Todd Nosher

DECLARATION OF TODD NOSHER
IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO SHORTEN TIME                    - 3 -

# EXHIBIT 1

# United States Patent [19]

## Imai et al.

[11] Patent Number: 4,703,063

[45] Date of Patent: Oct. 27, 1987

[54] **SULFAMOYL SUBSTITUTED PHENETHYLAMINE DERIVATIVES AND PROCESS OF PRODUCING THEM**

[75] Inventors: **Kazuo Imai; Kunihiro Niigata; Takashi Fujikura, all of Saitama; Shinichi Hashimoto, Chiba; Toichi Takenaka, Tokyo, all of Japan**

[73] Assignee: **Yamanouchi Pharmaceutical Co., Ltd., Tokyo, Japan**

[21] Appl. No.: **756,790**

[22] Filed: **Jul. 18, 1985**

### Related U.S. Application Data

[60] Continuation of Ser. No. 632,258, Jul. 18, 1984, Pat. No. 4,558,156, which is a continuation of Ser. No. 403,006, Jul. 29, 1982, abandoned, which is a division of Ser. No. 231,421, Feb. 4, 1981, Pat. No. 4,373,106.

### [30] Foreign Application Priority Data

Feb. 8, 1980 [JP] Japan .................................. 55-14382

[51] Int. Cl.$^4$ .................. C07C 143/78; C07C 143/80; A61K 31/18

[52] U.S. Cl. ...................................... 514/603; 564/86

[58] Field of Search ........................... 564/86; 514/603

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,723,524 | 3/1973 | Augstein et al. | 564/86 |
| 3,860,647 | 1/1975 | Colella et al. | 564/86 |
| 4,140,713 | 2/1979 | Oxford et al. | 564/86 |
| 4,217,305 | 8/1980 | Imai et al. | 564/86 |
| 4,373,106 | 2/1983 | Imai et al. | 564/86 |
| 4,558,156 | 12/1985 | Imai et al. | 564/86 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 34432 | 8/1981 | European Pat. Off. | 564/86 |
| 159757 | 10/1982 | Japan | 564/86 |
| 41860 | 3/1983 | Japan | 564/86 |

*Primary Examiner*—Paul F. Shaver
*Attorney, Agent, or Firm*—Burgess, Ryan and Wayne

[57] **ABSTRACT**

Novel sulfamoyl-substituted phenethylamine derivatives which exhibit α-adrenergic blocking action and are useful as an antihypertensive agent and an agent for the treatment of congestive heart failure.

**19 Claims, No Drawings**

4,703,063

**1**

# SULFAMOYL SUBSTITUTED PHENETHYLAMINE DERIVATIVES AND PROCESS OF PRODUCING THEM

This is a continuation of Ser. No. 632,258, filed July 18, 1984, now U.S. Pat. No. 4,558,156, which is a continuation of Ser. No. 403,006, filed July 29, 1982, now abandoned, which is a division of Ser. No. 231,421, filed Feb. 4, 1981, now U.S. Pat. No. 4,373,106.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to novel sulfamoyl-substituted phenethylamine derivatives and the acid addition salts thereof, and more particularly, to novel sulfamoyl-substituted phenethylamine derivatives and the acid addition salts thereof which exhibit a strong α-adrenergic blocking action and are useful as an antihypertensive agent and a treating agent for congestive heart failure. The invention is further concerned with the process of producing these derivatives and the acid addition salts thereof.

### 2. Description of the Prior Art

British Pat. No. 2,006,772 discloses a series of compounds exhibiting α- and β-adrenergic blocking actions and also the patent discloses that the compound shown by the following formula exhibits strong α- and β-adrenergic blocking actions



U.S. Pat. No. 3,860,647 discloses a series of compounds shown by the following general formula



wherein R represents hydrogen or alkyl having 1–4 carbon atoms; R' represents alkyl having 1–6 carbon atoms, cycloalkyl having 3–6 carbon atoms, $XC_6H_4(CH_2)_2C(CH_3)_3$, $XC_6H_4(CH_2)_2C(CH_3)_2$, $XC_6H_4CH_2CH(CH_3)$, or $XC_6H_4CH_2CH(CH_3)_2$ (wherein X represents hydrogen, hydroxyl or methoxy); and Y represents hydrogen or hydroxy. It is also described in the patent specification that these compounds exhibit a β-adrenergic blocking action.

British Pat. No. 902,617 discloses a series of compounds shown by the following general formula



wherein $R_1$ is hydroxyl, methyl, methoxy, etc.; $R_2$ is hydrogen, methyl, etc.; $R_3$ is phenyl, benzyl or hydroxy-, methyl-, methoxy-, ethoxy-, chloro- or bromo-substituted phenyl or benzyl radical, etc.; and $R_4$ is

**2**

hydrogen, etc. These compounds exhibit an α-adrenergic blocking action (see, "J. Med. Chem."; 9, 812–818 (1966)) and possess an antihypertensive activity.

Also, in "J. Med. Chem."; 9, 812–818 (1966), there is described that the phenoxyethylamine-type compounds shown by the following general formula possess an α-adrenergic blocking action;



wherein $R_1$ represents o-OCH$_3$, etc., and $R_2$ represents o- or p-OCH$_3$, etc.

## SUMMARY OF THE INVENTION

An object of this invention is to provide the novel sulfamoyl-substituted phenethylamine derivatives shown by following general formula and the acid addition salts thereof which possess a hypotensive activity based on an α-adrenergic blocking action and are useful as an antihypertensive agent, an agent for the treatment of congestive heart failure, etc.

Another object of this invention is to provide the process for producing the above-described pharmaceutically useful compounds.

That is, according to this invention, there are provided the sulfamoyl-substituted phenethylamine derivatives shown by following general formula I and the acid addition salts thereof



wherein $R_1$ represents, an amino group or a mono- or di-lower alkylamino group; $R_2$ represents, a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents, hydrogen atom, halogen atom, a lower alkyl group, a lower alkoxy group, a phenylthio group, or a phenylsulfinyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represents, hydrogen atom or a lower alkyl group; $R_{10}$ represents, hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents oxygen atom or a methylene group; said Y being, however, an oxygen atom when $R_2$ is a hydroxyl group.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Now, the term "lower" used in the above-described formula means a straight or branched carbon chain having 1 to 5 carbon atoms. Therefore, for example, a lower alkyl group includes a methyl group, ethyl group, propyl group, butyl group, pentyl group, isobutyl group, etc., and a lower alkoxy group includes a methoxy group, ethoxy group, propoxy group, butoxy group, etc. Also, in the above-described formula, $R_{10}$ which is a substituent of the benzene ring may be disposed at any position of which is ortho, meta or para to the side chain. Furthermore, since the compounds of this invention shown by formula I can readily form the salts thereof and contain asymmetric carbon atom(s),

4,703,063

**3**

the compounds of this invention include the salts thereof, the racemic compounds thereof, a mixture of the racemic compounds, and each optically active substance.

The compounds of formula I and the acid addition salts thereof provided by the present invention exhibit an $\alpha$-adrenergic blocking action and thus they can be utilized for various treatments. For example, they can be used as useful agents for the treatments of hypertension, congestive heart failure, angina pectoris, lower urinary tract dysfunction, prostatic hypertrophy, pheochromocytoma and peripheral vascular disorders.

The compounds of this invention shown by formula I can be produced by the following processes.

Process 1:

The compounds of formula I are obtained by reacting the compounds shown by general formula II



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in formula I with a halogenating agent and then, if desired, (a) reducing the halogenated product obtained by the above reaction; or (b) reacting the halogenated product with an alkaline material and then reacting the product thus obtained with hydrogen iodide, a lower alcohol, or thiophenol, and further, if desired, oxidizing the product obtained by the reaction with thiophenol.

Process I is further described in more detail. That is, according to the process, the starting materials shown by formula II described above are reacted with a halogenating agent to provide the compounds shown by general formula $I_1$



wherein X represents, chlorine atom or bromine atom and R, $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in formula II, and then, if desired, (a) the halogenated compounds shown by formula $I_1$ are reduced to form the compounds shown by formula $I_2$



wherein R, $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described; or (b) the halogenated compounds shown by formula $I_1$ are treated with an alkaline material to form the aziridine compounds shown by the following general formula III

**4**



wherein $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described, then, the aziridine compounds are reacted with hydrogen iodide, a lower alcohol, or thiophenol to provide the compounds shown by general formula $I_3$



wherein R′ represents an iodine atom, a lower alkoxy group or a phenylthio group and $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described and further, when R′ of the compounds shown by formula $I_3$ is a phenylthio group, if desired, the compounds of $I_3$ are oxidized to provide the compounds shown by general formula $I_4$



wherein $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described.

This process is further schematically shown below, wherein the compounds shown by formulae $I_1$, $I_2$, $I_3$ and $I_4$ are the desired compounds of this invention.



Step 1  Halogenation



Step 2
Reduction

Step 3    (in case of R and
$R_6$ of compound
$I_1$ being a

4,703,063

| 5 | 6 |

-continued



hydrogen atom) Treatment with alkaline material



Step 4 | HI, lower alcohol or thiophenol



Step 5 | (in case of R' of compound $I_3$ being a phenylthio group) Oxidation



The reaction condition in each step described above is as follows:

Step 1:

The halogenation of the compounds of formula II can be performed in an organic solvent such as toluene, methyl ethyl ketone, acetonitrile, tetrahydrofuran, etc., at room temperature or under heating using a halogenating agent such as thionyl chloride, hydrogen chloride, hydrogen bromide, phosphorus trichloride, phosphorus pentachloride, phosphorus oxychloride, thionyl bromide, etc.

Step 2:

The reduction of the compounds of formula $I_1$ can be performed in an organic solvent such as methanol, ethanol, toluene, acetonitrile, tetrahydrofuran, etc., under a hydrogen stream, at normal temperature and normal pressure using a catalyst such as platinum oxide, palladium carbon, etc.

Step 3:

The compounds of formula III can be obtained by treating the compounds of formula $I_1$ (wherein, however, R and $R_6$ are hydrogen atom) with an alkaline material such as sodium carbonate, metal alcoholate, sodium hydroxide, potassium hydroxide, etc., in an organic solvent such as ethyl acetate, ethanol, dioxane, benzene, etc., at room temperature to 50° C.

Step 4:

(i): The compounds of formula $I_3$ (wherein, R' is a phenylthio group) can be obtained by reacting the compounds of formula III with thiophenol in an organic solvent such as methanol, chloroform, ethyl acetate, dioxane, benzene, etc., at room temperature.

(ii): The compounds of formula $I_3$ (wherein, R' is a lower alkoxy group) can be obtained by reacting the

compounds of formula III with a lower alcohol in the presence of a $BF_3$ catalyst under the same condition as in the step (i).

(iii): The compounds of formula $I_3$ (wherein, R' is an iodine atom) can be obtained by reacting the compounds of formula III with hydroiodic acid in an organic solvent such as dioxane, methanol, etc., at room temperature.

Step 5:

The oxidation of the compounds of formula $I_3$ (wherein R' is a phenylthio group) can be performed in acetic acid at a temperature of 50°–60° C. using $H_2O_2$ as the oxidizing agent.

In addition, among the compounds of this invention, the compounds shown by the following general formula $I_5$



wherein R'' represents a lower alkoxy group or a phenylthio group and R, $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described can be obtained by reacting the compounds of formula $I_1$ directly with a lower alcohol or thiophenol.

The starting materials of formula II (wherein R is hydrogen atom) used in the process of this invention are described in British Pat. No. 2,006,772 and also the starting materials of formula II (wherein R is a lower alkyl group) can be obtained by reacting the compounds of the following formula



described in the aforesaid British patent with a Grignard reagent (lower alkyl-MgX).

Process 2:

Among the compounds of formula I, the compounds of this invention shown by following general formula $I_6$



wherein $R_1$, $R_2$, $R_3$, $R_4$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the formula I, can be produced by condensing the compound shown by the general formula



IV

4,703,063

**7**

and the compound shown by the following formula

$$H_2N-\underset{\underset{R_8}{|}}{\overset{\overset{R_7}{|}}{C}}-CH-Y-\underset{\underset{R_9}{|}}{}$$ V $R_{10}$

and then reducing the products thus obtained.

This reaction is performed by condensing the compounds of formula IV and the compounds of formula V in an organic solvent such as methanol, ethanol, toluene, acetonitrile, tetrahydrofuran, etc., and then reducing the products in the presence of a PtO$_2$ catalyst or a Raney nickel catalyst or with NaBH$_4$, LiAlH$_4$, etc.

The isolation and purification of the compounds of this invention shown by general formulae I$_1$-I$_6$ formed by Process 1 and 2 are performed by filtration, extraction with a solvent, separation by column chromatography, recrystallization, etc.

The pharmacological effects of the compounds of this invention were determined by the following experiments. The effects of the typical compounds of this invention were compared with 5-{1-hydroxy-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide (Compound A) which is one of the typical compounds disclosed in British Pat. No. 2,006,722 and phentolamine.

A. α-Adrenergic blocking action:

The blood pressure was measured in the rats anesthetized with urethane and treated with pentolinium. The effects of the test samples (intravenous injection) to antagonize the hypertensive response to phenylephrine (10 μg/Kg i.v.) were measured and the results were shown in Table I.

B. Antihypertensive effects in spontaneously hypertensive rats:

Oral administration: The systolic blood pressure was measured indirectly from the tail cuff method using a programmed electrosphygmomanometer (Narco Bio-Systems Inc., PE-300) on spontaneously hypertensive rats having a systolic blood pressure higher than 150 mmHg, the result being shown in Table II.

### TABLE I

| α-Adrenergic blocking action: | |
| Sample | α-adrenergic blocking ED$_{50}$ (mg/Kg) i.v. |
| --- | --- |
| Compounds of this invention (Ex. No.) | |
| 4 | 0.00035 |
| 5 | 0.00026 |
| 10 | 0.0059 |
| 11 | 0.012 |
| 12 | 0.0073 |
| 15 | 0.0013 |
| 16 | 0.0008 |
| 20 | 0.00000014 |
| 25 | 0.0012 |
| 26 | 0.004 |
| Known compounds | |
| Compound A | 0.034 |
| Phentolamine | 0.061 |

### TABLE II

| Antihypertensive effect: | | |
| Sample | Dose (mg/Kg) | Change in systolic blood pressure (mmHg) at stated dose p.o. |
| --- | --- | --- |
| Compounds of this | | |

**8**

### TABLE II-continued

| Antihypertensive effect: | | |
| Sample | Dose (mg/Kg) | Change in systolic blood pressure (mmHg) at stated dose p.o. |
| --- | --- | --- |
| invention (Ex. No.) | | |
| 10 | 10 | −57 ± 5.6 |
| 11 | 30 | −50 ± 4.7 |
| 12 | 10 | −48 ± 2.0 |
| 15 | 10 | −54 ± 6.2 |
| 16 | 10 | −71 ± 11.1 |
| 20 | 3 | −57 ± 4.2 |
| 25 | 10 | −46 ± 3.6 |
| 26 | 10 | −46 ± 4.3 |
| Known compounds | | |
| Compound A | 10 | −35 ± 6.4 |
| Phentolamine | 10 | +7.8 ± 5.0 |
| Phentolamine | 100 | −70 ± 10.1 |

The clinical administration of the compounds of this invention is usually practiced by intravenous injection or orally as the free bases or the acid addition salts thereof (e.g., hydrochlorides, sulfates, maleates, acetates, furarates, lactates, citrates, etc.). It is proper to administer 10 ng–1 mg per ounce of the compound several times per day in case of intravenous administration or 0.1–100 mg of the compound two or three times per day in the case of oral administration.

The compounds of this invention may be formulated into ordinary dosage forms such as, for example, tablets, capsules, pills, solutions, etc., and in these cases, the medicaments can be prepared by conventional methods with conventional pharmaceutical excipients.

Then, the production of the compounds of this invention will be further described in the following examples. In addition, the starting materials used in this invention include novel compounds and the production thereof are shown in the Reference Examples.

### REFERENCE EXAMPLE 1

$$CH_3O-\underset{\underset{SO_2NHCH_3}{}}{}-CH_2-COCH_3$$

(1) To 250 g of chlorosulfonic acid was added dropwise 50 g of 4-methoxyphenylacetone at 0°–5° C. After stirring the mixture for 4 hours at room temperature, the reaction mixture was poured into 2,500 ml of ice water and extracted three with 500 ml of ethyl acetate. The extract was washed with water and after drying the extract with anhydrous magnesium sulfate, the solvent was distilled off under reduced pressure. The crude crystals obtained were recrystallized from benzene-ether to provide 32 g of 3-chlorosulfonyl-4-methoxyphenylacetone. Melting point: 80°–81° C.

(2) In 26 ml of tetrahydrofuran was dissolved 2.6 g of 3-chlorosulfonyl-4-methoxyphenylacetone and then 1.2 g of 40% methylamine was added dropwise to the solution at a temperature lower than 10° C. After stirring the mixture for one hour at room temperature, the solvent was distilled off under reduced pressure and the residue was extracted with ethyl acetate. The extract was washed with water and after drying with anhydrous magnesium sulfate, the solvent was distilled off under reduced pressure. The crude crystals obtained

4,703,063

**9**

were recrystallized from isopropanol-ether to provide 1.8 g of 4-methoxy-3-N-methylsulfamylphenylactone.

Melting point: 100°–101° C.

## REFERENCE EXAMPLE 2



By reacting 2.6 g of 3-chlorosulfonyl-4-methoxyphenylacetone and 0.6 g of dimethylamine in the same manner as in Reference Example 1-(2), 2.5 g of oily 4-methoxy-3-N,N-dimethylsulfamylphenylacetone was obtained.

Nuclear magnetic resonance spectra (CDCl$_3$):

δ: 2.18 (3H, S, COCH$_3$)

2.82 (6H, S, N(CH$_3$)$_2$)

3.69 (2H, S, CH$_2$CO)

3.90 (3H, S, O—CH$_3$)

## EXAMPLE 1



In 1,000 ml of acetonitrile was suspended 17 g of 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-1-hydroxy-2-methyl-ethyl}-2-methoxybenzenesulfonamide hydrochloride and while stirring the suspension, 9 g of thionyl chloride was added dropwise to the suspension at room temperature, whereby the product was dissolved and then began to crystallize gradually. After stirring the mixture for two days, the crystals formed were recovered by filtration, washed with chloroform and dried to provide 15 g of 5-{1-chloro-2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide hydrochloride.

The product has the following physicochemical properties.

Melting point: 197°–200° C.

Elemental analysis for C$_{20}$H$_{27}$N$_2$O$_5$SCl.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 50.11 | 5.89 | 5.84 |
| Found: | 50.06 | 5.96 | 5.95 |

Nuclear magnetic resonance spectra (CD$_3$OD):

**10**

| | | Nuclear magnetic resonance spectra (CD$_3$OD): |
|---|---|---|
| δ: | 1.30 | (3H, d, CH—CH$_3$) |
| | 1.40 | (3H, t, CH$_2$—CH$_3$) |
| | 3.63 | (2H, t, CH$_2$—CH$_2$—N) |
| | 4.01 | (3H, s, O—CH$_3$) |
| | 4.12 | (2H, q, CH$_3$—CH$_2$—O) |
| | 4.36 | (2H, t, CH$_2$—CH$_2$—O) |
| | 5.30 | (1H, d, Cl—CH) |

The compounds in Examples 2 and 3 were obtained in the same manner as in Example 1.

## EXAMPLE 2



5-{1-Chloro-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.

Physicochemical properties:

Melting point: 190°–191° C.

Elemental analysis for C$_{18}$H$_{23}$N$_2$O$_4$SCl.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 49.66 | 5.56 | 6.43 |
| Found: | 49.51 | 5.70 | 6.53 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

δ:

2.61 (3H, s, CH$_3$),

3.64 (3H, s, OCH$_3$)

5.66 (1H, m, CH—Cl)

## EXAMPLE 3



5-{1-Chloro-2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide hydrochloride.

Physicochemical properties:

Melting point: 195°–197° C. (decomposed).

Elemental analysis for C$_{19}$H$_{25}$N$_2$O$_5$SCl.HCl:

4,703,063

**11**

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 49.04 | 5.63 | 6.02 |
| Found: | 49.02 | 5.64 | 6.08 |

Nuclear magnetic resonance spectra (CD$_3$OD+d$_6$-DMSO):

δ:

1.18 (3H, d, CH—CH$_3$)

3.80 and 3.95 (3H + 3H, s, —O—CH$_3$)

5.56 (1H, d, CH—Cl)

## EXAMPLE 4



A mixture of 1.4 g of 4-methoxy-3-N-methylsulfamyl-phenylacetone, 1 g of 2-methoxyphenoxyethylamine, and 30 ml of methanol was refluxed for one hour. After cooling the mixture, 60 mg of a platinum oxide catalyst was added thereto, the reduction was performed at normal temperature and pressure. After absorbing a theoretical amount of hydrogen, the catalyst was filtered away. After the filtrate was acidified with an alcoholic 5% hydrochloric acid, the solvent was distilled off under reduced pressure to form 1.6 g of crystals, which were recovered and recrystallized to provide 1.2 g of the colorless crystals of 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N-methylbenzenesulfonamide hydrochloride.

The product has the following physicochemical properties.

Melting point: 162°–163° C.

Elemental analysis for C$_{20}$H$_{28}$N$_2$O$_5$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 53.99 | 6.57 | 6.30 |
| Found: | 53.85 | 6.70 | 6.27 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

δ:     1.15 (3H, d, —CHCH$_3$)
3.76 and 3.88 (3H + 3H, S, O—CH$_3$)

The product of Example 5 was obtained in the same manner as in Example 4.

**12**

## EXAMPLE 5



2-Methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N,N-dimethylbenzenesulfonamide hydrochloride.

Physicochemical properties:

Melting point: 185°–187° C.

Elemental analysis for C$_{21}$H$_{30}$N$_2$O$_5$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 54.95 | 6.81 | 6.10 |
| Found: | 54.73 | 6.88 | 5.85 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

δ:     1.16 (3H, d, CHOH$_3$), 2.71 (6H, s, N(CH$_3$)$_2$)
3.76 and 3.87 (3H + 3H, s, —O—CH$_3$)

## REFERENCE EXAMPLE 3



In 50 ml of ethyl acetate was suspended 4.35 g (0.01 mole) of 5-{1-chloro-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride and then 50 ml of an aqueous 10% sodium carbonate solution was added to the suspension with stirring. After further stirring overnight vigorously, the reaction mixture was recovered by decantation. After removing inorganic materials by passing the ethyl acetate layer thus recovered through a silica gel column (50 ml of silica gel), the reaction product was evaporated to dryness to provide 3.2 g (88%) of colorless resinous 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylbenzenesulfonamide.

The product has the following physicochemical properties.

Amorphous form.

Elemental analysis for C$_{18}$H$_{22}$N$_2$O$_4$S:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 59.65 | 6.12 | 7.73 |
| Found: | 59.37 | 6.12 | 7.61 |

Nuclear magnetic resonance spectra (CDCl$_3$):

4,703,063

**13**

δ: 1.74 and 1.95    (1H + 1H, d, 

2.43    (1H, q, 

2.55    (3H, s 

4.10    (2H, t, O—CH₂—)

## EXAMPLE 6



In 50 ml of dioxane was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylben-zenesulfonamide and after adding thereto 1 g of concentrated hydroiodic acid, the mixture was stirred overnight. After the reaction was over, the solvent was distilled off under reduced pressure and the residue was washed three with 30 ml of water and then three with 200 ml of ether and crystallized by the addition of ethyl acetate. The crystals were recovered by filtration, washed with water, and dried to provide 1.7 g of 5-{1-iodo-2-[2-(2-methoxyphenoxyethylamino]ethyl}-2-methylbenzenesulfonamide hydroiodide.

The product has the following physicochemical properties.

Melting point: 154°–155° C.

Elemental analysis for $C_{18}H_{23}N_2O_4SI.HI$:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 34.97 | 3.91 | 4.53 |
| Found: | 35.07 | 3.98 | 4.39 |

Nuclear magnetic resonance spectra (CD₃OD):

δ:

2.65 (3H, s, 

3.54 (2H, t, —CH₂—N—)

4.30 (2H, t, —CH₂—O)

5.55 (1H, t, CH—I)

**14**

## EXAMPLE 7



In 50 ml of methanol was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylben-zenesulfonamide and after adding 1 g of thiophenol to the solution and stirring overnight the mixture at room temperature, methanol was distilled off. The residue was applied to a silica gel column chromatography and the product was eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio) to provide 2.4 g of 5-{2-[2-(2-methoxyphenoxy)ethylamino]-1-phenyl-thioethyl}-2-methylbenzenesulfonamide as a viscous oily material.

The product has the following physicochemical properties.

Amorphous form.

Elemental analysis for $C_{24}H_{28}N_2O_4S_2$:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 60.99 | 5.97 | 5.93 |
| Found: | 60.72 | 6.11 | 5.71 |

Nuclear magnetic resonance spectra (CDCl₃):

δ:

2.58 (3H, s, 

3.74 (3H, s, O—CH₃)

3.98 (2H, t, —CH₂—O)

4.35 (1H, t, CH—S)

## EXAMPLE 8



In 50 ml of methanol was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylben-zenesulfonamide and after adding thereto 2 ml of a boron trifluoride ether complex at room temperature, the mixture was stirred overnight. Thereafter, methanol was distilled off under reduced pressure and the residue was applied to a silica gel column chromatography. The

4,703,063

**15**

product was then eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio), whereby 1.5 g of a colorless viscous oily material was obtained. The product was crystallized by the addition of 5 ml of methanol and several drops of ammonia. The crystals formed were recovered by filtration, washed with water, and dried to provide 1.2 g of 5-{1-methoxy-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide.

The product has the following physicochemical properties.

Melting point: 150°–152° C.

Elemental analysis for $C_{19}H_{26}N_2O_5S$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 57.85 | 6.64 | 7.10 |
| Found | 57.58 | 6.79 | 7.24 |

Nuclear magnetic resonance spectra ($CD_3OD$):

δ: 2.65 (3H, s, —CH₃)

2.98 (2H, t, —CH₂N)

3.80 (3H, s, —OCH₃)

3.26 (3H, s, CH—OCH₃)

4.10 (2H, t, —CH₂O)

4.40 (1H, q, CH—O)

EXAMPLE 9



In 20 ml of acetic acid was dissolved 2 g of 5-{2-[2-(2-methoxyphenoxy)ethylamino]-1-phenylthioethyl}-2-methylbenzenesulfonamide and after adding thereto 0.5 ml of 30% $H_2O_2$, the mixture was heated to 50°–60° C. for 3 hours. After adding thereto 100 ml of water, the reaction mixture was extracted with 200 ml of ethyl acetate. The ethyl acetate extract was washed with an aqueous 1% sodium carbonate solution and then ethyl acetate was distilled off under reduced pressure. The residue was applied to a silica gel column chromatography, the product was eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio), and the colorless viscous oily product thus obtained was crys-

**16**

tallized by the addition of ethyl acetate. The crystals formed were recovered by filtration to provide 1.3 g of 5-{2-[2-(2-methoxyphenoxy)ethylamino]-1-phenylsulfinylethyl}-2-methylbenzenesulfonamide.

The product has the following physicochemical properties.

Melting point: 139°–141° C.

Elemental analysis for $C_{24}H_{28}N_2O_5S_2$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 59.00 | 5.78 | 5.73 |
| Found: | 58.91 | 5.74 | 5.72 |

EXAMPLE 10



In 150 ml of methanol was dissolved 3.8 g of 5-{1-chloro-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methoxybenzenesulfonamide hydrochloride and after adding thereto 0.5 g of 10% palladium carbon, it was dechlorinated under a hydrogen stream at normal temperature and pressure. Then, palladium carbon was filtered away and the filtrate was concentrated under reduced pressure to provide 3.1 g of 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]ethyl}benzenesulfonamide hydrochloride, which was recrystallized from 120 ml of a mixture of methanol and ethanol (1:4 by volume ratio) to provide 2.3 g of the colorless crystals thereof.

The product has the following physicochemical properties.

Melting point: 196°–198° C.

Elemental analysis for $C_{18}H_{24}N_2O_5S\cdot HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 51.86 | 6.04 | 6.72 |
| Found: | 51.72 | 6.23 | 6.68 |

Nuclear magnetic resonance spectra ($CD_3OD$):

| δ: | 3.84 and 3.98 (3H + 3H, s, —OCH₃) |
|---|---|
| | 4.24 (2H, t, —OCH₂—) |

The compounds in Examples 11–29 were obtained in the same manner as in Example 10.

EXAMPLE 11



5-{2-[2-(2-Methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.

4,703,063

**17**

Physicochemical properties:
Melting point: 173°–175° C.
Elemental analysis for $C_{18}H_{24}N_2O_4S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 53.93 | 6.28 | 6.99 |
| Found: | 53.83 | 6.27 | 6.97 |

Nuclear magnetic resonance spectra (CD$_3$OD):

δ: 2.64 (3H, s, CH$_3$—⟨ ⟩—), 3.84 (3H, s, —OCH$_3$)

4.28 (2H, t, —OCH$_2$—)

### EXAMPLE 12



5-{2-[2-(2-Ethoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 180°–181.5° C.
Elemental analysis for $C_{19}H_{26}N_2O_4S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.81 | 6.56 | 6.89 |

Nuclear magnetic resonance spectra (CD$_3$OD):

δ: 1.36 (3H, t, —OCH$_2$CH$_3$), 2.64 (3H, s, CH$_3$—⟨ ⟩—)

4.10 (2H, q, —OCH$_2$CH$_3$), 4.36 (2H, t, —OCH$_2$—CH$_2$—)

### EXAMPLE 13



5-{2-[2-(2-Methoxyphenoxy)-1-methylethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 169°–171° C.
Elemental analysis for $C_{19}H_{26}N_2O_4S.HCl$:

**18**

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.89 | 6.60 | 6.76 |

Nuclear magnetic resonance spectra (CD$_3$OD):

δ: 1.15 (3H, d, CH—CH$_3$), 2.64 (3H, s, CH$_3$—⟨ ⟩—)

3.80 (3H, s, —OCH$_3$)

### EXAMPLE 14



5-{2-[3-(2-Methoxyphenyl)-1-methylpropylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 198°–200° C.
Elemental analysis for $C_{20}H_{28}N_2O_3S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 58.17 | 7.08 | 6.78 |
| Found: | 58.09 | 7.01 | 6.62 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

δ: 1.35 (3H, d, CH—CH$_3$) 2.55 (3H, s, CH$_3$—⟨ ⟩—)

3.78 (3H, s, —OCH$_3$)

### EXAMPLE 15



2-Hydroxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]ethyl}benzenesulfonamide.
Physicochemical properties:
Melting point: 97°–99° C.
Elemental analysis for $C_{17}H_{22}N_2O_5S.H_2O$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 53.10 | 6.29 | 7.29 |

4,703,063

**19**

-continued

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Found: | 52.75 | 6.22 | 7.09 |

Nuclear magnetic resonance spectra (d₆-DMSO):

$\delta$: 3.76 (3H, s, —OC$\underline{H}_3$)

4.04 (2H, t, —OC$\underline{H}_2$—)

## EXAMPLE 16



2-Methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: above 250° C.
Elemental analysis for $C_{19}H_{26}N_2O_5S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 52.96 | 6.31 | 6.50 |
| Found: | 52.44 | 6.31 | 6.47 |

Nuclear magnetic resonance spectra (d₆-DMSO):

$\delta$ 1.15 (3H, d, $CH$—$CH_3$)

3.78 and 3.90 (3H + 3H, s, —OC$\underline{H}_3$)

4.38 (2H, t, —OC$\underline{H}_2$—)

## EXAMPLE 17



2-Methyl-5-{2-[2-(2-methoxyphenoxy)-1-methyle-thylamino]ethyl}benzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 183°–185° C.
Elemental analysis for $C_{19}H_{26}N_2O_3S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 57.20 | 6.82 | 7.02 |
| Found: | 57.13 | 6.79 | 6.99 |

Nuclear magnetic resonance spectra (CD₃OD):

**20**

$\delta$: 1.55 (3H, d, $CH$—$CH_3$) 2.24 (3H, s, O)

2.64 (3H, s, $CH_3$C)

2.08–2.40 (2H, m, —OC$\underline{H}_2$—)

## EXAMPLE 18



2-Methyl-5-[2-(2-phenoxyethylamino)ethyl]ben-zenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 208.5°–210° C.
Elemental analysis for $C_{17}H_{22}N_2O_3S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.05 | 6.25 | 7.55 |
| Found: | 54.83 | 6.23 | 7.48 |

Nuclear magnetic resonance spectra (CD₃OD):

$\delta$: 2.65 (3H, s, $CH_3$)

4.32 (2H, t, —OC$\underline{H}_2$)

## EXAMPLE 19



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-2,2-dime-thylethyl}-2-methylbenzenesulfonamide    hydrochloride.
Physicochemical properties:
Melting point: 199°–202° C.
Elemental analysis for $C_{20}H_{28}N_2O_4S.HCl.CH_3OH$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 54.71 | 7.21 | 6.08 |

4,703,063

**21**

-continued

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Found: | 54.50 | 7.17 | 6.14 |

Nuclear magnetic resonance spectra (d6-DMSO):



EXAMPLE 20

CH$_3$O—[SO$_2$NH$_2$ benzene]—CH$_2$CHNHCH$_2$CH$_2$O—[benzene].HCl
CH$_3$
OCH$_2$CH$_3$

5-{2-[2-(2-Ethoxyphenoxy)ethylamino]-2-methyle-thyl}-2-methoxybenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 254°–256° C.
Elemental analysis for C$_{20}$H$_{28}$N$_2$O$_5$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 53.99 | 6.57 | 6.30 |
| Found: | 53.79 | 6.58 | 6.26 |

Nuclear magnetic resonance spectra (CD$_3$OD):

δ: 1.28 (3H, d, CH—CH$_3$), 1.38 (3H, t, CH$_2$—CH$_3$)

3.97 (3H, s, O—CH$_3$), 4.30 (2H, t, CH$_2$—CH$_2$—O)

EXAMPLE 21

CH$_3$—[SO$_2$NH$_2$ benzene]—CHCH$_2$NHCH$_2$CH$_2$O—[benzene].HCl
CH$_3$
OCH$_3$

5-{2-[2-(2-Methoxyphenoxy)ethylamino]-1-methyle-thyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 183°–185° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_4$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |

**22**

-continued

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Found: | 54.76 | 6.56 | 6.74 |

Nuclear magnetic resonance spectra (CD$_3$OD):



EXAMPLE 22

CH$_3$—[SO$_2$NH$_2$ benzene]—CH$_2$CH$_2$NHCH$_2$CHO—[benzene].HCl
CH$_3$
OCH$_3$

5-{2-[2-(2-Methoxyphenoxy)-2-methylethylamino]e-thyl}-2-methylbezenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 231°–232° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_4$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.86 | 6.58 | 6.83 |

Nuclear magnetic resonance spectra (CD$_3$OD):

δ: 1.26 (3H, d, CH—CH$_3$), 2.60 (3H, s, CH$_3$)

3.76 (3H, s, OCH$_3$), 4.42 (1H, m, CH$_3$—CH—O)

EXAMPLE 23



5-{2-[2-(2-Methoxyphenoxy)-1,1-dimethyle-thylamino]ethyl}-2-methylbenzenesulfonamide hydro-chloride.
Physicochemical properties:
Melting point: 191°–193° C.
Elemental analysis for C$_{20}$H$_{28}$N$_2$O$_4$S.HCl:

4,703,063

**23**

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 56.00 | 6.81 | 6.53 |
| Found: | 55.83 | 6.86 | 6.32 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

δ: 1.44 (6H, s, N—C(CH$_3$)$_2$—C), 2.56 (3H, s,  CH$_3$)

3.66 (3H, s,  OCH$_3$), 4.08 (2H, s, —CH$_2$—O)

### EXAMPLE 24



5-{2-[N-[2-(2-Methoxyphenoxy)ethyl]-N-methylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 169°–171° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_4$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.88 | 6.51 | 6.64 |

Nuclear magnetic resonance spectra (d$_6$-DMSD):

δ: 2.56 (3H, s,  CH$_3$), 3.68 (3H, s,  OCH$_3$)

4.39 (2H, t, —CH$_2$—O)

### EXAMPLE 25



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-2-methyle-thyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 250°–252° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_4$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |

**24**

-continued

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Found: | 54.68 | 6.49 | 6.58 |

Nuclear magnetic resonance spectra (CDCl$_3$+d$_6$-DMSO+D$_2$O+Na$_2$CO$_3$)

δ: 1.06 (3H, d, CHCH$_3$), 2.61 (3H, s,  CH$_3$)

3.76 (3H, s,  OCH$_3$)

### EXAMPLE 26



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-2-ethyl-thyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 198°–200° C.
Elemental analysis for C$_{20}$H$_{28}$N$_2$O$_4$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 56.00 | 6.81 | 6.53 |
| Found: | 55.76 | 6.88 | 6.51 |

Nuclear magnetic resonance spectra (CDCl$_3$+d$_6$-DMSO+D$_2$O+Na$_2$CO$_3$):

δ: 0.94 (3H, t, CHCH$_2$CH$_3$), 1.22 (2H, m, CHCH$_2$CH$_3$)

2.56 (3H, s, CH$_3$ ), 3.76 (3H, s,  OCH$_3$)

### EXAMPLE 27



2-Hydroxy-5-{2-[2-(4-methoxyphenoxy)e-thylamino]ethyl}benzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 237°–241° C. (decomposed).
Elemental analysis for C$_{17}$H$_{22}$N$_2$O$_5$S.HCl:

4,703,063

| 25 | | | |
|---|---|---|---|
| | C (%) | H (%) | N (%) |
| Calculated: | 50.68 | 5.75 | 6.95 |
| Found: | 50.45 | 5.64 | 6.99 |

Nuclear magnetic resonance spectra (CD₃OD):

$\gamma$: 3.74 (3H, s, O—CH₃), 4.22 (2H, t, —CH₂—O)

### EXAMPLE 28



2-Hydroxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 211°–214° C.
Elemental analysis for $C_{18}H_{24}N_2O_5S \cdot HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 51.86 | 6.04 | 6.72 |
| Found: | 51.72 | 6.00 | 6.59 |

Nuclear magnetic resonance (CD₃OD):

$\delta$: 1.28 (3H, d, CHCH₃), 3.86 (3H, s, —OCH₃)

4.30 (2H, t, —CH₂—O)

### EXAMPLE 29



5-{2-[2-(2-Ethoxyphenoxy)ethylamino]-2-methyle-thyl}-2-hydroxybenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 172°–173° C.
Elemental analysis for $C_{19}H_{26}N_2O_5S \cdot HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 52.96 | 6.31 | 6.50 |
| Found: | 52.83 | 6.65 | 6.12 |

Nuclear magnetic resonance spectra (CD₃OD):

| 26 | |
|---|---|

1.26 (3H, d, CHCH₃), 1.36 (3H, t, —CH₂CH₃)

4.10 (2H, q, —CH₂CH₃), 4.26 (2H, t, —CH₂CH₂—O)

The starting materials and the reaction types applied to prepare the products of the above Examples 2, 3, 5 and 11–29 are shown below schematically;

| Example No. | Starting Material & Reaction Type |
|---|---|
| 2 |  |
| 3 |  |
| 5 |  |
| 11–29 |  |

(X represents halogen; R, R₁, R₂ and R₄–R₁₀ in the formula represent the same group as the corresponding group of the aimed compound)

What is claimed is:
1. Sulfamoyl-substituted phenethylamine derivatives represented by the general formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl

4,703,063

27

group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a lower alkoxy group or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom, and the salts thereof.

2. A pharmaceutical composition containing an effective $\alpha$-adrenergic antagonistic amount of a compound of claim 1 and a pharmaceutically acceptable excipient.

3. The salts of the sulfamoyl-substituted phenethylamine derivatives as claimed in claim 1 wherein $R_3$ is a lower alkyl group or a lower alkoxy group.

4. The compound of claim 1 wherein $R_3$ is a hydrogen atom and the salts thereof.

5. The compound of claim 1 wherein $R_3$ is a lower alkyl group and the salts thereof.

6. The compound of claim 1 which is a racemic compound.

7. The compound of claim 1 which is a mixture of racemic compounds.

8. The compound of claim 1 which is an optically active isomer.

9. The isomer of claim 8 which is the (+) isomer.

28

10. The isomer of claim 8 which is the (−) isomer.

11. The optically active isomers of the compound of claim 7.

12. The isomer of claim 11 which is the (+) isomer.

13. The isomer of claim 11 which is the (−) isomer.

14. The compound of claim 1 which is 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide.

15. The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide.

16. The compound of claim 1 which is 5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-2-methylbenzenesulfonamide.

17. The compound of claim 1 which is 5-{2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide.

18. The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino-2-methylethyl]-N-methylbenzenesulfonamide.

19. The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N,N-dimethylbenzenesulfonamide.

* * * * *

# EXHIBIT 2

# United States Patent [19]

## Imai et al.

[11]  **4,373,106**

[45]  **Feb. 8, 1983**

[54]  **SULFAMOYL-SUBSTITUTED PHENETHYLAMINE DERIVATIVES AND PROCESS OF PRODUCING THEM**

[75]  Inventors:  **Kazuo Imai**, Omiya; **Kunihiro Niigata**, Ageo; **Takashi Fujikura**, Urawa; **Shinichi Hashimoto**, Matsudo; **Toichi Takenaka**, Tokyo, all of Japan

[73]  Assignee:  **Yamanouchi Pharmaceutical Co., Ltd.**, Tokyo, Japan

[21]  Appl. No.:  **231,421**

[22]  Filed:  **Feb. 4, 1981**

[30]  **Foreign Application Priority Data**

Feb. 8, 1980 [JP]  Japan ................................. 55-14382

[51]  Int. Cl.³ ................................................ C07C 143/80
[52]  U.S. Cl. .................................... **564/85**; 564/86; 260/239 E
[58]  Field of Search ............................ 564/79, 85, 86; 424/321

[56]  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,701,808 | 10/1972 | Hartley et al. | 564/99 |
| 3,711,545 | 1/1973 | Kaiser | 564/79 X |
| 3,723,524 | 3/1973 | Augstein et al. | 564/86 X |
| 3,860,647 | 1/1975 | Colella et al. | 564/86 |
| 3,878,212 | 4/1975 | Rufer et al. | 564/86 X |
| 4,038,314 | 7/1977 | Mentrup et al. | 564/79 |
| 4,137,328 | 1/1979 | Cox et al. | 564/86 X |
| 4,140,713 | 2/1979 | Oxford et al. | 564/86 |
| 4,217,305 | 8/1980 | Imai et al. | 564/86 |

*Primary Examiner*—Thomas A. Waltz
*Attorney, Agent, or Firm*—Burgess, Ryan and Wayne

[57]  **ABSTRACT**

Novel sulfamoyl-substituted phenethylamine derivatives which exhibit α-adrenergic blocking action and are useful as an antihypertensive agent and an agent for the treatment of congestive heart failure.

**13 Claims, No Drawings**

4,373,106

| 1 | 2 |

## SULFAMOYL-SUBSTITUTED PHENETHYLAMINE DERIVATIVES AND PROCESS OF PRODUCING THEM

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to novel sulfamoyl-substituted phenethylamine derivatives and the acid addition salts thereof, and more particularly, to novel sulfamoyl-substituted phenethylamine derivatives and the acid addition salts thereof which exhibit a strong $\alpha$-adrenergic blocking action and are useful as an antihypertensive agent and a treating agent for congestive heart failure. The invention is further concerned with the process of producing these derivatives and the acid additon salts thereof.

2. Description of the Prior Art

British Pat. No. 2,006,772 discloses a series of compounds exhibiting $\alpha$- and $\beta$-adrenergic blocking actions and also the patent discloses that the compound shown by the following formula exhibits strong $\alpha$- and $\beta$-adrenergic blocking actions



U.S. Pat. No. 3,860,647 discloses a series of compounds shown by the following general formula



wherein R represents hydrogen or alkyl having 1–4 carbon atoms; R' represents alkyl having 1–6 carbon atoms, cycloalkyl having 3–6 carbon atoms, $XC_6H_4(CH_2)_2CH(CH_3)$, $XC_6H_4(CH_2)_2C(CH_3)_2$, $XC_6H_4CH_2CH(CH_3)$, or $XC_6H_4CH_2C(CH_3)_2$ (wherein X represents hydrogen, hydroxyl or methoxy); and Y represents hydrogen or hydroxy.

It is also described in the patent specification that these compounds exhibit a $\beta$-adrenergic blocking action.

British Pat. No. 902,617 discloses a series of compounds shown by the following general formula



wherein $R_1$ is hydroxyl, methyl, methoxy, etc.; $R_2$ is hydrogen, methyl, etc.; $R_3$ is phenyl, benzyl or hydroxy-, methyl-, methoxy-, ethoxy-, chloro- or bromo-substituted phenyl or benzyl radical, etc.; and $R_4$ is hydrogen, etc.

These compounds exhibit an $\alpha$-adrenergic blocking action (see, "J. Med. Chem.;" 9, 812–818(1966)) and possess an antihypertensive activity.

Also, in "J. Med. Chem.;" 9, 812–818(1966), there is decribed that the phenoxyethylamine-type compounds shown by the following general formula possess an $\alpha$-adrenergic blocking action;



wherein $R_1$ represents o-$OCH_3$, etc., and $R_2$ represents o— or p—$OCH_3$, etc.

### SUMMARY OF THE INVENTION

An object of this invention is to provide the novel sulfamoyl-substituted phenethylamine derivatives shown by following general formula and the acid addition salts thereof which possess a hypotensive activity based on an $\alpha$-adrenergic blocking action and are useful as an antihypertensive agent, an agent for the treatment of congestive heart failure, etc.

Another object of this invention is to provide the process for producing the above-described pharmaceutically useful compounds.

That is, according to this invention, there are provided the sulfamoyl-substituted phenethylamine derivatives shown by following general formula I and the acid addition salts thereof



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, halogen atom, a lower alkyl group, a lower alkoxy group, a phenylthio group, or a phenylsulfinyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being, however, an oxygen atom when $R_2$ is a hydroxyl group.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

Now, the term "lower" used in the above-described formula means a straight or branched carbon chain having 1 to 5 carbon atoms. Therefore, for example, a lower alkyl group includes a methyl group, ethyl group, propyl group, butyl group, pentyl group, isobutyl group, etc., and a lower alkoxy group includes a methoxy group, ethoxy group, propoxy group, butoxy group, etc. Also, in the above-described formula, $R_{10}$ which is a substituent of the benzene ring may be disposed at any position which is ortho, meta or para to the side chain. Furthermore, since the compounds of this invention shown by formula I can readily form the salts thereof and contain asymmetric carbon atom(s), the compounds of this invention include the salts thereof,

4,373,106

**3**

the racemic compounds thereof, a mixture of the racemic compounds, and each optically active substance.

The compounds of formula I and the acid addition salts thereof provided by the present invention exhibit an $\alpha$-adrenergic blocking action and thus they can be utilized for various treatments. For example, they can be used as useful agents for the treatments of hypertension, congestive heart failure, angina pectoris, lower urinary tract dysfunction, prostatic hypertrophy, pheochromocytoma and peripheral vascular disorders.

The compounds of this invention shown by formula I can be produced by the following processes.

Process 1:

The compounds of formula I are obtained by reacting the compounds shown by general formula II



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in formula I
with a halogenating agent and then, if desired, (a) reducing the halogenated product obtained by the above reaction; or (b) reacting the halogenated product with an alkaline material and then reacting the product thus obtained with hydrogen iodide, a lower alcohol, or thiophenol, and further, if desired, oxidizing the product obtained by the reaction with thiophenol.

Process 1 is further described in more detail. That is, according to the process, the starting materials shown by formula II described above are reacted with a halogenating agent to provide the compounds shown by general formula $I_1$



wherein X represents a chlorine atom or bromine atom and R, $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in formula II
and then, if desired, (a) the halogenated compounds shown by formula $I_1$ are reduced to form the compounds shown by formula $I_2$

**4**



wherein R, $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described;
or (b) the halogenated compounds shown by formula $I_1$ are treated with an alkaline material to form the aziridine compounds shown by the following general formula III



wherein $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described,
then, the aziridine compounds are reacted with hydrogen iodide, a lower alcohol, or thiophenol to provide the compounds shown by general formula $I_3$



wherein R' represents an iodine atom, a lower alkoxy group or a phenylthio group and $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described and further, when R' of the compounds shown by formula $I_3$ is a phenylthio group, if desired, the compounds of $I_3$ are oxidized to provide the compounds shown by general formula $I_4$



wherein $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described.

This process is further schematically shown below, wherein the compounds shown by formulae $I_1$, $I_2$, $I_3$ and $I_4$ are the desired compounds of this invention.



Step 1 | Halogenation

4,373,106

5    6

-continued



The reaction condition in each step described above is as follows:

Step 1:

The halogenation of the compounds of formula II can be performed in an organic solvent such as toluene, methyl ethyl ketone, acetonitrile, tetrahydrofuran, etc., at room temperature or under heating using a halogenating agent such as thionyl chloride, hydrogen chloride, hydrogen bromide, phosphorus trichloride, phosphorus pentachloride, phosphorus oxychloride, thionyl bromide, etc.

Step 2:

The reduction of the compounds of formula $I_1$ can be performed in an organic solvent such as methanol, ethanol, toluene, acetonitrile, tetrahydrofuran, etc., under a hydrogen stream, at normal temperature and normal pressure using a catalyst such as platinum oxide, palladium carbon, etc.

Step 3:

The compounds of formula III can be obtained by treating the compounds of formula $I_1$ (wherein, however, R and $R_6$ are hydrogen atom) with an alkaline material such as sodium carbonate, metal alcoholate, sodium hydroxide, potassium hydroxide, etc., in an organic solvent such as ethyl acetate,

ethanol, dioxane, benzene, etc., at room temperature to 50° C.

Step 4:

(i): The compounds of formula $I_3$ (wherein, R′ is a phenylthio group) can be obtained by reacting the compounds of formula III with thiophenol in an organc solvent such as methanol, chloroform, ethyl acetate, dioxane, benzene, etc., at room temperature.

(ii): The compounds of formula $I_3$ (wherein, R′ is a lower alkoxy group) can be obtained by reacting the compounds of formula III with a lower alcohol in the presence of a $BF_3$ catalyst under the same condition as in the step (i).

(iii): The compounds of formula $I_3$ (wherein, R′ is an iodine atom) can be obtained by reacting the compounds of formula III with hydroiodic acid in an organic solvent such as dioxane, methanol, etc., at room temperature.

Step 5:

The oxidation of the compounds of formula $I_3$ (wherein R′ is a phenylthio group) can be performed in acetic acid at a temperature of 50°–60° C. using $H_2O_2$ as the oxidizing agent.

4,373,106

**7**

In addition, among the compounds of this invention, the compounds shown by following general formula $I_5$



$I_5$

wherein R″ represents a lower alkoxy group or a phenylthio group and R, $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described can be obtained by reacting the compounds of formula $I_1$ directly with a lower alcohol or thiophenol.

The starting materials of formula II (wherein R is hydrogen atom) used in the process of this invention are described in British Pat. No. 2,006,772 and also the starting materials of formula II (wherein R is a lower alkyl group) can be obtained by reacting the compounds of the following formula



described in the aforesaid British patent with a Grignard reagent (lower alkyl-MgX).

Process 2:

Among the compounds of formula I, the compounds of this invention shown by following general formula $I_6$



$I_6$

wherein $R_1$, $R_2$, $R_3$, $R_4$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in formula I can be produced by condensing the compound shown by the general formula



IV

and the compound shown by the following formula



V

and then reducing the products thus obtained.

This reaction is performed by condensing the compounds of formula IV and the compounds of formula V in an organic solvent such as methanol, ethanol, toluene, acetonitrile, tetrahydrofuran, etc., and then reduc-

**8**

ing the products in the presence of a $PtO_2$ catalyst or a Raney nickel catalyst or with $NaBH_4$, $LiAlH_4$, etc.

The isolation and purification of the compounds of this invention shown by general formulae $I_1$–$I_6$ formed by Process 1 and 2 are performed by filtration, extraction with a solvent, separation by column chromatography, recrystallization, etc.

The pharmacological effects of the compounds of this invention were determined by the following experiments. The effects of the typical compounds of this invention were compared with 5-{1-hydroxy-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide (Compound A) which is one of the typical compounds disclosed in British Pat. No. 2,006,772 and phentolamine.

A. α-Adrenergic blocking action:

The blood pressure was measured in the rats anesthetized with urethane and treated with pentolinium. The effects of the test samples (intravenous injection) to antagonize the hypertensive response to phenylephrine (10 μg/Kg i.v.) were measured and the results were shown in Table I.

B. Antihypertensive effects in spontaneously hypertensive rats:

Oral administration: The systolic blood pressure was measured indirectly from the tail cuff method using a programmed electrosphygmanometer (Narco Bio-Systems Inc., PE-300) on spontaneously hypertensive rats having a systolic blood pressure higher than 150 mmHg, the results being shown in Table II.

**TABLE I**

| | α-Adrenergic blocking action: |
| --- | --- |
| Sample | α-adrenergic blocking $ED_{50}$ (mg/Kg) i.v. |
| Compounds of this invention (Ex. No.) | |
| 4 | 0.00035 |
| 5 | 0.00026 |
| 10 | 0.0059 |
| 11 | 0.012 |
| 12 | 0.0073 |
| 15 | 0.0013 |
| 16 | 0.0008 |
| 20 | 0.00000014 |
| 25 | 0.0012 |
| 26 | 0.004 |
| Known compounds | |
| Compound A | 0.034 |
| Phentolamine | 0.061 |

**TABLE II**

| | Antihypertensive effect: | |
| --- | --- | --- |
| Sample | Dose (mg/Kg) | Change in systolic blood pressure (mmHg) at stated dose p.o. |
| Compounds of this invention (Ex. No.) | | |
| 10 | 10 | −57 ± 5.6 |
| 11 | 30 | −50 ± 4.7 |
| 12 | 10 | −48 ± 2.0 |
| 15 | 10 | −54 ± 6.2 |
| 16 | 10 | −71 ± 11.1 |
| 20 | 3 | −57 ± 4.2 |
| 25 | 10 | −46 ± 3.6 |
| 26 | 10 | −46 ± 4.3 |
| Known compounds | | |
| Compound A | 10 | −35 ± 6.4 |
| Phentolamine | 10 | +7.8 ± 5.0 |
| ″ | 100 | −70 ± 10.1 |

4,373,106

| 9 | 10 |

The clinical administration of the compounds of this invention is usually practiced by intravenous injection or orally as the free bases or the acid addition salts thereof (e.g., hydrochlorides, sulfates, maleates, acetates, furarates, lactates, citrates, etc.). It is proper to administer 10 ng–1 mg per ounce of the compound several times per day in case of intravenous administration or 0.1–100 mg of the compound two or three times per day in the case of oral administration.

The compounds of this invention may be formulated into ordinary dosage forms such as, for example, tablets, capsules, pills, solutions, etc., and in these cases, the medicaments can be prepared by conventional methods with conventional pharmaceutical excipients.

Then, the production of the compounds of this invention will be further described in the following examples. In addition, the starting materials used in this invention include novel compounds and the production thereof are shown in the Reference Examples.

Reference Example 1



$$CH_3O\text{—}\underset{SO_2NHCH_3}{\bigcirc}\text{—}CH_2\text{—}COCH_3$$

(1) To 250 g of chlorosulfonic acid was added dropwise 50 g of 4-methoxyphenylacetone at 0°–5° C. After stirring the mixture for 4 hours at room temperature, the reaction mixture was poured into 2,500 ml of ice water and extracted three times with 500 ml of ethyl acetate. The extract was washed with water and after drying the extract with anhydrous magnesium sulfate, the solvent was distilled off under reduced pressure. The crude crystals obtained were recrystallized from benzene-ether to provide 32 g of 3-chlorosulfonyl-4-methoxyphenylacetone.

Melting point: 80°–81° C.

(2) In 26 ml of tetrahydrofuran was dissolved 2.6 g of 3-chlorosulfonyl-4-methoxyphenylacetone and then 1.2 g of 40% methylamine was added dropwise to the solution at a temperature lower than 10° C. After stirring the mixture for one hour at room temperature, the solvent was distilled off under reduced pressure and the residue was extracted with ethyl acetate. The extract was washed with water and after drying with anhydrous magnesium sulfate, the solvent was distilled off under reduced pressure. The crude crystals obtained were recrystallized from isopropanol-ether to provide 1.8 g of 4-methoxy-3-N-methylsulfamylphenylacetone.

Melting point: 100°–101° C.

Reference Example 2.



$$CH_3O\text{—}\underset{SO_2N\underset{CH_3}{\overset{CH_3}{}}}{\bigcirc}\text{—}CH_2\text{—}COCH_3$$

By reacting 2.6 g of 3-chlorosulfonyl-4-methoxyphenylacetone and 0.6 g of dimethylamine in the same manner as in Reference Example 1-(2), 2.5 g of oily

4-methoxy-3-N,N-dimethylsulfamylphenylacetone was obtained.

Nuclear magnetic resonance spectra (CDCl₃):

| δ: | 2.18 (3H, S, COCH₃) |
| | 2.82 (6H, S, N(CH₃)₂) |
| | 3.69 (2H, S, ⬡—CH₂CO) |
| | 3.90 (3H, S, O—CH₃) |

EXAMPLE 1



$$CH_3O\text{—}\underset{SO_2NH_2}{\bigcirc}\text{—}CH\underset{Cl}{\overset{}{}}CH\underset{CH_3}{\overset{}{}}NHNHCH_2CH_2O\text{—}\underset{OCH_2CH_3}{\bigcirc}\cdot HCl$$

In 1,000 ml of acetonitrile was suspended 17 g of 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-1-hydroxy-2-methyl-ethyl}-2-methoxybenzenesulfonamide hydrochloride and while stirring the suspension, 9 g of thionyl chloride was added dropwise to the suspension at room temperature, whereby the product was dissolved and then began crystallize gradually. After stirring the mixture for two days, the crystals formed were recovered by filtration, washed with chloroform and dried to provide 15 g of 5-{1-chloro-2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide hydrochloride.

The product has the following physicochemical properties.

Melting point: 197°–200° C.

Elemental analysis for C₂₀H₂₇N₂O₅SCl.HCl:

| | C(%) | H(%) | N(%) |
|---|---|---|---|
| Calcd.: | 50.11 | 5.89 | 5.84 |
| Found: | 50.06 | 5.96 | 5.95 |

Nuclear magnetic resonance spectra (CD₃OD):

| δ: | 1.30 | (3H, d, CH—CH₃) |
| | 1.40 | (3H, t, CH₂—CH₃) |
| | 3.63 | (2H, t, CH₂—CH₂—N) |
| | 4.01 | (3H, s, O—CH₃) |
| | 4.12 | (2H, q, CH₃—CH₂—O) |
| | 4.36 | (2H, t, CH₂—CH₂—O) |
| | 5.30 | (1H, d, Cl—CH) |

The compounds in Examples 2 and 3 were obtained in the same manner as in Example 1.

EXAMPLE 2



$$CH_3\text{—}\underset{SO_2NH_2}{\bigcirc}\text{—}CHCH_2\underset{Cl}{\overset{}{}}NHCH_2CH_2O\text{—}\underset{OCH_3}{\bigcirc}\cdot HCl$$

4,373,106

## 11

5-{1-Chloro-2-[2-(2-methoxyphenoxy)ethylamino]e-thyl}-2-methylbenzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 190°–191° C.

Elemental analysis for $C_{18}H_{23}N_2O_4SCl.HCl$:

|            | C(%)  | H(%) | N(%) |
|------------|-------|------|------|
| Calculated:| 49.66 | 5.56 | 6.43 |
| Found:     | 49.51 | 5.70 | 6.53 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):



δ:

2.61 (3H, s, ⟨ ⟩—CH$_3$), 3.64 (3H, s, ⟨ ⟩—OCH$_3$)

5.66 (1H, m, \CH—Cl)

### EXAMPLE 3



5-{1-Chloro-2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide hydro-chloride

Physicochemical properties:

Melting point: 195°–197° C. (decomposed)

Elemental analysis for $C_{19}H_{25}N_2O_5SCl.HCl$:

|            | C(%)  | H(%) | N(%) |
|------------|-------|------|------|
| Calculated:| 49.04 | 5.63 | 6.02 |
| Found:     | 49.02 | 5.64 | 6.08 |

Nuclear magnetic resonance spectra (CD$_3$OD+d$_6$-DMSO)

δ:

1.18 (3H, d, \CH—CH$_3$)

3.80 and 3.95 (3H + 3H, s, —O—CH$_3$)

5.56 (1H, d, \CH—Cl)

## 12

### EXAMPLE 4



A mixture of 1.4 g of 4-methoxy-3-N-methylsulfamyl-phenylacetone, 1 g of 2-methoxyphenoxyethylamine, and 30 ml of methanol was refluxed for one hour. After cooling the mixture, 60 mg of a platinum oxide catalyst was added thereto, the reduction was performed at normal temperature and pressure. After absorbing a theoretical amount of hydrogen, the catalyst was filtered away. After the filtrate was acidified with an alcoholic 5% hydrochloric acid, the solvent was distilled off under reduced pressure to form 1.6 g of crystals, which were recovered and recrystallized to provide 1.2 g of the colorless crystals of 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N-methylbenzenesulfonamide hydrochloride.

The product has the following physicochemical properties.

Melting point: 162°–163° C.

Elemental analysis for $C_{20}H_{28}N_2O_5S.HCl$:

|        | C(%)  | H(%) | N(%) |
|--------|-------|------|------|
| Calcd.:| 53.99 | 6.57 | 6.30 |
| Found: | 53.85 | 6.70 | 6.27 |

Nuclear magnetic resonance spectra (d$_6$-DMSO)

δ:    1.15 (3H, d, —CHCH$_3$)
      3.76 and 3.88 (3H + 3H, S, O—CH$_3$)

The product of Example 5 was obtained in the same manner as in Example 4.

### EXAMPLE 5



2-Methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N,N-dimethylbenzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 185°–187° C.

Elemental analysis for $C_{21}H_{30}N_2O_5S.HCl$

|            | C(%)  | H(%) | N(%) |
|------------|-------|------|------|
| Calculated:| 54.95 | 6.81 | 6.10 |
| Found:     | 54.73 | 6.88 | 5.85 |

Nuclear magnetic resonance spectra (d$_6$-DMSO)

4,373,106

**13**

δ: 1.16 (3H, d, CHCH₃), 2.71 (6H, s, N(CH₃)₂)
3.76 and 3.87 (3H + 3H, s, —O—CH₃)

### REFERENCE EXAMPLE 3



In 50 ml of ethyl acetate was suspended 4.35 g (0.01 mole) of 5-{1-chloro-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride and then 50 ml of an aqueous 10% sodium carbonate solution was added to the suspension with stirring. After further stirring overnight vigorously, the reaction mixture was recovered by decantation. After removing inorganic matters by passing the ethyl acetate layer thus recovered through a silica gel column (50 ml of silica gel), the reaction product was evaporated to dryness to provide 3.2 g (88%) of colorless resinous 5-{1-[2-(2-methoxyphenoxy)-ethyl]aziridin-2-yl}-2-methylbenzenesulfonamide.

The product has the following physicochemical properties. Amorphous form.

Elemental analysis for C₁₈H₂₂N₂O₄S:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 59.65 | 6.12 | 7.73 |
| Found: | 59.37 | 6.12 | 7.61 |

Nuclear magnetic resonance spectra (CDCl₃):

| δ: | 1.74 and 1.95 | (1H + 1H, | d, | CH₂) |
| | 2.43 | (1H, | q, | C—CH₂) |
| | 2.55 | (3H, | s | —CH₃) |
| | 4.10 | (2H, | t, | O—CH₂—) |

### EXAMPLE 6



In 50 ml of dioxane was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylben-

**14**

zenesulfonamide and after adding thereto 1 g of concentrated hydroiodic acid, the mixture was stirred overnight. After the reaction was over, the solvent was distilled off under reduced pressure and the residue was washed three times with 30 ml of water and then three times with 200 ml of ether and crystallized by the addition of ethyl acetate. The crystals were recovered by filtration, washed with water, and dried to provide 1.7 g of 5-{1-iodo-2-[2-(2-methoxyphenoxyethylamino)ethyl}-2-methylbenzenesulfonamide hydroiodide.

The product has the following physicochemical properties.

Melting point: 154°–155° C.

Elemental analysis for C₁₈H₂₃N₂O₄SI.HI:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 34.97 | 3.91 | 4.53 |
| Found: | 35.07 | 3.98 | 4.39 |

Nuclear magnetic resonance spectra (CD₃OD):

| δ: | 2.65 | (3H, | s, | —CH₃) |
| | 3.54 | (2H, | t, | —CH₂—N—) |
| | 4.30 | (2H, | t, | —CH₂—O) |
| | 5.55 | (1H, | t, | CH—I) |

### EXAMPLE 7



In 50 ml of methanol was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylbenzenesulfonamide and after adding 1 g of thiophenol to the solution and stirring overnight the mixture at room temperature, methanol was distilled off. The residue was applied to a silica gel column chromatography and the product was eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio) to provide 2.4 g of 5-{2-[2-(2-methoxyphenoxy)-ethylamino]-1-phenylthioethyl}-2-methylbenzenesulfonamide as a viscous oily material.

The product has the following physicochemical properties.

Amorphous form.

Elemental analysis for C₂₄H₂₈N₂O₄S₂:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 60.99 | 5.97 | 5.93 |
| Found: | 60.72 | 6.11 | 5.71 |

4,373,106

**15**

Nuclear magnetic resonance spectra (CDCl₃):

$\delta:$  2.58  (3H, s, —CH₃)

3.74  (3H, s, O—CH₃)

3.98  (2H, t, —CH₂—O)

4.35  (1H, t, CH—S)

### EXAMPLE 8



In 50 ml of methanol was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylben-zenesulfonamide and after adding thereto 2 ml of a boron trifluoride ether complex at room temperature, the mixture was stirred overnight. Thereafter, methanol was distilled off under reduced pressure and the residue was applied to a silica gel column chromatography. The product was then eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio), whereby 1.5 g of a colorless viscous oily material was obtained. The product was crystallized by the addition of 5 ml of methanol and several drops of ammonia. The crystals formed were recovered by filtration, washed with water, and dried to provide 1.2 g of 5-{1-methoxy-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylben-zenesulfonamide.

The product has the following physicochemical properties.

Melting point: 150°–152° C.

Elemental analysis for C₁₉H₂₆N₂O₅S:

|       | C (%) | H (%) | N (%) |
|-------|-------|-------|-------|
| Calcd.: | 57.85 | 6.64 | 7.10 |
| Found: | 57.58 | 6.79 | 7.24 |

Nuclear magnetic resonance spectra (CD₃OD):

$\delta:$  2.65  (3H, s, —CH₃)

2.98  (2H, t, —CH₂N)

3.80  (3H, s, —OCH₃)

3.26  (3H, s, CH—OCH₃)

4.10  (2H, t, —CH₂O)

4.40  (1H, q, CH—O)

**16**

### EXAMPLE 9



In 20 ml of acetic acid was dissolved 2 g of 5-{2-[2-(2-methoxyphenoxy)ethylamino]-1-phenylthioethyl}-2-methylbenzenesulfonamide and after adding thereto 0.5 ml of 30% H₂O₂, the mixture was heated to 50°–60° C. for 3 hours. After adding thereto 100 ml of water, the reaction mixture was extracted with 200 ml of ethyl acetate. The ethyl acetate extract was washed with an aqueous 1% sodium carbonate solution and then ethyl acetate was distilled off under reduced pressure. The residue was applied to a silica gel column chromatography; the product was eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio), and the colorless viscous oily product thus obtained was crystallized by the addition of ethyl acetate. The crystals formed were recovered by filtration to provide 1.3 g of 5-{2-[2-(2-methoxyphenoxy)-ethylamino]-1-phenylsul-finylethyl}-2-methylbenzenesulfonamide.

The product has the following physicochemical properties.

Melting point: 139°–141° C.

Elemental analysis for C₂₄H₂₈N₂O₅S₂:

|       | C(%) | H(%) | N(%) |
|-------|------|------|------|
| Calcd.: | 59.00 | 5.78 | 5.73 |
| Found: | 58.91 | 5.74 | 5.72 |

### EXAMPLE 10



In 150 ml of methanol was dissolved 3.8 g of 5-{1-chloro-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methoxybenzenesulfonamide hydrochloride and after adding thereto 0.5 g of 10% palladium carbon, it was dechlorinated under a hydrogen stream at normal temperature and pressure. Then, palladium carbon was filtered away and the filtrate was concentrated under reduced pressure to provide 3.1 g of 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]ethyl}benzenesulfona-mide hydrochloride, which was recrystallized from 120 ml of a mixture of methanol and ethanol (1:4 by volume ratio) to provide 2.3 g of the colorless crystals thereof.

The product has the following physiocochemical properties.

Melting point: 196°–198° C.

Elemental analysis for C₁₈H₂₄N₂O₅S.HCl:

4,373,106

**17**                                                                      **18**

| | C(%) | H(%) | N(%) |
|---|---|---|---|
| Calcd.: | 51.86 | 6.04 | 6.72 |
| Found: | 51.72 | 6.23 | 6.68 |

Nuclear magnetic resonance spectra (CD$_3$OD):

| δ: | 3.84 and 3.98 | (3H + 3H, s, —OCH$_3$) |
|---|---|---|
| | 4.24 | (2H, t, —OCH$_2$—) |

The compounds in Examples 11–29 were obtained in the same manner as in Example 10.

### EXAMPLE 11



5-{2-[2-(2-Methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride
Physicochemical properties
Melting point: 173°–175° C.
Elemental analysis for C$_{18}$H$_{24}$N$_2$O$_4$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 53.93 | 6.28 | 6.99 |
| Found: | 53.83 | 6.27 | 6.97 |

Nuclear magnetic resonance spectra (CD$_3$OD)

| δ: | 2.64 (3H, s, CH$_3$—⬡—), | 3.84 (3H, s, —OCH$_3$) |
|---|---|---|
| | 4.28 (2H, t, —OCH$_2$—) | |

### EXAMPLE 12



5-{2-[2-(2-Ethoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride
Physicochemical properties
Melting point: 180°–181.5° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_4$S.HCl

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.81 | 6.56 | 6.89 |

Nuclear magnetic resonance spectra (CD$_3$OD):

| δ: | 1.36 (3H, t, —OCH$_2$CH$_3$), | 2.64 (3H, s, CH$_3$—⬡—) |
|---|---|---|
| | 4.10 (2H, q, —OCH$_2$CH$_3$), | 4.36 (2H, t, —OCH$_2$—CH$_2$—) |

### EXAMPLE 13



5-{2-[2-(2-Methoxyphenoxy)-1-methylethylamino]ethyl}-2-methylbezenesulfonamide hydrochloride
Physicochemical properties:
Melting point: 169°–171° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_4$S.HCl

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.89 | 6.60 | 6.76 |

Nuclear magnetic resonance spectra (CD$_3$OD):

| δ: | 1.15 (3H, d, CH—CH$_3$), | 2.64 (3H, s, CH$_3$—⬡—) |
|---|---|---|
| | 3.80 (3H, s, —OCH$_3$) | |

### EXAMPLE 14



5-{2-[3-(2-Methoxyphenyl)-1-methylpropylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride
Physicochemical properties:
Melting point: 198°–200° C.
Elemental analysis for C$_{20}$H$_{28}$N$_2$O$_3$S.HCl

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 58.17 | 7.08 | 6.78 |
| Found: | 58.09 | 7.01 | 6.62 |

Nuclear magnetic resonance spectra (d$_6$-DMSO)

| δ: | 1.35 (3H, d, CH—CH$_3$) | 2.55 (3H, s, CH$_3$—⬡—) |
|---|---|---|

4,373,106

| 19 | 20 |

-continued

3.78 (3H, s, —OCH$_3$)

### EXAMPLE 15



2-Hydroxy-5-{2-[2-(2-methoxyphenoxy)e-thylamino]ethyl}benzenesulfonamide
Physicochemical properties:
Melting point: 97°–99° C.
Elemental analysis for C$_{17}$H$_{22}$N$_2$O$_5$S.H$_2$O

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 53.10 | 6.29 | 7.29 |
| Found: | 52.75 | 6.22 | 7.09 |

Nuclear magnetic resonance spectra (d$_6$-DMSO)

| δ: | 3.76 | (3H, s, —OCH$_3$) |
|---|---|---|
|  | 4.04 | (2H, t, —OCH$_2$—) |

### EXAMPLE 16



2-Methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide hydrochloride
Physicochemical properties:
Melting point: above 250° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_5$S.HCl

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 52.96 | 6.31 | 6.50 |
| Found: | 52.44 | 6.31 | 6.47 |

Nuclear magnetic resonance spectra (d$_6$-DMSO)

δ 1.15 (3H, d, CH—CH$_3$)

3.78 and 3.90 (3H + 3H, s, —OCH$_3$)
4.38 (2H, t, —OCH$_2$—)

### EXAMPLE 17



2-Methyl-5-{2-[2-(2-methylphenoxy)-1-methyl-ethylamino]ethyl}benzenesulfonamide hydrochloride
Physicochemical properties:
Melting point: 183°–185° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_3$S.HCl:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 57.20 | 6.82 | 7.02 |
| Found: | 52.13 | 6.79 | 6.99 |

Nuclear magnetic resonance spectra (CD$_3$OD)

δ: 1.55 (3H, d, CH—CH$_3$) 2.24 (3H, s, O





2.64 (3H, s, CH$_3$—

2.08–2.40 (2H, m, —OCH$_2$—)

### EXAMPLE 18



2-Methyl-5-[2-(2-phenoxyethylamino)ethyl]ben-zenesulfonamide hydrochloride
Physicochemical properties:
Melting point: 208.5°–210° C.
Elemental analysis for C$_{17}$H$_{22}$N$_2$O$_3$S.HCl:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.05 | 6.25 | 7.55 |
| Found: | 54.83 | 6.23 | 7.48 |

Nuclear magnetic resonance spectra (CD$_3$OD)

δ: 2.65 (3H, s, CH$_3$—



4.32 (2H, t, —OCH$_2$—)

4,373,106

**21**

## EXAMPLE 19



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-2,2-dimethylethyl]-2-methylbenzenesulfonamide hydrochloride
Physicochemical properties:
Melting point: 199°–202° C.
Elemental analysis for $C_{20}H_{28}N_2O_4S.HCl.CH_3OH$

|              | C (%) | H (%) | N (%) |
|--------------|-------|-------|-------|
| Calculated:  | 54.71 | 7.21  | 6.08  |
| Found:       | 54.50 | 7.17  | 6.14  |

Nuclear magnetic resonance spectra ($d_6$-DMSO)



δ: 1,24 (6H, s, —C—CH₃), 2.56 (3H, s, —⟨⟩—CH₃)

3.74 (3H, s, ⟨⟩—OCH₃), 4.30 (2H, t, —CH₂—O)

## EXAMPLE 20



5-{2-[2-(2-Ethoxyphenoxy)ethylamino]-2-methylethyl]-2-methoxybenzenesulfonamide hydrochloride
Physicochemical properties:
Melting point: 254°–256° C.
Elemental analysis for $C_{20}H_{28}N_2O_5S.HCl$

|              | C (%) | H (%) | N (%) |
|--------------|-------|-------|-------|
| Calculated:  | 53.99 | 6.57  | 6.30  |
| Found:       | 53.79 | 6.58  | 6.26  |

Nuclear magnetic resonance spectra (CD₃OD):

δ: 1.28 (3H, d, CH—CH₃), 1.38 (3H, t, CH₂—CH₃)

3.97 (3H, s, O—CH₃), 4.30 (2H, t, CH₂—CH₂—O)

**22**

## EXAMPLE 21



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-1-methylethyl]-2-methylbenzenesulfonamide hydrochloride
Physicochemical properties:
Melting point: 183°–185° C.
Elemental analysis for $C_{19}H_{26}N_2O_4S.HCl$:

|              | C (%) | H (%) | N (%) |
|--------------|-------|-------|-------|
| Calculated:  | 55.00 | 6.56  | 6.75  |
| Found:       | 54.76 | 6.56  | 6.74  |

Nuclear magnetic resonance spectra (CD₃OD)



δ: 1.40 (3H, d, CH—CH₃), 2.64 (3H, s, ⟨⟩—CH₃)

3.80 (3H, s, ⟨⟩—OCH₃), 4.23 (2H, t, —CH₂—O)

## EXAMPLE 22



5-{2-[2-(2-Methoxyphenoxy)-2-methylethylamino]ethyl]-2-methylbezenesulfonamide hydrochloride
Physicochemical properties:
Melting point: 231°–232° C.
Elemental analysis for $C_{19}H_{26}N_2O_4S.HCl$:

|              | C (%) | H (%) | N (%) |
|--------------|-------|-------|-------|
| Calculated:  | 55.00 | 6.56  | 6.75  |
| Found:       | 54.86 | 6.58  | 6.83  |

Nuclear magnetic resonance spectra (CD₃OD):

δ: 1.26 (3H, d, CH—CH₃), 2.60 (3H, s, ⟨⟩—CH₃)

3.76 (3H, s, ⟨⟩—OCH₃), 4.42 (1H, m, CH₃—CH—O)

4,373,106

**23**

**24**

EXAMPLE 23



5-{2-[2-(2-Methoxyphenoxy)-1,1-dimethylethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 191°–193° C.

Elemental analysis for $C_{20}H_{28}N_2O_4S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 56.00 | 6.81 | 6.53 |
| Found: | 55.83 | 6.86 | 6.32 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):



δ: 1.44 (6H, s, N—C(CH$_3$)$_2$—C), 2.56 (3H, s,



3.66 (3H, s, ), 4.08 (2H, s, —CH$_2$—O)

EXAMPLE 24



5-{2-[N-[2-(2-Methoxyphenoxy)ethyl]-N-methylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 169°–171° C.

Elemental analysis for $C_{19}H_{26}N_2O_4S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.88 | 6.51 | 6.64 |

Nuclear magnetic resonance spectra (d$_6$-DMSD):



δ: 2.56 (3H, s, —CH$_3$), 3.68 (3H, s, —OCH$_3$)

4.39 (2H, t, —CH$_2$—O)

EXAMPLE 25



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-2-methylethyl}-2-methylbenzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 250°–252° C.

Elemental analysis for $C_{19}H_{26}N_2O_4S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.68 | 6.49 | 6.58 |

Nuclear magnetic resonance spectra (CDCl$_3$+d$_6$-DMSO+D$_2$O+Na$_2$CO$_3$):



δ: 1.06 (3H, d, CHCH$_3$), 2.61 (3H, s, CH$_3$ )

3.76 (3H, s, —OCH$_3$)

EXAMPLE 26



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-2-ethylethyl}-2-methylbenzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 198°–200° C.

Elemental analysis for $C_{20}H_{28}N_2O_4S.HCl$

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 56.00 | 6.81 | 6.53 |
| Found: | 55.76 | 6.88 | 6.51 |

Nuclear magnetic resonance spectra (CDCl$_3$+d$_6$-DMSO+D$_2$O+Na$_2$CO$_3$):

δ: 0.94 (3H, t, CHCH$_2$CH$_3$), 1.22 (2H, m, CHCH$_2$CH$_3$)

4,373,106

**25**

-continued

2.56 (3H, s, CH₃—⟨ ⟩—), 3.76 (3H, s, ⟨ ⟩—OCH₃)

## EXAMPLE 27

2-Hydroxy-5-{2-[2-(4-methoxyphenoxy)e-thylamino]ethyl}-benzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 237°–241° C. (decomposed):

Elemental analysis for C₁₇H₂₂N₂O₅S.HCl:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 50.68 | 5.75 | 6.95 |
| Found: | 50.45 | 5.64 | 6.99 |

Nuclear magnetic resonance spectra (CD₃OD):

δ: 3.74 (3H, s, O—CH₃), 4.22 (2H, t, —CH₂—O)

## Example 28

2-Hydroxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 211°–214° C.

Elemental analysis for C₁₈H₂₄N₂O₅S.HCl:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 51.86 | 6.04 | 6.72 |
| Found: | 51.72 | 6.00 | 6.59 |

Nuclear magnetic resonance (CD₃OD):

δ: 1.28 (3H, d, CHCH₃), 3.86 (3H, s, —OCH₃)

4.30 (2H, t, —CH₂—O)

**26**

## EXAMPLE 29

5-{2-[2-(2-Ethoxyphenoxy)ethylamino]-2-methyle-thyl}-2-hydroxybenzenesulfonamide hydrochloride

Physicochemical properties:

Melting point: 172°–173° C.

Elemental analysis for C₁₉H₂₆N₂O₅S.HCl:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 52.96 | 6.31 | 6.50 |
| Found: | 52.83 | 6.65 | 6.12 |

Nuclear magnetic resonance spectra (CD₃OD):

1.26 (3H, d, CHCH₃), 1.36 (3H, t, —CH₂CH₃)

4.10 (2H, q, —CH₂CH₃), 4.26 (2H, t, —CH₂—O)

The starting materials and the reaction types applied to prepare the products of the above Examples 2,3,5 and 11–29 are shown below schematically;



| Example No. | Starting Material & Reaction Type |
|---|---|

2

chlorination of hydroxyl group

the desired product

3

chlorination of hydroxyl group

the desired product

5

condensation

the desired product

4,373,106

27
28

-continued

| Example No. | Starting Material & Reaction Type |
|---|---|
| 11–29 | |



$$\text{reduction}$$

the desired product
(X represents halogen;
R, R$_1$, R$_2$ and R$_4$–R$_{10}$ in
the formula represent
the same group as the
corresponding group of
the desired product)

What is claimed is:

1. A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein R$_1$ represents an amino group or a mono- or di-lower alkylamino group; R$_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; R$_3$ represents a hydrogen atom, a halogen atom, a lower alkyl group, a lower alkoxy group, a phenylthio group, or a phenylsulfinyl group; R$_4$, R$_7$, R$_8$ and R$_9$ each represent a hydrogen atom or a lower alkyl group; R$_{10}$ represents a hydrogen atom, a lower alkyl group and Y represents an oxygen atom or a lower alkoxy group and Y represents an oxygen atom or a methylene group; said Y is an oxygen atom when R$_2$ is a hydroxyl group or the salts thereof which comprises condensing a compound represented by the formula



wherein R$_1$, R$_2$, R$_3$ and R$_4$ have the same significance as in the above formula
and a compound represented by the formula



wherein R$_7$, R$_8$, R$_9$, R$_{10}$ and Y have the same significance as in the above formula
and then reducing the condensation product.

2. A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein R$_1$ represents an amino group or a mono- or di-lower alkylamino group; R$_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; R$_3$ represents a chlorine or bromine atom; R$_4$, R$_5$, R$_6$, R$_7$, R$_8$ and R$_9$ each represent a hydrogen atom or a lower alkyl group; R$_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when R$_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and R$_1$, R$_2$, R$_4$, R$_5$, R$_6$, R$_7$, R$_8$, R$_9$, R$_{10}$ and Y have the same significance as in the above formula with a chlorinating or brominating agent.

3. A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein R$_1$ represents an amino group or a mono- or di-lower alkylamino group; R$_2$ represents a hydroxy group, a lower alkyl group or a lower alkoxy group; R$_3$ represents a hydrogen atom or a lower alkyl group; R$_4$, R$_5$, R$_6$, R$_7$, R$_8$ and R$_9$ each represent a hydrogen atom or a lower alkyl group; R$_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when R$_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and R$_1$, R$_2$, R$_4$, R$_5$, R$_6$, R$_7$, R$_8$, R$_9$, R$_{10}$ and Y have the same significance as in the above formula with a halogenating agent and reducing the halogenated product.

4. The process as defined in claim 3 for the preparation of 5-[2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl]-2-methoxybenzenesulfonamide.

4,373,106

**29**

5. The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-benzensulfonamide.

6. The process as defined in claim 3 for the preparation of 5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-2-methylbenzenesulfonamide.

7. The process as defined in claim 3 for the preparation of 5-[2-[2-(2-methoxyphenoxy)ethylamino]ethyl]-2-methylbenzenesulfonamide.

8. The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-N-methylbenzenesulfonamide.

9. The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-N,N-dimethylbenzenesulfonamide.

10. The process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; $R_3$ represents phenylsulfinyl; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent to form a halogenated product, reacting said halogenated product with an alkaline material, reacting the product thus obtained with thiophenol, and oxidizing the resulting product.

11. A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; $R_3$ represents iodine; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ repre-

**30**

sents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent to form a halogenated product



wherein X represents a chlorine atom or bromine atom and R and $R_6$ are hydrogen, reacting said halogenated product with an alkaline material and then reacting the product



thus obtained with hydrogen iodide.

12. A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; $R_3$ represents a lower alkoxy group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; and Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula

4,373,106

31



wherein R represents a hydrogen atom or a lower alkyl group and R$_1$, R$_2$, R$_4$, R$_5$, R$_6$, R$_7$, R$_8$, R$_9$, R$_{10}$ and Y have the same significance as in the above formula with a halogenating agent fo form a halogenated product



wherein X represents a chlorine atom or bromine atom and R and R$_6$ are hydrogen, reacting said halogenated product with an alkaline material and then reacting the product



thus obtained with a lower alcohol.

**13.** A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



32

wherein R$_1$ represents an amino group or a mono- or di-lower alkylamino group; R$_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; R$_3$ represents phenylthio; R$_4$, R$_5$, R$_6$, R$_7$, R$_8$ and R$_9$ each represent a hydrogen atom or a lower alkyl group; R$_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when R$_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and R$_1$, R$_2$, R$_4$, R$_5$, R$_6$, R$_7$, R$_8$, R$_9$, R$_{10}$ and Y have the same significance as in the above formula with a halogenating agent to form a halogenated product



wherein X represents a chlorine atom or bromine atom and R and R$_6$ are hydrogen, reacting said halogenated product with an alkaline material and then reacting the product



thus obtained with thiophenol.

* * * * *

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ASTELLAS PHARMA, INC., et al., | : : : | CIVIL ACTION NO. 05-2563 (MLC) |
| Plaintiffs, | : : | **MEMORANDUM OPINION** |
| v. | : : | |
| RANBAXY INC., et al., | : : | |
| Defendants. | : : | |

**COOPER, District Judge**

Plaintiffs, Astellas Pharma, Inc. ("Astellas Pharma"), and
Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer")
(collectively "Astellas") commenced this action against
defendants Ranbaxy Inc., Ranbaxy Pharmaceuticals Inc., and
Ranbaxy Laboratories Ltd. (collectively "Ranbaxy") alleging
Ranbaxy infringed upon United States patent number 4,703,063 (the
"'063 patent") held by Astellas. (Compl., at 4.) Ranbaxy
asserted affirmative defenses and a counterclaim based on the
alleged invalidity and unenforceability of the '063 patent.
(Dkt. entry no. 4.)

Currently before the Court are a motion and a cross motion
for summary judgment pursuant to Federal Rule ("Rule") of Civil
Procedure 56. (Dkt. entry no. 17.)[1] Pursuant to a stipulation
entered into between the parties and approved by the Court,

---

[1]    Astellas cross-moved for summary judgment at oral argument
on defendants' motion. (Tr. of 2-02-07 Oral Arg., at 98-99; see
dkt. entry no. 39.)

Ranbaxy admits to infringing upon the '063 patent and agreed to the dismissal with prejudice of its affirmative defenses alleging invalidity or unenforceability under 35 U.S.C. §§ 101, 102, 103, and 112. (Dkt. entry no. 32, at 2.) The only affirmative defense and counterclaim not dismissed through the stipulation is the invalidity of '063 for obviousness-type double patenting, and thus the parties agree this is the only issue remaining before the Court. (Id.) For the reasons stated herein, the Court will grant Astellas's cross motion and deny Ranbaxy's motion.

## BACKGROUND

Yamanouchi Pharmaceutical Co. ("Yamanouchi"), one of the companies that subsequently merged in 2005 to become Astellas Pharma, Inc., filed a patent application in 1981 for a class of sulfamoyl-substituted phenethylamines, believed to be useful for treating hypertension and related disorders. (Pls. Stmt. of Facts, at ¶¶ 2, 11; Defs. Stmt. of Facts, at ¶ 6.) The application contained claims to the class of new chemical compounds, which included tamsulosin, as well as the pharmaceutical compositions containing those chemical compounds and the processes for making the chemical compounds. (Pls. Stmt. of Facts, at ¶ 13; Defs. Stmt. of Facts, at ¶ 9.)

The patent examiner rejected the pharmaceutical composition and chemical compound claims, only allowing the claims for the processes to make the compounds. (Pls. Stmt. of Facts, at ¶ 16;

2

Defs. Stmt. of Facts, at ¶ 8.)   Patent number 4,373,106 (the
"'106 patent") was issued to Yamanouchi in 1983 and it claimed
the processes for making the new class of sulfamoyl-substituted
phenethylamines.  (Pls. Stmt. of Facts, at ¶ 19; Defs. Stmt. of
Facts, at ¶ 9; see Decl. of Thomas R. Burns ("Burns Decl."), Ex.
A.)  The '106 patent expired on February 4, 2001.  (Pls. Stmt. of
Facts, at ¶ 20; Defs. Stmt. of Facts, at ¶ 12.)

Before the '106 patent was issued, Yamanouchi applied
multiple times to the patent office to claim the pharmaceutical
compositions and chemical compounds rejected by the examiner in
the '106 application.  (Pls. Stmt. of Facts, at ¶¶ 24-25; Defs.
Stmt. of Facts, at ¶ 13.)[2]  On October 27, 1987, the '063 patent
claiming those pharmaceutical compositions and chemical compounds
was issued to Yamanouchi.  (See Burns Decl., Ex. B.)  The
eighteen claims in the '063 patent cover the chemical compounds
(claims 1 & 3-18) and the pharmaceutical compositions (claim 2).
(Id.)  The '063 patent expires on October 27, 2009.  (Pls. Stmt.
of Facts, at ¶ 30; Defs. Stmt. of Facts, at ¶ 19.)

Boehringer, Astellas Pharma's marketing partner in the
United States, filed a New Drug Application ("NDA") for

--------------------

[2]   The '063 patent application originally included process
claims but they were rejected by the patent examiner.  Our
analysis, however, does not rest on that aspect of the '063
patent history.  The parties agree that no restriction was
imposed by the patent examiner reviewing the first filed
application resulting in the '106 patent.

tamsulosin with the Food and Drug Administration ("F.D.A.") on April 15, 1996.  (Pls. Stmt. of Facts, at ¶ 39.)  The NDA was approved exactly one year later and Boehringer began marketing tamsulosin in the United States under the trade name Flomax. (Id.)  Flomax is used to treat benign prostatic hyperplasia. (Pls. Stmt. of Facts, at ¶¶ 4, 42.)

Ranbaxy filed an Abbreviated New Drug Application ("ANDA") on December 20, 2004, seeking approval to market generic tamsulosin hydrochloride capsules.  (Dkt. entry no. 17, Decl. of Jay R. Deskmukh, at ¶ 4.)  On April 6, 2005, Ranbaxy notified Astellas of the F.D.A.'s acceptance of Ranbaxy's ANDA.  (Id. at ¶ 5.)  Ranbaxy also provided Astellas with notice of its opinion that the '063 patent was invalid for, inter alia, double patenting over the claims of the '106 patent.  Astellas subsequently filed the complaint for patent infringement against Ranbaxy in this Court.  (Dkt. entry no. 1.)

## DISCUSSION

Claim 3 of the earlier issued '106 patent states:

A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula [DRAWING OF CHEMICAL FORMULA] wherein R1 represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxy group, a lower alkyl group or a lower alkoxy group; $R_3$ represents a hydrogen atom or a lower alkoyl group, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which

4

comprises reacting a compound represented by the formula [DRAWING OF CHEMICAL FORMULA] wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent and reducing the halogenated product.

(Burns Decl., Ex. A, at 28.)  Claim 4 of the earlier issued '106

patent states: "The process as defined in claim 3 for the

preparation of 5-[2-[2-(2-ethoxyphenoxy)ethylamino]-2-

methylethyl]-2-methoxybenzensulfonamide."  (Id.)

Claim 1 of the later issued '063 patent states:

Sulfamoyl-substituted phenethylamine derivatives represented by the general formula [DRAWING OF CHEMICAL FORMULA] wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a lower alkoxy group or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom, and the salts thereof.

(Id., Ex. B, at 26-27.)  Claim 2 of the '063 patent states: "A

pharmaceutical composition containing an effective []-adrenergic

antagonistic amount of a compound of claim 1 and a

pharmaceutically acceptable excipient."  (Id. at 27.)  Claim 14

of the '063 patent states: "The compound of claim 1 which is 5-

{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}

benzenesulfonamide."  (Id. at 28.)  Claims 4, 8, 10 & 14 of the

'063 patent are dependent claims that directly or indirectly

depend on claim 1.  (See id., at 27-28.)

The parties do not dispute the process claimed in the '106 patent, when practiced, will produce tamsulosin, as well as other compounds within the class of sulfamoyl-substituted phenethylamines. Nor do the parties dispute the compound claimed in the dependent claim 14 of the '063 patent is tamsulosin.[3]

Ranbaxy argues that claims 1, 2, 4, 8, 10 & 14 of the '063 patent are invalid for obviousness-type double patenting. More specifically, Ranbaxy argues: (1) the '063 patent covers the same compound already patented in claim 4 of the '106 patent, (2) claim 4 of the '106 patent falls within the "genus and subgenus" of the compounds in claims 1, 4, 8, 10 & 14 of the '063 patent (the "'063 claims"), or in other words claim 4 of the '106 patent anticipates claims 1, 4, 8, 10 & 14 of the '063 patent, and (3) claim 2 of the '063 patent would have been obvious in view of claim 4 of the '106 patent. (Defs. Br., at 17, 22.)

Astellas argues that the '106 and '063 patents are patentably distinct because the '106 patent claims distinct processes for making "new classes of sulfamoyl substituted phenethylamins," including tamsulosin, while the '063 patent claims the chemical compound tamsulosin and its pharmaceutical compositions, regardless of the process used to make them. Astellas further argues (1) the case law concerning anticipation,

---

[3]    The fact there are other isomers that can be produced using the process in the '106 patent is undisputed by the parties, but not material to the Court's analysis.

genus and sub-genus, does not apply because '106 claimed a

process, not a product, (2) Ranbaxy improperly relies upon the

specification of the '106 patent, and (3) claim 2 of the '063

patent is patentably distinct from the claims in the '106 patent

because it claims unexpected properties of "adrenergic

antagonists" that were not in the earlier process claims of the

'106 patent.

## I.    Standard

A patent is presumed to be valid, and each of its claims are

presumed valid independent of the validity of other claims.  35

U.S.C. § 282.  A party asserting the invalidity of a patent or

one or more of its claims has the burden of establishing such

invalidity, which is satisfied only by clear and convincing

evidence.  Id.; Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve,

Inc., 796 F.2d 443, 446 (Fed. Cir. 1986).  "It is black letter

law that the ultimate question of obviousness is a question of

law."  Richardson-Vicks Inc. v. Upjohn Co., 122 F.3d 1476, 1479

(Fed. Cir. 1997).

## II.   Obviousness-type Double Patenting[4]

"The judicially-created doctrine of obviousness-type double

patenting [prohibits] a party from obtaining an extension of the

---

[4]    Obviousness-type double patenting is also commonly referred
to as "nonstatutory double patenting."  See generally Geneva
Pharm., Inc. v. Glaxosmithkline PLC, 349 F.3d 1373 (Fed. Cir.
2003).

7

right to exclude through claims in a later patent that are not
patentably distinct from claims in a commonly owned earlier
patent." Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 967
(Fed. Cir. 2001).   In analyzing a claim of obviousness-type
double patenting, the Court determines (1) the differences
between the claims of the earlier and later patent and (2)
whether the differences make the claims patentably distinct. Id.
at 968.   A claim that defines more than an obvious variation is
patentably distinct.   Geneva Pharm., Inc. v. Glaxosmithkline PLC,
349 F.3d 1373, 1383 (Fed. Cir. 2003).   "A claim cannot be
patentably distinct over anticipatory subject matter." Id.; Eli
Lilly, 251 F.3d at 968 (same); In re Goodman, 11 F.3d 1046, 1053
(Fed. Cir. 1993) (holding that an earlier species claim
anticipates and therefore is not patentably distinct from a later
genus claim).

"[T]he law of double patenting is concerned only with what
patents claim" and therefore double patenting "involves an
inquiry into what, if anything, has been claimed twice." Gen.
Foods Corp. v. Studiengesellschaft Kohle mbH, 972 F.2d 1272, 1275
(Fed. Cir. 1992).   Claim interpretation is a question of law.
Id. at 1277.   A patent contains two main parts: "(1) a written
description of the invention, which may . . . include drawings,
calling the 'specification,' enabling those skilled in the art to
practice the invention, and (2) claims which define or delimit

8

the scope of the legal protection which the government grant gives the patent owner, the patent 'monopoly.'" Id. at 1274.

Whereas a court's inquiry into obviousness under 35 U.S.C. § 103 compares claimed subject matter to the prior art, the proper inquiry for obviousness-type double patenting "does not include an examination of the motivation to modify the prior art, nor does it involve an inquiry into objective criteria suggesting non-obviousness." Applera Corp. v. MJ Res. Inc., 363 F.Supp.2d 261, 264 (D. Conn. 2005). The distinctions between obviousness under § 103 and obviousness-type double patenting include:

> (1) The objects of comparison are very different: Obviousness compares claimed subject matter to the prior art; [obviousness-type] double patenting compares claims in an earlier patent to claims in a later patent or application;
>
> (2) Obviousness requires inquiry into a motivation to modify the prior art; [obviousness-type] double patenting does not;
>
> (3) Obviousness requires inquiry into objective criteria suggesting non-obviousness; [obviousness-type] double patenting does not.

Geneva Pharm., 349 F.3d at 1378 n. 1. "It cannot be said – though it often is, incorrectly, by the uninitiated – that a part of the claim is 'claimed' subject matter." Gen. Foods, 972 F.2d at 1274. Each claim in a patent "is an entity which must be considered as a whole." Id.

Applying these principles, we construe claim 4 of the '106 patent to be a claim for a process to make the named compound, 5-

9

[2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl]-2-
methoxybenzensulfonamide.  We construe independent claim 1 of the
'063 patent and its dependent claims 4, 8, 10 & 14 to be claims
for the <u>compound</u> sulfamoyl-substituted phenethylamine
derivatives.  We construe individual claim 2 of the '063 patent
as a claim for a <u>pharmaceutical composition</u> of the named
compound, having the stated <u>pharmaceutical properties</u>.  In
rendering this claim construction, we have considered the fact
that the intrinsic evidence relating to both patents is a
virtually identical specification.  (<u>Compare</u>, Burns Decl., Ex. A,
at 2, <u>with id.</u>, Ex. B, at 2.)  However, we decline to read into
the <u>process claim</u> of claim 4 of the '106 patent the compound or
the pharmaceutical composition and properties that are distinctly
claimed in the '063 patent.  <u>See Markman v. Westview Instruments,
Inc.</u>, 52 F.3d 967, 970 (Fed. Cir. 1995), <u>aff'd</u>, 517 U.S. 370
(1996), <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1313 (Fed. Cir.
2005), <u>Gen. Foods</u>, 972 F.2d at 1274.

     The Federal Circuit found that the district court in <u>General
Foods</u> had erred in its comparison of the earlier and later claims
at issue, and explained what the district court should have done:

          Where there is a second patentable invention, as there
          is here, because the difference is not an obvious one,
          it is important to bear in mind that comparison can be
          made only with what invention is claimed in the earlier
          patent, paying careful attention to the rules of claim
          interpretation to determine what invention a claim
          defines and not looking to the claim for anything that

happens to be mentioned in it as though it were a prior
art reference.

Id. at 1280.  The approach advocated by Ranbaxy would, in our
view, result in a similar error in comparing the claims of the
'063 patent to more than only the claims of the '106 patent.
Defendants rely on the type of comparisons that are required
under the test for obviousness under § 103, and not the more
limited comparisons between claims utilized pursuant to the test
for obviousness-type double patenting.  See Applera Corp., 363
F.Supp.2d at 264.

Defendants, in support of their argument, impermissibly
characterize the compounds named in the processes claimed in the
'106 patent as if the compounds were also themselves claimed.  In
order to reach the conclusion that defendants desire, the Court
would have to go beyond what is claimed by the two patents and
compare the '063 claims with the compounds merely named and not
claimed in the '106 patent, contrary to the law of obviousness-
type double patenting.  See Gen. Foods, 972 F.2d at 1274 (noting
that "one cannot properly speak of any single step as being
'claimed,' for it is not; all that is claimed is the process
consisting of the combination of all three steps").  Defendants'
arguments do nothing more than show how the two patents are
related, and do not meet the burden of showing by clear and

11

convincing evidence that the '063 patent is invalid for obviousness-type double patenting.

Defendants have also not persuaded the Court that the rule of anticipation, holding that an earlier claim to a species defeats a later claim to a genus containing that species, controls the result in this case.  See Geneva, 349 F.3d at 1383-84 (applying genus/species argument in nonstatutory double patenting case).  A "reference is anticipatory if it discloses every limitation of the claimed invention either explicitly or inherently."  Eli Lilly, 251 F.3d at 970.  "A reference includes an inherent characteristic if that characteristic is the natural result flowing from the reference's explicitly explicated limitations."  Id. (citation and quotations omitted).  Similarly, "a later patent claim that fails to provide novel invention over an earlier claim is not patentably distinct from the other claim."  Id.

Defendants make two arguments concerning anticipation: (1) "Claim 14 [of the '063 patent] recites a compound by the name . . . and Claim 4 [of the '106 patent] recites a process wherein the compound of the same name is the product of the process" and (2) "The only difference between Claims 1, 4, 8, and 10 of the '063 patent . . . and Claim 4 of the '106 patent . . . is that the former each recite various genuses of compounds and the latter recites a process to make a compound that is encompassed by each

12

genus." (Defs. Br., at 17, 20.) In other words, "once the Court concludes Claim 14 of the '063 patent is invalid for double patenting, the remainder of the compound claims (claims 1, 4, 8, & 10) are also invalid." (Defs. Reply Br., at 13.)

Defendants do not point to, and the Court could not find, one double-patenting case where a later product claim was anticipated by the earlier process claim for making that product, or where a <u>product</u> or the compounds comprising that product were found to be a "genus" anticipated by the "species" of the earlier <u>process</u> claims. In the absence of such caselaw, and in light of the Court's consideration of <u>Geneva</u>, <u>supra</u>, and <u>Taylor</u>, <u>infra</u>, the Court concludes that it cannot find claims 1, 4, 8, 10 & 14 in the '063 patent invalid based upon defendants' species/genus argument. In order to reach such a conclusion the Court would have to compare the '063 claims with the compounds merely named as part of the claimed processes in the '106 patent, contrary to the law of obviousness-type double patenting. <u>See Gen. Foods</u>, 972 F.2d at 1280.

The cases relied upon by Ranbaxy are all distinguishable from the instant case. Ranbaxy relies upon two "method of use" cases: (1) <u>Geneva Pharm.</u>, 349 F.3d at 1385-86, where the court held that an earlier claim to a compound whose only use was to combat bacteria was not patentably distinct from a later claim to the method of using the compound for the same purpose, and (2) <u>In</u>

re Lonardo, 119 F.3d 960, 968 (Fed. Cir. 1997), where the court held that the earlier claim for a device for healing foot injuries was not patentably distinct from the later claim for a method of using the same device. These two cases do not control here because the later "method of use" patents are not analogous to the later "product" patent at issue in this case, for all of the aforementioned reasoning by the Court as to the product/process distinction.

In re Freeman, 166 F.2d 178 (C.C.P.A. 1948), also cited by Ranbaxy, is also distinguishable from this case. In Freeman, the court affirmed the patent examiner's finding of double patenting on the grounds that the earlier process claims precluded a later claim to the composition resulting from the same process, because the composition, i.e. product, could only be described by the earlier patented process for making it. Id. at 180-81. In this case, however, it is generally recognized by both parties that tamsulosin can be made by processes other than those claimed by the '106 patent, thereby distinguishing Freeman. (See Burns Decl., Ex. J, at 83-84.)

Defendants also argue that claim 2 of the '063 patent is obvious, under double-patenting principles, in view of claim 4 of the '106 patent. (Defs. Br., at 22.) Plaintiffs argue that the adrenergic antagonists in claim 2 of the '063 patent are "unexpected and unpredictable pharmaceutical properties" that

14

make the later '063 patent patentably distinct from the earlier
'106 patent. (Pls. Br., at 35.) Plaintiffs' argument is
bolstered by defendants' concession:

> Claim 2 of the '063 patent therefore differs from Claim
> 4 of the '106 patent in that (1) the compound is part
> of the pharmaceutical composition, (2) the
> pharmaceutical composition contains an excipient, and
> (3) the pharmaceutical composition contains an
> effective []adrenergic antagonistic amount of the
> compound, which is merely a recitation of the inherent
> property of the compound.

(Defs. Br., at 23.) Defendants' subsequent attempts to argue
that these differences do not render claim 2 of the '063 patent
patentably distinct from the compound in claim 4 of the '106
patent are unpersuasive.

Claim 2 of the '063 patent distinguishes that patent from
claim 4 of the '106 patent because, as plaintiffs argue, it
claims unexpectedly potent adrenergic antagonists that are not
claimed in the earlier patent. Defendants' expert, Professor
Mitscher, even testified that claim 2 of the '063 patent contains
unexpectedly potent elements that are not present in the earlier
claims. (Burns Decl., Ex. L, at 187-88, 192.) When comparing
only what is claimed, as we must, the unexpected and unique
potency of the adrenergic antagonists in claim 2 of the '063
patent render claim 2 patentably distinct from claim 4 of the
'106 patent.

The Court finds Ranbaxy's reliance on Brenner v. Manson, 383
U.S. 519 (1966), in support of its argument that Claim 2 is

obvious, is misplaced.  In Brenner, the Supreme Court construed a patent for "a chemical process which yields an already known product whose utility-other than as a possible object of scientific inquiry-has not yet been evidenced." Id. at 529.  The Court affirmed the Court of Customs and Patent Appeals's holding that the process sought to be claimed by the applicant's patent application "did not disclose a sufficient likelihood" of achieving the claimed utility and therefore was not patentable. Id. at 532.  Nothing in Brenner lends support to Ranbaxy's argument that the claim in the '106 patent for the process of making adrenergic antagonists with unique blocking capabilities makes obvious the later claim in the '063 patent for the adrenergic antagonists themselves.

The Court concludes that the '063 claims are patentably distinct from claim 4 in the '106 patent.  The following excerpt from In re Taylor, 360 F.2d 232 (C.C.P.A. 1966), is instructive. In analyzing whether two claims defined the same invention, the court noted:

> [D]o the claims in fact define the same invention, i.e., a process?  The answer is no.  The appealed claim defines a product per se in terms of its physical properties as well as in terms of a process for making it.  The invention defined by the appealed claim is a product.  The patent claims define a process.  Thus, two independant [sic], albeit related inventions are presented, the appealed claim covering a product and the issued patent claiming a process.

Id. at 234.  The court concluded that "while the patented process may produce a product which falls within the claim to a product

16

as defined in the appealed claim, this does not require the conclusion that double patenting exists." Id. at 236. Despite the different procedural posture in Taylor and this case, the Court finds this particular substantive issue sufficiently analogous to make the court's reasoning in Taylor persuasive.

There is no genuine issue of fact as to the product and process distinction between the claims of the two patents at issue here because the testimony of defendants' expert, Professor Mitscher, confirms that the '106 patent only claims the processes for making the compounds and the '063 patent only claims the compounds themselves. Mitscher testified during his deposition on several occasions that only the specifications for the '106 and '063 patents were identical, and that the claims were different to the extent that the '106 patent claimed the processes for making the compounds and the '063 patent claimed the compounds themselves. (Burns Decl., Ex. I, at 83 & 124; Ex. K, at 33 & 85.) When asked if what was claimed in each patent were different inventions, Mitscher's reply was "[t]hey really refer to the same compound. In one case it's how you make it. In the other case it's the compound." (Id., Ex. I, at 150.)

The Court's conclusion that the '063 product claims are patentably distinct from the '106 process claims is further supported by the United States Patent and Trademark Office's Manual of Patent Examining Procedure ("MPEP"), which

distinguishes between patents for product and process inventions. (Burns Decl., Ex. D., at §§ 802.02, 803, & 806.05(f).)[5]  The MPEP states in relevant part:

> A process of making and a product made by the process can be shown to be distinct inventions if either or both of the following can be shown: (A) that the process as claimed is not an obvious process of making the product and the process as claimed can be used to make another materially different product; or (B) that the product as claimed can be made by another materially different process.

MPEP § 806.05(f) (8th ed. 2005).  The MPEP goes on to explain "[a] product defined by the process by which it can be made is still a product claim . . . and can be restricted from the process if the examiner can demonstrate that the product as claimed can be made by another materially different process."  Id.

Ranbaxy's own expert testimony, again, resolves any genuine issue of material fact on this issue.  Mitscher testified during his deposition that it "wouldn't surprise [him] in the slightest"

---

[5]    Ranbaxy correctly states that the prosecution history of the '106 patent did not include a restriction by the examiner, but rather a rejection of the compound/composition claims, and rather than opposing that rejection the applicant filed new applications eventually resulting in the issuance of the '063 patent.  (Defs. Reply Br., at 7-10.)  The law is clear that no obviousness-type double patenting arguments can be made where the examiner issued a restriction and the applicant agrees to a terminal waiver as to the later issued claims.  See Goodman, 11 F.3d at 1052.  Of course that is not the prosecution history of the '106 and '063 patents, and Ranbaxy has the right to raise the present issue of obviousness-type double patenting.  We nonetheless find the quoted text from the MPEP to be instructive on the question of what is "patentably distinct."

if there were processes other than those claimed in the '106 patent that could be used to make tamsulosin in the form claimed by the '063 patent.  (Burns Decl., Ex. J, at 83-84.)  Also, if the Court were to adopt Ranbaxy's argument that the process claims in the '106 patent anticipate the product claims in the '063 patent, such a conclusion would run contrary to MPEP § 806.05(f)'s allowance of separate inventions for processes and the product resulting from the same processes where "the product as claimed can be made by another materially different process."

Astellas has presented ample evidence that claim 4 of the '106 patent is patentably distinct from claims 1, 2, 4, 8, 10 & 14 the '063 patent.  Ranbaxy has not presented sufficient evidence in response and therefore there is no genuine issue of fact as to whether patent '063 is invalid for obviousness-type double patenting.  See Eli Lilly, 251 F.3d at 971-72.  The Court has compared the differences between the claims at issue as a whole and concludes that Ranbaxy has not met the burden of proving invalidity by clear and convincing evidence.

## CONCLUSION

The Court, for the aforementioned reasons, concludes that the claims of the '063 patent are not invalid for obviousness-type double patenting.  The Court will therefore grant Astellas's cross motion for summary judgment and deny Ranbaxy's motion for summary judgment.  The Court will issue an appropriate order and judgment.

_____s/ Mary L. Cooper_____
**MARY L. COOPER**
United States District Judge

# EXHIBIT 4



30831 Huntwood Avenue Hayward, CA 94544
Phone (510) 476-2000  Fax (510) 972-7756

June 5, 2008

*Via Federal Express*

Boehringer Ingelheim Corp.
Boehringer Ingelheim Pharmaceuticals, Inc.          Tracking No. 8613 5618 0943
900 Ridgebury Rd.
Ridgefield, CT 06877

Astellas Pharma US, Inc.                            Tracking No. 8613 5618 0932
3 Parkway North
Deerfield, IL 60015

Astellas Pharma Inc.                                Tracking No. 8309 0643 6385
3-11, Nihonbashi-Honcho 2-Chome,
Chuo-ku
Tokyo 103-8411
Japan

    Re:  Patent Certification Notice - U.S. Patent No. 4,703,063;
        Impax's Tamsulosin Hydrochloride Capsules, 0.4 mg.
        Impax Laboratories, Inc.'s ANDA 90-377

Dear Sir or Madam:

  This is to provide the notice and information required by 21 U.S.C. § 355(j)(2)(B)(i) and (ii) and § 505(j)(2)(B)(i) and (ii) of the Food, Drug and Cosmetic Act, that Impax Laboratories, Inc. ("Impax"), a Delaware corporation, with its principal place of business at 30831 Huntwood Avenue, Hayward, California, 94544, has submitted an ANDA for the above-referenced drug product which contains the required bioavailability and/or bioequivalence data and Paragraph IV certification with respect to the following patent:

| Patent Number | Inventor | Issue Date | Expiration Date |
|---|---|---|---|
| 4,703,063 | Imai, et al | October 27, 1987 | October 27, 2009 |

A detailed statement of the factual and legal bases for Impax's position regarding this patent is provided herein. Impax reserves the right to assert additional grounds, reasons and authorities for its position that the aforesaid patent is invalid, unenforceable, or not infringed.

Permission to use Federal Express for delivery of this notice and detailed statement was granted by Martin Shimer of the Office of Generic Drugs on February 29, 2008.

Sincerely,
Impax Laboratories, Inc.

Mark C. Shaw
Vice-President, Regulatory Affairs
and Compliance

MCS/vkf

Enclosure:    Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases that U.S. Patent No. 4,703,063 is Invalid, Unenforceable or Not Infringed

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting**

Page 1 of 25

This is the detailed statement of Impax Laboratories, Inc. ("Impax"), pursuant to Section 505(j)(2)(B)(ii) of the Food and Drug Act (codified at 21 U.S.C. § 355(j)(2)(B)(ii)) and 21 C.F.R. § 314.95(c), that discloses Impax's factual and legal bases why the manufacture, use, sale, or offer for sale of Impax's Proposed Tamsulosin Hydrochloride Product would not infringe any valid claim of U.S. Patent No. 4,703,063 ("the '063 patent"). More specifically, all claims of the '063 patent are invalid for non-statutory double patenting over claims in U.S. Patent No. 4,373,106 ("the '106 patent") because the claims of the '063 patent essentially claim nothing more than the same compounds made by the process claims of the '106 patent.

## I. The Applications that Led to the '063 Patent and Flomax®

The '063 patent, entitled "Sulfamoyl Substituted Phenethylamine Derivatives and Process of Producing Them," issued on October 27, 1987 from Application Serial No. 756,790 and names Yamanouchi Pharmaceuticals, Co. as its assignee. The '063 patent claims, among other things, the compound tamsulosin hydrochloride, which is the active ingredient in Flomax,® which Boehringer Ingelheim, the marketing partner of Yamanouchi's successor, Astellas Pharma, Inc., sells as a 0.4 mg oral capsule to treat the signs and symptoms of benign prostatic hyperplasia.

According to the package insert that accompanies Flomax,® Tamsulosin hydrochloride is an antagonist of $alpha_{1A}$ adrenoceptors in the prostate. Tamsulosin hydrochloride is (-)-(R)-5-[2-[[2-(o-Ethoxyphenoxy) ethyl]amino] propyl]-2-methoxy benzenesulfonamide, monohydrochloride. Tamsulosin hydrochloride is a white crystalline powder that melts with decomposition at approximately 230°C. It is sparingly soluble in water and methanol, slightly soluble in glacial acetic acid and ethanol, and practically insoluble in ether.

The application that immediately issued as the '063 patent arose from a series of prior applications, ultimately reaching back for priority to a February 8, 1980 Japanese patent application (55-14382). This series of applications also spun off two other patents, the '106 patent and U.S. Patent No. 4,558,156 ("the '156 patent"). Both prior patents in the chain (the '106 and '156 patents) have already expired. The '063 patent's term, originally set to expire on October 27, 2004, was extended five years pursuant to 35 U.S.C. § 156. A graphic depiction of the prior applications in the chain that lead to the '063 patent is shown below:

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 2 of 25



**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting**

Page 3 of 25

## II.    The '063 Patent Specification Describes Compounds and Processes To Make Compounds As One Invention

Under the "Background of the Invention" section of the specification,[1] and further under the subheading "1. Field of the Invention," the specification of the '063 patent characterizes "the invention" as both relating to novel compounds, and "further concerned with the process of producing these derivatives and the acid addition salts thereof."

> This invention relates to novel sulfamoyl-substituted phenethylamine derivatives and the acid addition salts thereof, and more particularly, to novel sulfamoyl-substituted phenethylamine derivatives and the acid addition salts thereof which exhibit a strong α-adrenergic blocking action and are useful as an antihypertensive agent and a treating agent for congestive heart failure. The invention is further concerned with the process of producing these derivatives and the acid addition salts thereof.

Col. 1, lns. 14 – 23.    The specification identifies prior art that exhibits α- and β-adrenergic blocking action (col. I, ln. 24 – col. 2, ln. 16).    The "Summary of the Invention" section identifies a generic structural figure with eleven replacement groups ($R_1 - R_{10}$ & Y).    Though this figure is identical to the generic structure in claim 1 of the '063 patent, the list of possible substituents for these groups in this part of the specification is broader than the possible substituents set forth in claim I (e.g., in this part of the specification, but *not* in claim 1, $R_3$ may be a phenythio or phenylsulfinyl group, and Y may be a methylene group when $R_2$ is not a hydroxyl group).

The "Summary of the Invention" lists two "objects of this invention:" (I) "An object of this invention is to provide the novel sulfamoyl-substituted phenethylamine derivatives shown by following general formula and the acid addition salts thereof which possess a hypotensive activity based on an α-adrenergic blocking action and are useful as

---

[1] Although this section discusses the specification of the '063 patent, because the '063 patent arose from an unbroken chain of continuations that reaches back to the application that issued as the '106 patent (Appl. Serial No. 231,421), the '063 patent specification is essentially identical to that of the '106 patent. *See* 37 C.F.R. § 1.53(b); MPEP 201.07. Therefore, all comments here apply with equal force to the specification of the '106 patent. However, the column and line references numbers for the analogous parts of the specification of the '106 patent are not generally the same as those set forth here for the '063 patent.

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting**

Page 4 of 25

an antihypertensive agent, an agent for the treatment of congestive heart failure, etc.," and (2) "to provide the process for producing the above-described pharmaceutically useful compounds." (col. 2, lns. 19 – 29). The "Description of the Preferred Embodiments" lists two general synthetic schemes "Process 1," (col. 3, ln. 15 – col. 6, ln. 45) and "Process 2," (col. 6, ln. 46 – col. 7, ln. 20). The specification further provides 29 examples of compounds that have the general structural formula set forth in the Summary of the Invention, along with reported physicochemical data for each. Tamsulosin hydrochloride is the (-)(R)-enantiomer of the compound listed in Example 20 (col. 21, lns. 19 – 48).[2]

The '063 specification describes both compounds and processes to makes these compounds. None of the processes have any purported novelty apart from the compounds they produce.

**III.     The '063 Patent Claims
            the Compounds Made by Processes
            Claimed in the '106 Patent**

**A.     The '063 Patent Claims**

The '063 patent issued with 19 claims. Claims 1 and 2 are independent.[3] Claim 14, which depends from claim 1, explicitly claims the single compound (5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide). The (-)-

---

[2] For tamsulosin hydrochloride, the (-)-enantiomer and the (-)(R)-enantiomer are identical. The '063 patent specification uses the terms "(-)-optical isomer" or "(-)-isomer." All of these terms have the same meaning here. Moreover, the compound listed there as "5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide hydrochloride" means the same thing as "(-)-(R)-5-[[2-(o-Ethoxyphenoxy) ethyl]amino] propyl]-2-methoxy benzenesulfonamide, monohydrochloride," as recited in the Flomax® package insert.

[3] Claim 11 of the '063 patent ostensibly depends from claim 7 since it references claim 7. Nevertheless, claim 11 might be characterized as independent because it claims "optically active isomers" and claim 7 claims "a mixture of racemic compounds." Racemic compounds and mixtures of racemic compounds contain equimolar amounts of enantiomers. Because an "optically active isomer" does not contain equimolar amounts of enantiomers, claim 11 would not incorporate all of the elements of claim 7, and therefore could not properly depend from claim 7. The proper characterization of claim 11 as dependant or independent, and any ramification that could flow from Astella Pharma's improper claim drafting form, do not bear on the conclusions recited in here.

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting**

Page 5 of 25

enantiomer of this compound is tamsulosin.   Eight of the claims require particular combinations of substituents that exclude tamsulosin.

The claims of the '063 patent are:

1.   Sulfamoyl-substituted phenethylamine derivatives represented by the general formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a lower alkoxy group or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom, and the salts thereof.

2.   A pharmaceutical composition containing an effective α-adrenergic antagonistic amount of a compound of claim 1 and a pharmaceutically acceptable excipient.

3.   The salts of the sulfamoyl-substituted phenethylamine derivatives as claimed in claim 1 wherein $R_3$ is a lower alkyl group or a lower alkoxy group.

4.   The compound of claim 1 wherein $R_3$ is a hydrogen atom and the salts thereof.

5.   The compound of claim 1 wherein $R_3$ is a lower alkyl group and the salts thereof.

6.   The compound of claim 1 which is a racemic compound.

7.   The compound of claim 1 which is a mixture of racemic compounds.

8.   The compound of claim 1 which is an optically active isomer.

9.   The isomer of claim 8 which is the (+) isomer.

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting**

Page 6 of 25

10.    The isomer of claim 8 which is the (-) isomer.

11.    The optically active isomers of the compound of claim 7.

12.    The isomer of claim 11 which is the (+) isomer.

13.    The isomer of claim 11 which is the (-) isomer.

14.    The compound of claim 1 which is 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide.

15.    The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide.

16.    The compound of claim 1 which is 5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-2-methylbenzenesulfonamide.

17.    The compound of claim 1 which is 5-{2-[2-(2-methoxyphenoxy) ethylamino] ethyl}-2-methylbenzenesulfonamide.

18.    The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxy phenoxy)ethylamino]-2-methylethyl}-N-methylbenzenesulfonamide.

19.    The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N,N-dimethylbenzenesulfonamide.

All of the claims of the '063 patent are compounds explicitly named by processes claimed in the '106 patent, or are species or subgenera within the genera of compounds made by the processes in the claims of the '106 patent.

**B.    The '106 Patent Claims**

1.    A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 7 of 25



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a halogen atom, a lower alkyl group, a lower alkoxy group, a phenylthio group, or a phenylsulfinyl group; $R_4$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group and Y represents an oxygen atom or a methylene group; said Y is an oxygen atom when $R_2$ is a hydroxyl group or the salts thereof which comprises condensing a compound represented by the formula



wherein $R_1$, $R_2$, $R_3$ and $R_4$ have the same significance as in the above formula

and a compound represented by the formula



wherein $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula

and then reducing the condensation product.

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting**

Page 8 of 25

2.    A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; $R_3$ represents a chlorine or bromine atom; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a chlorinating or brominating agent.

3.    A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 9 of 25

wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxy group, a lower alkyl group or a lower alkoxy group; $R_3$ represents a hydrogen atom or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent and reducing the halogenated product.

4.    The process as defined in claim 3 for the preparation of 5-[2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl]-2-methoxybenzenesulfonamide.

5.    The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-benzensulfonamide.

6.    The process as defined in claim 3 for the preparation of 5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-2-methylbenzenesulfonamide.

7.    The process as defined in claim 3 for the preparation of 5-[2-[2-(2-methoxyphenoxy)ethylamino]ethyl]-2-methylbenzenesulfonamide.

8.    The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-N-methylbenzenesulfonamide.

9.    The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-N,N-dimethylbenzenesulfonamide.

10.    The process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 10 of 25



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; $R_3$ represents phenylsulfinyl; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent to form a halogenated product, reacting said halogenated product with an alkaline material, reacting the product thus obtained with thiophenol, and oxidizing the resulting product.

11.   A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; $R_3$ represents iodine; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 11 of 25

atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent to form a halogenated product



wherein X represents a chlorine atom or bromine atom and R and $R_6$ are hydrogen, reacting said halogenated product with an alkaline material and then reacting the product



thus obtained with hydrogen iodide.

12.   A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 12 of 25



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; $R_3$ represents a lower alkoxy group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; and Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent fo form a halogenated product



wherein X represents a chlorine atom or bromine atom and R and $R_6$ are hydrogen, reacting said halogenated product with an alkaline material and then reacting the product

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 13 of 25



thus obtained with a lower alcohol.

13. A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group or a lower alkoxy group; $R_3$ represents phenylthio; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent to form a halogenated product

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 14 of 25



wherein X represents a chlorine atom or bromine atom and R and $R_6$ are hydrogen, reacting said halogenated product with an alkaline material and then reacting the product



thus obtained with thiophenol.

## IV. The Examiner in the Initial Application Never Imposed a Restriction Requirement and Therefore Never Considered the Process Claims and Compound Claims Patentably Distinct

Though the prosecution history from the initial U.S. application through the three subsequent continuations is lengthy, only certain parts have relevance to this Notice Letter. These parts are findings, comments and responses concerning restriction requirements employed by the Patent Office to classify and organize patent applications, see e.g. 37 CFR 1.142[4] and the concomitant protection afforded afterward through 35 U.S.C. § 121.[5]

---

[4] **37 CFR 1.142. Requirement for restriction.**

(a) If two or more independent and distinct inventions are claimed in a single application, the examiner in an Office action will require the applicant in the reply to that action to elect an invention to which the claims will be restricted, this official action being called a requirement for restriction (also known as a requirement for division). Such requirement will normally be made before any action on the merits; however, it may be made at any time before final action.

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

On February 4, 1981, Astellas Pharma filed its original patent application, U.S. Patent Application Serial No. 06/231,421 ("the '421 application"), directed to certain sulfamoyl-substituted phenethylamine derivatives and processes for making these compounds. In this application, Astellas Pharma sought claims directed to specific compounds and genera of compounds, pharmaceutical compositions containing these compounds and processes for making these compounds. During prosecution of this application, the Examiner rejected the compound and pharmaceutical composition claims several times as obvious over the prior art, but allowed claims directed to processes for making the compounds. The Examiner never issued any restriction requirement during prosecution of the '421 application. In other words, the Examiner thought that the compound and process claims constituted a single invention, as opposed to two or more independent and distinct inventions.

Astellas Pharma pursued the process claims of the '421 application to issuance and cancelled the compound and pharmaceutical composition claims. The process claims issued in Astellas Pharma's '106 patent on February 8, 1983. The '106 patent expired on February 4, 2001.

Although the Examiner had *not* issued any restriction requirement during prosecution of the '421 application, on July 29, 1982, Astellas Pharma filed U.S. Patent Application Serial No. 06/403,006 ("the '006 application"), which Astellas Pharma

---

(b) Claims to the invention or inventions not elected, if not canceled, are nevertheless withdrawn from further consideration by the examiner by the election, subject however to reinstatement in the event the requirement for restriction is withdrawn or overruled

[5] **Divisional Applications**

If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 of this title it shall be entitled to the benefit of the filing date of the original application. A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application. If a divisional application is directed solely to subject matter described and claimed in the original application as filed, the Director may dispense with signing and execution by the inventor. The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention.

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

characterized as a "divisional" of the '421 application.[6]  In this "divisional" application, Astellas Pharma sought compound, pharmaceutical composition and process for making claims that were nearly identical to those it had presented in the original '421 application. Astellas Pharma ultimately abandoned the '006 application and, on July 18, 1984, filed a continuation of the '006 application, U.S. Patent Application Serial No. 06/532,258.  This continuation application matured into the '156 patent.

One year later, on July 18, 1985, Astellas Pharma filed another continuation application, U.S. Patent Application Serial No. 06/756,790.  In this application, Astellas Pharma again sought claims directed to compounds, pharmaceutical compositions and processes for making, again nearly identical to those it had presented in the original '421 application.   Following a series of preliminary amendments, the Examiner issued a restriction requirement that, *inter alia*, restricted the compound and pharmaceutical composition claims from the process for making claims.  Astellas Pharma objected to the restriction requirement, and asserted, *inter alia*, that the compound, pharmaceutical composition and process for making claims were directed to a "single invention." Astellas Pharma also contended:

> Applicants respectfully submit that the fact that claimed subject matter falls into separate statutory categories and are subject to separate classification, is not indicative of the fact that the subject matter is directed to but a single invention.  The classification of subject matter is for the convenience of the Patent Office, and does not necessarily divide the subject matter along patentably distinct lines.

Notwithstanding these objections,[7] Astellas Pharma elected to prosecute only the compound and pharmaceutical composition claims.   After further prosecution, the Examiner allowed the compound and pharmaceutical composition claims.  These claims issued in the '063 patent on October 27, 1987.

---

[6] Though we are unaware of any MPEP rule, then or now, that prevents an applicant from filing a continuation and labeling it as a "divisional" application where the Patent Office has *not* issued a restriction requirement, an applicant's characterization of its continuation application as a "divisional" application cannot invoke 35 U.S.C. §121.

[7] This Examiner wrongly issued this restriction requirement because the applicant could not "elect" to pursue the process claims regardless of whether they remained a part of this application.  The issued '106 patent already claimed these processes.  Therefore, the only correct rejection would have been an actual (*i.e., not* provisional) double patenting rejection.

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 17 of 25

## V.    The Law of Claim Construction

The first step in an invalidity analysis is to ascertain the meaning and scope of the claims. *See Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350 (Fed. Cir. 1999). This analysis, called claim construction, is an issue of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*). The Federal Circuit ruled on the manner for carrying out claim construction in its *en banc* decision in *Edward H. Phillips v. AWH Corp., Hopeman Brothers, Inc., and Lofton Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

According to the *Phillips* case, claim interpretation begins with an inquiry into how a person of ordinary skill in the art understands a claim term. *Id.* at 1313. The sources available to understand disputed claim language include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence, including relevant scientific principles, the meaning of technical terms, and the state of the art. *Id.* at 1314.

First, the particular claims to be construed are reviewed, including the context in which the disputed term is used in these claims. This review may include consideration of other claims of the patent, both asserted and unasserted. *Id.* at 1314, 1315. For example, if an independent claim in a patent is followed by a further dependent claim that adds a particular limitation, this gives rise to a presumption that the limitation in question is not present in the independent claim. *Id.* at 1315.

Second, the claims must be read in view of the specification. *Id.* at 1315. Indeed, "[t]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Id.* at 1315, quoting *MultiForm Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998). "It is therefore entirely appropriate for a court, when conducting claim construction to rely heavily on the [specification] for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317. In reviewing the specification, however, a court must avoid reading limitations from the specification into the claims, a task that can be difficult to accomplish in practice. *Id.* at 1323. A key to making a proper reading of the claims in light of the specification is to keep in mind that "the purposes of the specification are to teach and enable those of skill in the art to make and use the invention." *Id.* at 1323. "One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.* at 1323, 1324.

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Third, the patent's prosecution history should also be consulted in construing the claims as the patentee created it in attempting to explain and obtain the patent. *Id.* at 1317. "[T]he prosecution history can often inform the meaning to the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317.

Finally, extrinsic evidence, although less reliable than intrinsic evidence, may be used to determine how to read claim terms. Such extrinsic evidence may include expert testimony, dictionaries and learned treatises. *Id.* at 1317, 1318. However, such extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of intrinsic evidence." *Id.* at 1319. The *Phillips* case emphasized that the dictionary definitions of claim terms, whether taken from general or technical dictionaries, are not to be given primacy over intrinsic evidence in the construction of claims. *Id.* at 1321, 1322.

In conclusion, the *Phillips* case made clear that there is no rigid algorithm for claim construction. That is, there is no legally prescribed sequence of steps to be taken in claim construction. It is permissible for a court to consult a dictionary before it has completed its review of the intrinsic evidence, but the court must give appropriate weight to the sources consulted in its claim construction. For example, as explained above, intrinsic evidence such as the claims and the specification are to be given more weight than extrinsic evidence in conducting claim construction. *Id.* at 1324.

The preamble of a patent claim is construed like all other claim language, in view of the language of the claim itself, the patent specification, and the patent prosecution history. *Bell Communications v. Vitalink Communications*, 55 F.3d 615, 620 (Fed. Cir. 1995). Thus, whether and to what extent a preamble limits the claim in which it appears is a matter to be determined on the facts of each case. *Id.* "In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning and vitality' to the claim." *Catalina Marketing Int'l. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)) Preamble language that merely describes the intended use of the invention is generally not construed as a limitation. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861 (Fed. Cir. 1985). The Federal Circuit has held that the determination of whether preamble recitations are structural limitations or mere statements of purpose or use "can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Corning Glass Works*, 868 F.2d at 1257. This inquiry involves examination of the entire patent to determine what invention the patentee intended to define and protect. *See Bell Communications*, 55 F.3d at 621; *In re Paulsen*, 30 F.3d

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

1475, 1479 (Fed. Cir. 1994); *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 689 (Fed. Cir. 1990).

## VI.    Construction of the Claims of the '063 Patent and Earlier '106 Patent

Before an analysis of non-statutory double patenting may proceed, the pertinent claims of the '063 patent as well as the claims of the earlier '106 must be construed. However, Judge Mary L. Cooper, of the District Court of New Jersey has already construed, in prior litigation concerning the '063 patent, particular claims of both '063 patent and the '106 patent in *Astellas Pharma, Inc. v. Ranbaxy Inc.* 2007 WL 576341 (D.N.J. February 21, 2007) (MLC) ("the *Ranbaxy* case"). While Judge Cooper's claim construction in the *Ranbaxy* case does not bind Impax, it would collaterally estop Astellas Pharma from arguing for a different construction in any prospective litigation with Impax. *See Pfaff v. Wells Electronics, Inc.*, 5 F.3d 514, 518 (Fed. Cir. 1993), *aff'd*, 525 U.S. 55, (1998). ("Here, the district court and both parties agree that the claim interpretation of the Indiana case-that 'the claim requires the coaction of the spreader means with the pin ends' inner edges which define the cavity'-controls in this case. They are correct. The prior claim interpretation has issue preclusive effect in the present case insofar as it was necessary to the judgment of noninfringement in the previous case."); *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 654 (Fed. Cir.1984) ("As held in *A.B. Dick,* where a determination of the scope of patent claims was made in a prior case, and the determination was essential to the judgment there on the issue of infringement, there is collateral estoppel in a later case on the scope of such claims, i.e., the determined scope cannot be changed.").

Nevertheless, at least for purposes of this Statement, Impax accepts the following claim construction determined by Judge Cooper in the *Ranbaxy* case and applies that construction here:

> [W]e construe claim 4 of the '106 patent to be a claim for a process to make the named compound, 5-[2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl]-2-methoxy-benzensulfonamide. We construe independent claim 1 of the '063 patent and its dependent claims 4, 8, 10 & 14 to be claims for the compound sulfamoyl-substituted phenethylamine derivative. We construe individual claim 2 of the '063 patent as a claim for a pharmaceutical composition of the named compound, having the stated pharmaceutical properties. In rendering this claim construction, we have considered the fact that the intrinsic evidence relating to both patents is a virtually identical specification.

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

*Ranbaxy*, at *4.

In defining claim 2 of the '063 patent Judge Cooper's use of the phrase "stated pharmaceutical properties" must mean, and only mean, α-adrenergic antagonist activity because that is both the only pharmaceutical property set forth in claim 2 of the '063 patent and the only pharmaceutical property identified in the specification of either the '063 or '106 patents in any of the claimed compounds. Alpha-adrenergic activity is the only useful activity identified with the compounds claimed in either the '063 patent and those made by the processes claimed in the '106 patent. Moreover, the specification of the '106 patent uses the term "5-{2-[2-(2-ethoxyphenoxy)-ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide" in claim 4 of the '106 patent to mean the racemate of this compounds as well as its (+) and (-) optical isomers ("the compound of this invention include the salts thereof, the racemic compounds thereof, a mixture of the racemic compounds, and each optically active substance." '106 Specification, col. 2, ln. 67 – col. 3, ln. 2). Claim 4 of the '106 patent therefore means:

> The process as defined in claim 3 for the preparation of the (-)-optical isomer [tamsulosin], the (+)-optical isomer and the racemate of 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide.

In short, as found by the New Jersey District Court, "the process claimed in the '106 patent, when practiced, will produce tamsulosin, as well as other compounds within the class of sulfamoyl-substituted phenethylamines. Nor do the parties dispute the compound claimed in the dependent claim 14 of the '063 patent is tamsulosin." *Ranbaxy*, at *3.

Claim 14 of the '063 patent means the single compound described by the chemical formula 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxy-benzenesulfonamide – whose (-)-optical isomer is tamsulosin. The respective specifications of the '106 patent and the '063 patent are not materially different and Astellas Pharma did not argue otherwise in the *Ranbaxy* case.

## VII.    All Claims of the '063 Patent are Invalid for Non-Statutory Double Patenting Over The '106 Patent Claims

### A.    The Law of Non-Statutory Double Patenting

The doctrine of obviousness-type or nonstatutory double patenting prohibits a party from "obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent." *Eli*

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

*Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001). As stated in *Lilly,*

> A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim. In re Longi, 759 F.2d at 896, 225 USPQ at 651 (affirming a holding of obviousness-type double patenting because the claims at issue were obvious over claims in four prior art patents); In re Berg, 140 F.3d at 1437, 46 USPQ2d at 1233 (Fed. Cir. 1998) (affirming a holding of obviousness-type double patenting where a patent application claim to a genus is anticipated by a patent claim to a species within that genus).

*Lilly,* 251 F.3d at 958. In *Lilly,* the Federal Circuit further explained the underlying basis for the doctrine of obviousness-type double patenting, as follows:

> As one of our predecessor courts explained, [t]he fundamental reason for the rule [of obviousness-type double patenting] is to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about.

*Lilly,* at 967-68, quoting *In re Van Ornum,* 686 F.2d 937, 943-944 (CCPA 1982) and *In re Schneller,* 397 F.2d 350, 354 (CCPA 1968).

The Federal Circuit has enunciated a two-step analysis to determine whether a patent is invalid for nonstatutory double patenting. First, the court must construe the claims in the earlier patent and the claims in the later patent and determine the differences between the claims. *Lilly,* 251 F.3d at 968. Second, the court must determine whether the differences in subject matter between the earlier and later claims render the claims patentably distinct. *Id.* A later claim that is not patentably distinct from an earlier claim is invalid for nonstatutory double patenting.

With respect to the second prong of this test, the Federal Court has confirmed that the analysis for nonstatutory double patenting is different from an obviousness analysis under 35 U.S.C. § 103. *Geneva Pharms., Inc. v. GlaxoSmithKline,* 349 F.3d 1373, 1377-78 n.1 (Fed. Cir. 2003). In doing so, this Court explained the reasons why a determination of nonstatutory double patenting is not subsumed by the obviousness analysis under § 103:

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

1. The objects of comparison are very different: Obviousness compares claimed subject matter to the prior art; nonstatutory double patenting compares claims in an earlier patent to claims in a later patent or application;

2. Obviousness requires inquiry into a motivation to modify the prior art; nonstatutory double patenting does not;

3. Obviousness requires inquiry into objective criteria suggesting non-obviousness; nonstatutory double patenting does not.

*Id.*

In assessing double patenting, the specification of the first patent may not be used as prior art; it may however be used to determine the meaning of terms in the patent claims. *In re Vogel*, 422 F.2d 438 (CCPA 1970); and *In re Braat*, 937 F.2d 589 (Fed. Cir. 1991). The portions of the specification which provide support for the patent claims may also be examined and considered. *In re Vogel* at 442. The prior art may be relied upon to assess the obviousness of variations between the limitations of the claims of the two patents in issue. *In re Vogel*, at 442 (relying on the prior art disclosure of the properties of a packaging material recited in a claim in issue); *Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1328 (Fed. Cir. 1999) (relying on prior art disclosures of properties of additives to gypsum board in rendering claims at issue invalid); and *Lilly*, 251 F.3d at 969 (relying on extrinsic evidence to support the prior art recognition of serotonin uptake inhibition as an inherent biological function of fluoxetine hydrochloride).

**B.    The District Court *Ranbaxy* Decision Rests Entirely Upon an Improper Distinction Between Process Claims and Compound Claims**

In the *Ranbaxy* case, Astellas Pharma insisted that the *difference in the type* of the claims between an earlier patent and the later patent not only mattered but determined the outcome of the obviousness-type double patenting inquiry. Astellas Pharma's position, which the District Court adopted, at least implicitly, was that a later compound claim could never be an obvious variant of an earlier process claim to make that same compound. More specifically, New Jersey District Court and Astellas Pharma regarded the asserted '063 patent claims[8] as patentably distinct and not obvious variants of earlier

---

[8] Only claims 1, 2, 4, 8, 10 and 14 of the '063 patent were at issue in the *Ranbaxy* case.

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 23 of 25

claims in the '106 patent because the earlier '106 patent claims claimed processes for making compounds, whereas the later '063 patent claims claimed compounds themselves, not processes to make them. This is wrong as a matter of law.

Case law both before and after the *Ranbaxy* case holds that obvious-type double patenting may be found between claims of different types. Most prominently, after the *Ranbaxy* case the Federal Circuit affirmed an obviousness-type double patenting summary judgment decision and held that earlier claims to a pharmaceutical composition comprising - (1) a metoprolol succinate core, (2) an inner, surrounding, controlled-release coating, and (3) an outer dissolving-resistant coating that released metoprolol succinate in or near the colon - made later claims to the compound metoprolol succinate unpatentable because this compound was an obvious variant of a composition comprising this compound. *In re Metoprolol Succinate Patent Litigation*, 494 F.3d 1011, 1017 (Fed. Cir. 2007).

In addressing a dispute between the parties in the *In re Metoprolol Succinate* case regarding whether the difference in the types between the earlier and later claims reflected a "genus/species relationship" or an "element/combination relationship," the Federal Circuit dismissed the proper characterization of the relationship as irrelevant to the obviousness-type double patenting inquiry. *Id.* at 1017 – 1018 ("This court has stated that such disputes 'about the characterization of the relation between two claims' in a double patenting context are irrelevant."), *citing In re Emert*, 124 F.3d 1458, 1461 – 62 (Fed. Cir. 1997) ("Emert insists that the claims stand in a combination ('624 patent) and subcombination ('887 application) relationship. The PTO insists that the claims stand in a genus ('887 application) and species ('624 patent) relationship.... In spite of the parties' eagerness to conform the round-peg facts of the case into semantic, square holes, the critical inquiry remains whether the claims in the '887 application define an obvious variation of the invention claimed in the '624 patent.").

Moreover, the Federal Circuit in *In re Metoprolol Succinate* distinguished an earlier Federal Circuit case that had held a later two-step process to decaffeinate coffee was not an obvious variant of an earlier nine-step process to recover caffeine because the earlier Federal Circuit case (*General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1281 (Fed. Cir. 1992)) "does not preclude a finding that a claim on a compound (A) cannot be an obvious variant of an earlier claim on a composition comprised of compound (A), inner layer (B), and outer layer (C)." *In re Metoprolol Succinate*, 494 F.3d at 1019.

Cases before *Ranbaxy* also stand for the proposition that a difference in the type of claims between earlier and later patents does not control the obviousness-type double patenting inquiry. *See Geneva*, 349 F.3d at 1385-86 (later method of use claim invalid as an obvious variant over an earlier compound claim); *In re Lonardo*, 119 F.3d 960, 967 –

Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting

Page 24 of 25

68 (Fed. Cir. 1997)(later method of use claim an obvious variant over an earlier product claim); *In re Freedman*, 166 F.2d 178, 179 (C.C.P.A. 1948)(later product claim obvious variant over and earlier process for making claim); *In re Braithwaite*, 379 F.2d 594, 599-600 (C.C.P.A. 1967)(later claim to product an obvious variant over earlier claim to process for using the product).

### C.   All Claims of the '063 Parent are Invalid for Non-Statutory Double Patenting

Claim 4 of the '106 patent recites a process for making 5-{2-[2-(2-ethoxyphenoxy) ethylamino] -2-methylethyl} -2-methoxybenzenesulfonamide. As discussed above at p. 12, this process covers the making of tamsulosin. Claim 3 of the '106 patent recites a process for making a genus of compounds, which includes tamsulosin and related compounds. The novelty and utility of these claimed processes resides entirely in making the compounds described and specifically named in these claims. More specifically, the patentability of claim 4 rests entirely on the novelty of the compound made by the process, not by the combination of process steps to make the compound, which are not novel in and of themselves apart from the compound they produce. More specifically as set forth in claim 4 of the '106 patent, converting a hydroxyl group (-OH) first to a halogen atom, and then to a hydrogen atom is not a novel process in and of itself.

Claim 3 of the '106 patent claims a process to make the same compounds later claimed in claims 3 – 5 of the '063 patent. The compound produced by the process of claim 4 of the '106 patent is a species of the genus and subgenera of claims 1 and 4 of the ' 063 patent and therefore obvious variants of '106 patent claim 4.

Claim 2 of the '063 patent claims a pharmaceutical composition that contains an effective α-adrenergic antagonistic amount of a compound of claim 1 of the '063 patent and a pharmaceutically acceptable excipient. The addition of a pharmaceutical excipient to this claim cannot make this claim patentably distinct from a claim without such an excipient. The addition of an excipient is an obvious variant of a composition containing this compound itself, and a composition with this compound is an obvious variant of the compound itself. Similarly, the recitation of the inherent α-adrenergic antagonistic amount of a compound of claim 1 cannot make this claim patentably distinct from a process for making the same compounds because the α-adrenergic antagonistic activity of these compounds was, at all relevant times, and is the only known property of these compounds that had and has any use. In short, claim 2 of the '063 patent claims a pharmaceutical composition that included the compound made by the '106 patent claim 4 process. For this reason, claim 2 of the '063 patent is not patentably distinct from claim 4 of the '106 patent.

**Impax Laboratories, Inc.'s Detailed Statement of the Factual and Legal Bases Why the Claims of U.S. Patent No. 4,703,063 are Invalid For Non-Statutory Double Patenting**

Claims 6 – 13 of the '063 patent claim racemic compound(s) and optically active isomers of compounds within claim 1 of the '063 patent. Claims 3 – 9 of the '106 patent claim processes that make compounds set forth in claims 6 – 13 of the '063 patent because the processes claimed in claims 3 – 9 of the '106 patent will result in the racemic compound or particular isomers based upon the starting material.

Claims 14 – 19 of the '063 patent each claim specific compounds within the genus set forth in claim 1 of the '063 patent. Each of these specific compounds is explicitly named, *in seriatim*, as the result of the processes claimed, respectively, in claims 4 – 9 of the '106 patent. For example, claim 4 of the '106 patent claims: "The process defined in claim 3 for the preparation of 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide." Claim 14 of the '063 patent claims: "The compound of claim 1 which is 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide." The only difference between these claims is the earlier '106 patent claims speak to processes to make compounds, while the later '063 claims speak to these same compounds themselves. This distinction in claim form, in and of itself, cannot make the later compound claims patentably distinct because compounds are obvious variants of processes to make those compounds whose entire novelty rests in the formation of the compound itself and not the process steps to make those compounds.

Astellas Pharma cannot cure the obviousness double patenting of its '063 patent claims over claims of the '106 patent by filing a terminal disclaimer because the '106 patent has already expired. *See In re Lonardo,* 119 F.3d at 965; *Eli Lilly & Co.,* 251 F.3d at 967 n.5. The '106 patent expired on February 5, 2001. Accordingly, each claim of the '063 patent is invalid.

# EXHIBIT 5

**Search results from the "OB_Rx" table for query on "020579."**

| | |
|---|---|
| Active Ingredient: | TAMSULOSIN HYDROCHLORIDE |
| Dosage Form;Route: | CAPSULE; ORAL |
| Proprietary Name: | FLOMAX |
| Applicant: | BOEHRINGER INGELHEIM |
| Strength: | 0.4MG |
| Application Number: | 020579 |
| Product Number: | 001 |
| Approval Date: | Apr 15, 1997 |
| Reference Listed Drug: | Yes |
| RX/OTC/DISCN: | RX |
| TE Code: | |
| Patent and Exclusivity Info for this product: | View |

Return to Electronic Orange Book Home Page

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs
Division of Labeling and Program Support
Update Frequency:

    Orange Book Data - **Monthly**

    Generic Drug Product Information & Patent Information - **Daily**

    Orange Book Data Updated Through June, 2008

    Patent and Generic Drug Product Data Last Updated: August 01, 2008

# EXHIBIT 6

04/06/2005 17:30 FAX  609 514   3       RANBAXY IP                    ☑002/031

# RANBAXY

RANBAXY INC., 600 COLLEGE ROAD EAST, PRINCETON, NJ 08540.  PHONE: (609) 720-9200  FAX: (609) 720-1155

George E. Heibel, Esq.
Senior Counsel – Global Intellectual Property
Direct Dial: (609) 720-5334
Facsimile: (609) 514-9779

April 6, 2005

VIA FACSIMILE – (203) 798-4408
CONFIRMATION VIA U.S. FIRST CLASS MAIL
RETURN RECEIPT REQUESTED

Michael Morris, Esq.
Vice President, Intellectual Property
Boehringer Ingelheim Corp.
900 Ridgebury Road/P.O. Box 368
Ridgefield, CT 06877
Telephone: (203) 798-5285

Re:   Tamsulosin Hydrochloride Capsules
      ANDA No. 77-451
      U.S. Patent No. 4,703,063

Dear Mr. Morris:

Pursuant to Section 505(j)(2)(B) of the Food, Drug and Cosmetic Act ("FDCA") and 21
C.F.R. 314.95, you are hereby notified as follows:

(1)   Ranbaxy Laboratories Limited ("RLL") has submitted and the FDA has received
an abbreviated new drug application ("ANDA") under FDCA Section
505(j)(2)(B)(ii) which contains bioavailability or bioequivalence data in order to
obtain approval to engage in the commercial manufacture, use or sale of drug
products containing **tamsulosin hydrochloride.**

(2)   RLL's ANDA referred to in paragraph (1) has been assigned No. 77-451.

(3)   The established name for the drug product is **Tamsulosin Hydrochloride,** and the
proprietary name of the drug product as listed in the 22nd edition of FDA's
publication entitled *Approved Drug Products with Therapeutic Equivalence
Evaluations* (2002) (the "Orange Book") is **Flomax.**

(4)   RLL's proposed drug products are in the form of capsules that contain 0.4 mg of
**tamsulosin hydrochloride** as the active ingredient.  U.S. Patent Nos. 4,731,478,
4,772,475, 4,868,216, and 4,703,063 are listed in the Electronic Orange Book
with respect to this drug product.  The Orange Book lists October 27, 2004,

Michael Morris, Esq.
April 6, 2005
Page -2-

February 27, 2006, September 19, 2006, and October 27, 2009 as the dates of expiration of these patents, respectively.

(5)     RLL's ANDA No. 77-451 contains a Paragraph III certification with respect to U.S. Patent Nos. 4,731,478, 4,772,475 and 4,868,216, indicating that RLL will not launch its product prior to the expiry of these patents.  RLL's ANDA No. 77-451 also certifies under FDCA Section 505(j)(2)(A)(vii), paragraph IV, that in the opinion of RLL and to the best of its knowledge, no claim of U.S. Patent No. 4,703,063 will be infringed by the manufacture, use, sale, or offer to sell of the drug product for which ANDA No. 77-451 has been submitted.  A detailed statement of the factual and legal basis for this opinion follows.

U.S. Patent No. 4,703,063 (the '063 Patent) is Invalid

The '063 Patent discloses sulfamoyl-substituted phenethylamine derivatives and processes for making the derivatives.  These compounds allegedly exhibit $\alpha$-adrenergic blocking properties.  The '063 Patent also indicates that these compounds may be formulated into pharmaceutical compositions, and that such compositions may be clinically administered.  The '063 Patent contains a total of 19 claims.  Claims 1, 2, and 11 are independent.

Claim 1 is directed to a set of sulfamoyl-substituted phenethylamine derivatives, and it recites:

1. Sulfamoyl-substituted phenethylamine derivatives represented by the general formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a lower alkoxy group or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom, and the salts thereof.

Claim 2 recites:

2.     A pharmaceutical composition containing an effective $\alpha$-adrenergic antagonistic amount of a compound of claim 1 and a pharmaceutically acceptable excipient.

Michael Morris, Esq.
April 6, 2005
Page -3-

Claim 11 recites:

11.    The optically active isomers of the compound of claim 7.

Claims 3-8 and 14-19 depend from Claim 1.  Claims 3-8 and 14-19 recite:

3.    The salts of the sulfamoyl-substituted phenethylamine derivatives as claimed in claim 1 wherein $R_3$ is a lower alkyl group or a lower alkoxy group.

4.    The compound of claim 1 wherein $R_3$ is a hydrogen atom and the salts thereof.

5.    The compound of claim 1 wherein $R_3$ is a lower alkyl group and the salts thereof.

6.    The compound of claim 1 which is a racemic compound.

7.    The compound of claim 1 which is a mixture of racemic compounds.

8.    The compound of claim 1 which is an optically active isomer.

14.    The compound of claim 1 which is 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide.

15.  The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide.

16.    The compound of claim 1 which is 5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-2-methylbenzenesulfonamide.

17.    The compound of claim 1 which is 5-{2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide.

18.    The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N-methylbenzenesulfonamide.

19.    The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N,N-dimethylbenzenesulfonamide.

Claims 9 and 10 depend from Claim 8.  Claims 9 and 10 recite:

Michael Morris, Esq.
April 6, 2005
Page -4-

9.    The isomer of claim 8 which is the (+) isomer.

10.   The isomer of claim 8 which is the (-) isomer.

Claims 12 and 13 depend from Claim 11.  Claims 12 and 13 recite:

12.   The isomer of claim 11 which is the (+) isomer.

13.   The isomer of claim 11 which is the (-) isomer.

The "Background of the Invention," section of the '063 Patent includes description of a compound found in British Patent No. 2,006,772 (hereinafter "the UK '772 Patent") having the structure:



'063 Patent, col. 1, lines 24-38.  This compound differs from certain of the claimed compounds only insofar as this compound contains an hydroxyl group.

The "Summary of the Invention" section of the '063 Patent provides, as a generic structure, the same structure recited in Claim 1.  The descriptions of the possible substitutents are, however, broader than those recited in Claim 1.  Specifically, in addition to the options recited in Claim 1, $R_3$ may be a halogen atom or a phenylthio or phenylsulfinyl group and Y can be a methylene group, provided $R_2$ is not a hydroxyl group.

The "Description of the Preferred Embodiments" section of the '063 Patent contains several brief definitions followed by a description of general synthetic schemes for making the compounds disclosed, a description of studies showing the activity of the compounds, and a series of examples describing the synthesis of specific compounds.  The brief definitions section includes the statement:

[f]urthermore, since the compounds of this invention shown by formula I can readily form the salts thereof and contain asymmetric carbon atom(s), the compounds of this invention include the salts thereof, the racemic compounds thereof, a mixture of racemic compounds, and each optically active substance.

Michael Morris, Esq.
April 6, 2005
Page -5-

(col. 2, line 66 to col. 3, line 4). Two general synthetic schemes are presented. (col. 3, line 15 to col. 7, line 20). The compounds shown throughout the described schemes may contain one or more chiral centers; nonetheless, no stereochemistry is depicted. Results from biological tests allegedly showing the α-adrenergic blocking action and antihypertensive effects of the compounds are also presented. These results are compared with similar tests on a compound disclosed in the UK '772 Patent and a compound identified as "phentolamine." (col. 7, line 20 to col. 8, line 18). Finally, the '063 Patent contains two reference examples describing the synthesis of starting materials and 28 other examples purporting to describe the synthesis of specific compounds within the class defined by generic formula I. The examples include analytical and spectroscopic data characterizing the synthesized compounds. None of these examples depict a structure describing specific stereochemistry, nor do any describe measurements that would indicate optical activity.

The '063 Patent issued from U.S. Application Serial No. 06/756,790 ("the '790 Application"), which was a continuation of U.S. Application Serial No. 06/632,258 ("the '258 Application"), which was a continuation of U.S. Application Serial No. 06/403,006 ("the '006 Application"), which was a divisional of U.S. Application Serial No. 06/231,421 ("the '421 Application"). The "grandparent" '258 Application issued as U.S. Patent No. 4,558,156 ("the '156 Patent"). The "great-great-grandparent" '421 Application issued as U.S. Patent No. 4,373,106 ("the '106 Patent").

## The '421 Application

The '421 Application was filed on February 4, 1981, claiming priority to Japanese Patent Application No. 14382/1980, filed February 8, 1980. The '421 Application was filed with four independent claims and 21 dependent claims.

An Office Action rejected Claims 1-9 over United States Patent No. 4,217,305 ("the '305 Patent"), in view of U.S. Patent No. 3,860,647 ("the '647 Patent"), and U.S. Patent No. 4,137,328. The Examiner also rejected Claims 10-25 as improper for reciting a Markush-type group of possible reactions and steps, thus rendering the claimed process vague and indefinite. The Examiner asserted that the '305 Patent discloses structurally similar compounds, thus rendering the pending claims *prima facie* obvious. The Examiner also asserted that the 2-OH ethylamino group could be considered a homolog of the claimed 2-methoxy ethylamino derivative. The Examiner further asserted that the '647 and '328 Patents teach that the α-carbon may be substituted with hydrogen (*i.e.*, corresponding to $R_3$=H), thus rendering the $R_3$=alkyl compounds structurally obvious. Finally, the Examiner cited six additional references to support the position that various sulfamoyl and sulfamide phenethylamines with a hydroxy substituent were obvious.

Applicants filed an amendment to correct a number of allegedly editorial errors in the specification and in Claim 11. Applicants cancelled Claims 10, 12-15, and 19, and added new

Michael Morris, Esq.
April 6, 2005
Page -6-

Claims 26-30. Finally, Applicants amended Claims 16-18 to depend from new Claim 29 and Claims 20-25 to depend from new Claim 27.

Applicants noted that the '305 Patent corresponded to the UK '772 Patent, discussed on pages 2 and 12 of their application. Applicants argued that the data provided established that the claimed compounds are markedly superior to the closest compound disclosed in the '305 Patent. With regard to the '647 and '328 Patents, Applicants argued that the utility of compounds having β-adrenergic antagonist activity and β-receptor stimulating properties was different than that of the claimed α-adrenergic blocking compounds.

A final Office Action rejected Claims 1-9, 16-18, 26, 28 and 29, and deemed Claims 10, 12-15, and 19 allowable. Claims 1-9 stood rejected as unpatentable over the '305 Patent in view of the '647 Patent. The Examiner did not find Applicants' response persuasive because the closest compounds were not compared. Claim 28 was rejected for reciting a Markush group of reactants, and Claims 16-18 were rejected for lacking an antecedent basis. Claim 26 was rejected for lack of enablement on the grounds that the preparation of $R_3$=halogen derivatives by one step contradicted Claim 28, wherein the preparation of $R_3$=iodine required three steps.

Applicants cancelled Claims 16-18, 28, and 29, amended Claim 26 to replace "halogen" with "chlorine or bromine," and added new Claims 31-33 in place of cancelled Claim 28.

Applicants acknowledged an error in the specification in the paragraph describing the reference compound on page 12. Applicants argued that the compound of Example 11 was the closest compound of the present invention to the prior art, and that the Example 11 compound had superior α-adrenergic blocking activity than Compound A of the UK '772 Patent. Applicants argued that the Examiner was incorrect in concluding that the hydrochloride salt would be expected to produce better results because of its greater solubility than the basic compound. Applicants asserted that with regard to the compounds of the invention, there was no difference in bioavailability between the basic compounds and the hydrochlorides. Finally, Applicants argued that the compounds of the invention possessed only α-adrenergic blocking action without the deleterious side effects associated with β-adrenergic blocking action, which the reference compounds possess.

An Advisory Action was mailed on July 1, 1982, stating that Claims 11, 20-27, and 30-33 would be allowable, and that Claims 1-9 would not be allowable without submission of the proposed declarations and a comparison commensurate with the scope of the claims.

Applicants filed a Supplemental Amendment on July 14, 1982, canceling Claims 1-9 "without prejudice to applicants' right to file a Divisional or Continuation application covering the subject matter thereof." A Notice of Allowability deemed Claims 11, 20-27, and 30-33 allowed. The '421 Application issued as the '106 Patent.

Michael Morris, Esq.
April 6, 2005
Page -7-

### The '006 Application

The '006 Application (a divisional of the '790 Application) was filed on July 27, 1982. A request for filing a divisional application under 37 C.F.R. § 1.60 was filed along with the application, cancelling Claims 10-25, leaving independent Claims 1 and 9.

The Examiner rejected Claims 1-9. Claim 9 was rejected as indefinite, and Claims 1-9 were rejected over U.S. Patent No. 4,217,305, in view of U.S. Patent No. 3,860,647. The Examiner asserted that the '305 Patent discloses all moieties of the claimed compound except the hydroxy substituent on the ethyl group between the benzenesulfonamide and the amino group, and that the claimed compounds were structurally obvious where $R_3$ = alkoxy. The Examiner further asserted that the '647 Patent, directed to the same use as the '305 Patent, teaches ortho-hydroxy sulfonamides where Y = hydrogen or hydroxy, and that the use of hydrogen or its homolog such as lower alkyl on the chain in place of hydroxy would be well within the ordinary skill of the art absent a showing of unobvious results.

Applicants amended Claim 9 to claim an effective $\alpha$-adrenergic antagonistic amount of the compound of Claim 1 and a pharmaceutically acceptable excipient. Applicants argued that the claimed invention was directed to a sulfamoyl-substituted phenethylamine derivative that exhibits $\alpha$-adrenergic blocking action and is useful as an anti-hypertensive agent and for the treatment of congestive heart failure. Applicants characterized the '305 Patent as being directed to sulfamoyl-substituted phenethylamine derivatives that exhibit $\alpha$-adrenergic action and also $\beta$-adrenergic blocking action. In addition, Applicants argued that the compounds disclosed in the '305 Patent required a hydroxyl group on the first carbon adjacent to the benzenesulfonamide moiety. Applicants asserted that the compounds of the claimed invention lack such an hydroxy group and argued that the removal of the hydroxy group provided a substantial increase in $\alpha$-adrenergic blocking activity.

Applicants argued that the pharmaceutical composition whose main activity involves the $\alpha$-adrenergic antagonistic effect is a valuable composition, and that while the elimination of the hydroxyl group on the 1-position might appear trivial, the unobvious and unexpected result of the structure differences provide the composition with its main activity. Applicants asserted that although the compounds of Claim 1 may be homologs when $R_3$ is an alkoxy group, it would be unexpected that the composition would have such an increase in the $\alpha$-adrenergic blocking activity. Applicants asserted that the compounds of Claims 2-8 were not homologs or analogs of the compounds disclosed in the '305 Patent.

Applicants argued that the deficiencies of the '305 Patent were not cured by the '647 Patent. Applicants asserted that the '647 Patent does not permit a phenoxy group in the R' substituent and therefore it neither teaches nor suggests compounds that have a structure closely related to the compositions of the claimed invention.

Michael Morris, Esq.
April 6, 2005
Page -8-

Applicants argued that one skilled in the art would not combine the '647 Patent with the '305 Patent. Applicants argued that the examples in the specification compare a composition of the type disclosed in the '305 Patent with several compositions of the claimed invention, and that it was clear from these examples that the compositions of the claimed invention have superior properties when compared to the compounds of the '305 Patent and the known compound phentolamine.

A final Office Action was mailed, maintaining the rejection of Claims 1-9 as unpatentable over the '305 Patent in view of the '647 Patent. The Examiner argued that the comparative data showing unobvious results did not overcome the rejection on the grounds that the showing was not commensurate with the scope of the claims and the reference, and that the results are not unobvious.

The Examiner reiterated that Claim 2 recites that $R_3$ can be a hydrogen atom or an alkyl and the '647 Patent teaches that in phenethanolamines similar to those disclosed in the '305 Patent, the hydroxy substituent is equivalent to a hydrogen atom (citing the definition of Y). The Examiner further asserted that an alkyl is homologous to a hydrogen atom.

In response to Applicants' reference to the differences in activity, the Examiner asserted that Applicants did not show that the teachings of the '647 Patent with regard to β-blocking would eliminate the α-adrenergic blocking actions of the compounds disclosed in the '305 Patent.

**The '258 Application**

The '258 Application was filed as a continuation of the '006 Application. A final Office Action was mailed in connection with the '258 Application, maintaining the rejection of Claims 1-9 as unpatentable over the '305 Patent in view of the '647 Patent. The Examiner asserted that the only difference occurred at the claimed $R_3$ position (hydroxyl group of the reference versus the claimed $R_3$ as H, alkyl, alkoxy, etc.), and that the '647 Patent, directed to the same use as the '305 Patent, taught ortho-hydroxy sulfonamides with Y as either hydrogen or hydroxy. The Examiner noted that Applicants had not overcome the rejection.

Applicants amended Claim 1 to indicate that the $R_3$ group could be a halogen atom, a phenylthio group, or a phenylsulfinyl group, thus removing hydrogen, lower alkyl, and lower alkoxy as possible substituents. Claims 2-9 were replaced by new Claims 26-34 directed to subgeneric and species claims wherein the individual members of the Markush group defining the $R_3$ group were specified. Applicants argued that in view of the present amendment to Claim 1, the $R_3$ moiety may be a halogen, phenylthio or phenylsulfinyl group, and that one of ordinary skill in the art and with only the '305 Patent before him would not find it obvious to prepare the novel derivatives of the claimed invention.

Michael Morris, Esq.
April 6, 2005
Page -9-

A Notice of Allowability was mailed, deeming Claims 1 and 26-34 allowed in view of Applicants' communication filed on April 29, 1985. The '258 Application issued as the '156 Patent.

### The '790 Application

The '790 Application was filed as a continuation of the '063 Patent on July 18, 1985. In the request for continuation, Claim 1 was cancelled leaving independent Claims 10 and 11.

A Preliminary Amendment was filed in which Claims 1 and 26-34 were cancelled and new Claims 35-49 were added. The new independent Claims 35 and 44 recite:

35.    Sulfamoyl-substituted phenethylamine derivatives represented by the general formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a halogen atom, a lower alkyl group, a lower alkoxy group, a phenylthio group, or a phenylsulfinyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being, however, an oxygen atom when $R_2$ is a hydroxyl group, and the salts thereof.

44.    Sulfamoyl-substituted phenethylamine derivatives represented by the general formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a lower alkyl group, [or] a lower alkoxy group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$

Michael Morris, Esq.
April 6, 2005
Page -10-

represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being, however, an oxygen atom when $R_2$ is a hydroxyl group, and the salts thereof.

Applicants argued that new Claims 35-43 were identical to Claims 1-9 as originally filed in the "grandparent" '006 Application, and that Claims 44-49 were directed to compounds and a pharmaceutical composition which differed from the sulfamoyl-substitute phenethylamine derivatives of Claim 35, in that the $R_3$ group represented a hydrogen atom, a lower alkyl group, or a lower alkoxy group only, leaving out the halogen atom, phenylthio, and phenylsulfinyl groups found in Claim 35. Claims 46-48 were characterized as subgeneric to Claim 44 and directed to the individual members of the Markush group defining $R_3$ in Claim 44. Finally, Claim 49 was characterized as being directed to a pharmaceutical composition containing the compound of Claim 44.

A Supplemental Preliminary Amendment was filed, cancelling Claims 35, 36 and 43-49 and adding new Claims 50-55. Independent Claim 50 recited:

50.  Sulfamoyl-substituted phenethylamine derivatives represented by the general formula



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being, however, an oxygen atom when $R_2$ is a hydroxyl group, and the salts thereof.

A Second Supplemental Preliminary Amendment was filed, adding dependent Claims 56-63, characterized as being directed to racemic compounds and isomers of the compounds of generic Claim 50. Applicants cited page 5 of the specification for support for the entry of the new claims in which they stated that it was clearly indicated that the compounds of the invention include the racemic compounds, mixtures of the racemic compounds and each optically active substance.

An Office Action was mailed, in which the Examiner withdrew Claims 10-25 and 52 from consideration and rejected Claims 50-51, 53-63 and 37-42. Restriction to one of four distinct inventions was required under 35 U.S.C. § 121 as follows:

Michael Morris, Esq.
April 6, 2005
Page -11-

Group I (Claims 50-51, 53-63 and 37-42, drawn to sulfonamide compounds and compositions containing them, classified in Class 564, Subclass 86, for example);

Group II (Claim 52, drawn to a method of producing α-adrenergic blocking action, classified in Class 514, Subclass 603, for example);

Group III (Claims 10 and 12-25, drawn to a process of producing sulfonamide compounds, classified in Class 564, Subclass 86, for example); and

Group IV (Claim 11, drawn to a process of producing sulfonamide compounds, classified in Class 564, Subclass 86, for example).

A provisional election was made with traverse to prosecute the invention of Group I (Claims 50-51, 53-63 and 37-42).

Claims 50, 53-63 and 37-42 were rejected under the judicially created doctrine of non-statutory double patenting as being unpatentable over the prior invention as set forth in Claims 1-9 of Imai et al., U.S. Patent No. 4,217,305, in view of Colella et al., U.S. Patent No. 3,860,647. The Examiner argued that motivation to modify the specific compounds claimed in the prior art document was found in the suggestions of the generic claims concerning substituent groups, and in the teaching of the interchangeability of hydroxy and hydrogen on the alkylene moiety bridging the sulfonamide phenyl and the amine group of similar compounds in the '647 Patent.

Claims 50-51, 54, 37, 58 and 60 were also provisionally rejected under the judicially created doctrine of non-statutory double patenting as being unpatentable over Claims 3-6 of copending application Serial No. 803,204 ("the '204 Application"). The Examiner asserted that, although the conflicting claims were not identical, they were not patentably distinct from each other because the stipulations of optical activity and (-)-isomer which were incorporated into the specific compound claims of the '204 Application were clearly encompassed by the cited claims in the present application.

Claims 50-51, 53-63 and 37-42 were rejected as being unpatentable over Oxford et al., U.S. Patent No. 4,140,713 taken with Colella et al., U.S. Patent No. 3,860,647, and Augstein et al., U.S. Patent No. 3,723,524. The Examiner asserted that the '713 Patent disclosed compounds that differed from the claimed compounds, and that the reference teaches the interchangeability of the substituent schemes specifically shown and the 1-4 carbon containing alkoxy required by most of the pending claims. In addition, the Examiner asserted that the '524 Patent disclosed the interchangeability of halogen and hydrogen, lower alkyl and lower alkoxy substituents, and suggested alkyl substitution on the sulfonamide nitrogens on similar compounds. The Examiner asserted that the '647 Patent suggested the equivalents of hydrogen and hydroxy substitution on the alkylene chain between the sulfonamide phenyl and the amino moiety. Finally, the Examiner asserted that there was nothing in the specification or the prior art to indicate that the various optical and stereo-isomers of the compounds were not prepared in the course of utilizing the prior inventions.

Michael Morris, Esq.
April 6, 2005
Page -12-

Applicants amended Claim 50 to define the Y moiety as only oxygen, and to include a lower alkoxy group in the definition of $R_3$. Applicants argued that Claims 50, 53-63 and 37-42 would not be obvious under the judicially created doctrine of non-statutory double patenting in view of their previously issued '305 Patent and the '647 Patent because the compounds disclosed in the '305 Patent contain an hydroxyl group on the carbon atom bonded to the aromatic ring. Applicants further noted that all of the compounds disclosed in the 77 examples of the '305 Patent include this hydroxyl group. Applicants asserted that the '647 Patent did not overcome the deficiencies of the primary reference because the disclosed compounds were structurally dissimilar and that nothing in the references suggested modification of the hydroxyl group.

Applicants also argued that Claims 50, 51, 54, 37, 58 and 60 would not be obvious under the judicially created doctrine of non-statutory double patenting over Claims 3-6 of Applicants' copending '204 Application. Applicants also noted that a Terminal Disclaimer together with the showing that the conflicting application and the present application were commonly owned would remove this rejection.

In response to the obviousness rejection under 35 U.S.C. § 103 over the '713 Patent, the '647 Patent and the '524 Patent, Applicants argued that it would be highly unlikely that one of ordinary skill in the art would manipulate the compounds disclosed in the '713 Patent by modifying groups to arrive at a compound structurally similar to the claimed compounds. Applicants argued that one cannot easily predict the biological effect of changes in substituents on a molecule, and that in some cases, modification in the length of an alkyl chain could cause differences in biological effects.

A final Office Action was sent, rejecting Claims 37-42, 50, 51 and 53-63, maintaining the provisional rejection of Claims 50, 51, 54, 37, 58 and 60 under the judicially created doctrine of non-statutory double patenting as being unpatentable over Claims 3-6 of the copending '204 Application. In addition, the Examiner maintained the rejection of Claims 50, 51, 53-63 and 37-42 under 35 U.S.C. § 103 as being unpatentable over the '713 Patent combined with the '647 Patent and the '524 Patent for the reasons presented in the previous Office Action.

Applicants filed a Response and cancelled claims to the non-elected inventions as requested by the Examiner. In response to the obviousness rejection, Applicants maintained their argument that the '713 Patent disclosed compounds that differed from the claimed compounds in numerous ways. Applicants submitted a Declaration under Rule 132 executed by Dr. Toichi Takenaka, setting forth comparative data for compounds of the '713 Patent and the claimed compounds. Applicants argued that from the evidence presented in the declaration one could conclude that the claimed compounds were superior to those in the '713 Patent in $\alpha$-adrenergic blocking action.

In response to the provisional rejection under the judicially created doctrine of non-statutory double patenting over claims of Applicants' copending '204 Application, Applicants

Michael Morris, Esq.
April 6, 2005
Page -13-

again noted that a Terminal Disclaimer together with a showing that the conflicting application
and the present application were commonly owned would remove this rejection. Applicants also
noted that because the instant application had an earlier filing date than the copending '204
Application, that a Terminal Disclaimer in the instant application would not be necessary.
Applicants stated that if a Terminal Disclaimer were required, it should be required in the later-
filed '204 Application.

A Notice of Allowance was mailed on May 27, 1987, and the '790 Application
subsequently issued as the '063 Patent. No terminal disclaimer was filed in the case.

An Application for Patent Term Extension under 35 U.S.C. § 156 was filed June 11,
1997, seeking extension of the term of the '063 Patent, which claims, *inter alia*, tamsulosin and
salts thereof, for a period of five years so that the expiration date of the patent would be changed
from October 27, 2004 to October 27, 2009. A letter from the Food and Drug Administration,
stamped June 26, 1998, indicates that the total length of regulatory review period for Flowmax™
was determined to be 3,529 days and that of this time, 3,163 days occurred during the testing
phase and 366 days occurred during the approval phase. Applicants elected an extension of
patent term for the '063 Patent on September 23, 1999.

## Construction Of The Limitation of a "Racemic Compound"

Claim 6 of the '063 Patent depends from Claim 1, and recites a "racemic compound."
The term "racemic compound" has a recognized meaning in the chemical arts, i.e., "any
homogeneous solid composed of equimolar amounts of enantiomeric molecules." There is no
contrary characterization of a "racemic compound" in the specification or prosecution history.
The IUPAC definition, for example, applies to "racemic compound."

## Construction Of The Limitation of a "Mixture of Racemic Compounds"

Claim 7 of the '063 Patent depends from Claim 1, and recites a "mixture of racemic
compounds." This phrase means "any homogeneous solid composed of equimolar amounts of
enantiomeric molecules." Thus, a "mixture of racemic compounds" has the following ordinary
meaning: a mixture, where each component of the mixture is a homogeneous solid composed of
equimolar amounts of enantiomeric molecules. No discussion in either the specification or the
prosecution history alters this ordinary meaning of "a mixture of racemic compounds."

## Construction Of Claim 11

Claim 11 recites: "The optically active isomers of the compound of claim 7." Although
this claim makes reference to Claim 7, Claim 11 should be construed as an independent claim.
Claim 7 is directed to a "mixture of racemic compounds." As discussed above, such a mixture
consists of a mixture of homogeneous solids containing equimolar amounts of enantiomeric
molecules. As such, the mixture would be optically inactive. Claim 11 recites subject matter not

Michael Morris, Esq.
April 6, 2005
Page -14-

embraced by Claim 7 and cannot incorporate all the limitations of Claim 7 and thus cannot depend from Claim 7.

Claim 11 is apparently directed to the specific stereoisomers present in the "mixture of racemic compounds" of Claim 7. Note that Claim 8 and Claim 11 are both directed to optically active isomers of the compounds of Claim 1 and appear have identical scope.[1] Similarly, Claims 9 and 10, which depend from Claim 8, may have the same scope as Claims 12 and 13, respectively, both of which depend from Claim 11. Claim 12 is directed to those stereoisomers of Claim 11 which are the (+) isomers. Claim 13 is directed to those stereoisomers of Claim 11 which are the (–) isomers.

Having considered the meaning of the claims, an analysis of the validity of the claims in the '063 Patent is now given.

## The Relevant Law Of Invalidity

The duration of a patentee's right to exclude others from practicing a claimed invention is statutorily defined in 35 U.S.C. § 154(a)(2). So called "obviousness-type double patenting" gives effect to that limited term by prohibiting a patentee from effectively obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned, earlier-expiring patent. A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim.

In determining whether claims are patentably distinct from each other, the court examines the later claims to see if they are the same as, or obvious variations of, the earlier claims. Since this test only operates to determine whether the *later* claims are patentable over the *earlier* claims, this test is typically referred to as the "one-way" test. It ensures that a patent owner cannot extend the patent term by obtaining a second patent for claims that are mere obvious variants of claims already received.

In a handful of special cases that have involved unusual circumstances, the Federal Circuit has made an exception to its standard practice of applying the one-way test, and instead applied a "two-way" test. Under the two-way exception, a court must apply the one-way test, but then also ask whether the *earlier* claims are obvious over the *later* claims, *i.e.*, the converse of the one-way test. The Federal Circuit has explicitly warned that this exception is a narrow one, to be applied only where unusual circumstances exist. For example, the Federal Circuit has explained that the exception should not be used where two patents have the same specification

---

[1]      An alternative interpretation leads to the conclusion that Claim 11 covers only the optically active isomers of the compounds of Claim 1 that are capable of forming as part of a racemic compound, and Claim 11 and Claim 8 may thus have different but nearly overlapping scopes.

Michael Morris, Esq.
April 6, 2005
Page -15-

and an applicant could therefore have filed the earlier and the later claims in the same application.

As recently discussed by the Federal Circuit in *Eli Lilly*, 251 F.3d at 968, claims in an earlier issued, co-owned patent may render later, co-owned claims invalid under the doctrine of non-statutory double patenting where the subject matter of the earlier claims anticipates the later claims under principles of inherency. Earlier claims directed to a process of making or process of using a composition may render later claims to that composition invalid for double patenting. *See, e.g., Geneva Pharms.*, 349 F.3d at 1385-86; *In re Lonardo*, 119 F.3d 960, 967-68 (Fed. Cir. 1997).

Under 35 U.S.C. § 121, double patenting law may not be used to invalidate claims in situations where the PTO has issued a relevant restriction requirement.. Section 121 will apply where "the earlier application . . . contain[s] formally entered claims that are restricted and removed, and . . . claims to the second invention reappear in a separate divisional application after the restriction." *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003). Further, "restriction requirements must provide a clear demarcation between the restricted subject matter to allow determination that claims in continuing applications are consonant and deserving of § 121's protections." *Id.* at 16. The regulatory requirements for a restriction requirement are set forth in 37 C.F.R. § 1.142.

The principle of consonance provides that an application is "entitled to the benefit of Section 121 so long as the claims continue to fall within the lines of demarcation among restricted inventions that were established by the original restriction requirement." *See Symbol Tech., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1579 (Fed. Cir. 1991). If the patent owner violates the principle of consonance, then the § 121 bar on double patenting rejections is not raised. Absent the § 121 bar, non-statutory double patenting becomes a potential basis for invalidating the claim. *Id.* A restriction requirement does not automatically carry over from one application to the next. *Bristol-Myers Squibb Co. v. Pharmachemie B.V.*, 361 F.3d 1343, 1348-1349 (Fed. Cir. 2004).

**Claims 1-19 of the '063 Patent Are Invalid for Non-Statutory Double Patenting Over One or More of Claims 3-9 of the '106 Patent**

Claims 3-9 of the '106 Patent recite:

3.    A process for producing sulfamoyl-substituted phenethylamine derivatives represented by the formula

04/06/2005 17:34 FAX  609 514 9  J      RANBAXY IP                    ☒017/031

Michael Morris, Esq.
April 6, 2005
Page -16-

wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxy group, a lower alkyl group or a lower alkoxy group; $R_3$ represents a hydrogen atom or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represent a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom or a methylene group; said Y being an oxygen atom when $R_2$ is a hydroxyl group, or the salts thereof which comprises reacting a compound represented by the formula



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_3$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in the above formula with a halogenating agent and reducing the halogenated product.

4.    The process as defined in claim 3 for the preparation of 5-[2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl]-2-methoxybenzenesulfonamide.

5.    The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-benzensulfonamide.

6.    The process as defined in claim 3 for the preparation of 5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-2-methylbenzenesulfonamide.

7.    The process as defined in claim 3 for the preparation of 5-[2-[2-(2-methoxyphenoxy)ethylamino]ethyl]-2-methylbenzenesulfonamide.

8.    The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-N-methylbenzenesulfonamide.

9.    The process as defined in claim 3 for the preparation of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-N,N-dimethylbenzenesulfonamide.

04/06/2005 17:35 FAX  609 514 9  J        RANBAXY IP                               ☑018/031

Michael Morris, Esq.
April 6, 2005
Page -17-


Claim 3 of the '106 Patent is directed to a process for making a genus of compounds. The genus defined in Claim 3 is substantially similar to the series of compounds claimed in Claim 1 of the '063 Patent. All of the compounds encompassed by Claims 3-5 of the '063 Patent are included within the definition of compounds prepared by the process of Claim 3 of the '106 Patent. Therefore, Claim 3 of the '106 Patent recites compounds that are also claimed as compounds, per se, in Claims 1 and 3-5 of the '063 Patent. Furthermore, each of the specific compounds identified in Claims 4-9 of the '106 Patent fall within the scope of the compounds recited in Claims 1 and 4 of the '063 Patent. As such, Claims 1 and 3-5 of the '063 Patent are not "patentably distinct" from the processes of Claims 3-9 of the '106 Patent; Claims 1 and 4 of the '063 Patent are effectively anticipated by Claims 3-9 of the '106 Patent and Claims 3 and 5 of the '063 Patent are anticipated by Claim 3 of the '106 Patent. Similarly, the specific compounds claimed in Claims 14-19 of the '063 Patent are among the compounds defined in Claim 3 of the '106 Patent and specifically named in Claims 4-9 respectively of the '106 Patent. Thus, the compounds of Claims 14-19 of the '063 Patent are not "patentably distinct" from the processes of making these compounds as recited in Claims 3-9 of the '106 Patent. Accordingly, Claims 1, 3-5, and 14-19 are invalid for non-statutory double patenting.[2]

Claim 2 of the '063 Patent is directed to a pharmaceutical composition that includes a compound defined in Claim 1 and an excipient. While the claims of the '106 Patent do not anticipate Claim 2 of the '063 Patent because the '106 Patent claims do not disclose an excipient, Claim 2 is nonetheless obvious over the Claims 3-9 of the '106 Patent. Those of skill in the art would have recognized that the compounds described in Claims 3-9 of the '106 Patent could be formulated in a conventional manner into a pharmaceutical composition. Therefore, Claim 2 of the '063 Patent is not patentably distinct from Claims 3-9 of the '106 Patent, as it is an obvious modification of the processes recited in those claims. As such, Claim 2 is invalid for non-statutory double patenting.

---

[2]      Because there was no restriction requirement imposed in the "parent" '258 Application, which issued as the '156 Patent, 35 U.S.C. § 121 does not shield the '106 Patent from invalidity based on the doctrine of non-statutory double patenting.

Michael Morris, Esq.
April 6, 2005
Page -18-

Claims 6-13 of the '063 Patent are directed to racemic compounds and optically active isomers of compounds claimed in Claim 1. Claims 3-9 of the '106 Patent define compounds embraced by the process of Claim 1 of the '063 Patent, and they do not recite any stereo-descriptors and thus cover both racemic mixtures and optically active compounds. The '106 Patent specification states that "the compounds of this invention include . . .the racemic compounds thereof, a mixture of the racemic compounds, and each optically active substance." ('106 Patent, col. 2, line 68 to col. 3, line 2). Thus, Claims 3-9 of the '106 Patent recite processes of making the racemic compounds and optically active isomers. Therefore, the racemic compounds and optically active isomers in Claims 6-13 of the '063 Patent are anticipated or rendered obvious by Claims 3-9 of the '106 Patent. *See In re Adamson*, 275 F.2d 952, 954 (C.C.P.A. 1960) (holding that claims directed to a stereoisomer were obvious over a prior disclosure of structures representing racemic mixtures of stereoisomers); *Brenner v. Ladd*, 247 F. Supp. 51 (D.D.C. 1965) (stating that "in the absence of unexpected or unobvious beneficial properties, an optically active isomer is unpatentable over either the isomer of opposite rotation or, as in this case, the racemic compound itself."). As such, Claims 6-13 of the '063 Patent are not "patentably distinct" from Claims 3-9 of the '106 Patent and are invalid for non-statutory double patenting.

Although the claims in the earlier '106 Patent are directed to a process for making compounds while the claims of the later '063 Patent are directed to the compounds themselves or compositions containing the compounds, the conclusions regarding double patenting remain. The claims of the '106 Patent clearly describe compounds falling within the scope of the compounds in the '063 Patent claims, thus providing an anticipatory disclosure or a basis for obviousness, thereby making the claims not "patentably distinct." *See In re Lonardo*, 119 F.3d 960, 968 (Fed. Cir. 1997) (holding that claims directed to a device rendered claims directed to a method of using the device invalid due to non-statutory double patenting, stating, "[w]e do not agree that there is a patentable distinction between the method of using the device and the device itself").[3] Furthermore, the later compound and composition patents effectively extend the term of the earlier process patent, triggering the policy rationale of double patenting.

## A.    Claims 8-13 of the '063 Patent Are Invalid for Lack of Enablement

Claims 8-13 are directed to optically active compounds. The '063 Patent describes two synthetic schemes for making the compounds described and claimed in the patent. Neither of these schemes depict stereochemistry, nor does either indicate how one might synthesize optically active isomers. None of the specific examples presented in the '063 Patent teach the synthesis of an optically active compound. The only support in the '063 Patent specification for optically active compounds is the statement that "since the compounds of this invention shown

---

[3]     We also note that Applicants originally presented compound claims, composition claims, and claims directed to methods of making the compounds together in the application that matured into the '106 Patent. The Examiner commenced examination of all of these claims without issuing a restriction requirement.

Michael Morris, Esq.
April 6, 2005
Page -19-

by formula I can readily form the salts thereof and contain asymmetric carbon atom(s), the compounds of this invention include the salts thereof, the racemic compounds thereof, a mixture of the racemic compounds, and each optically active substance." (col. 2, line 66 to col. 3, line 4).

The quantum of disclosure relating to optically active compounds in the '063 Patent is similar to the quantum of disclosure found inadequate, as a matter of law, to enable the claims in the patent at issue in *Genentech Inc. v. Novo Nordisk*, 108 F.3d 1361 (Fed. Cir. 1997). Despite the patentee's argument that the level of skill in the art was sufficient to provide any missing information, the court noted that "vague intimations of general ideas that may or may not be workable" does not satisfy the enablement requirement. *Id.* at 1366. The court observed that "[t]ossing out the mere germ of an idea does not constitute enabling disclosure." *Id.* Thus, Genentech's "vague statement of a problem" could not be "bootstrap[ed] . . . into an enabling disclosure sufficient to dominate someone else's solution of the problem." *Id.*

The '063 Patent only "toss[ed] out the mere germ of an idea" that the compounds it disclosed might be synthesized as optically pure compounds or otherwise prepared. It does not provide details necessary to enable the preparation of optically pure compounds.

"Process 1" in the '063 Patent describes a synthesis of some disclosed compounds (col. 3, line 15 to col. 6, line 45. The reaction scheme is as follows:

04/06/2005 17:35 FAX  609 514 9. .3      RANBAXY IP                                    ☑021/031

Michael Morris, Esq.
April 6, 2005
Page -20-

04/06/2005 17:35 FAX  609 514 9  J        RANBAXY IP                                    ⌀022/031

Michael Morris, Esq.
April 6, 2005
Page -21-

Although the starting material may have as many as four stereogenic centers, there is no indication that the starting material is optically active. None of the disclosed reaction steps is such that a stereochemically pure compound could be generated in the final product unless the starting material were optically active, thus "Process 1" in the '063 Patent does not teach how to obtain optically active compounds.

"Process 2" in the '063 Patent describes a two-step synthesis for some disclosed compounds. (col. 6, line 46 to col. 7, line 15). The first step is a condensation reaction followed by a reduction as follows:



The starting materials of this synthesis are not indicated as being optically active. Both steps of this reaction are non-stereospecific. The reaction could not generate a stereochemically pure product without a stereochemically pure starting material, thus "Process 2" does not teach how to obtain optically active compounds.

In contrast, U.S. Patent No. 4,731,478 ("the '478 Patent") teaches a synthesis of an optically active compound. In the '478 Patent, Applicants added further examples that described the synthesis of some optically active compounds. See for example, Examples 30(a), 31(a), 32(a), and 33(a). (col. 26, line 54 to col. 28, line 63). This synthesis is summarized by the following scheme:

04/06/2005 17:36 FAX  609 514 9     RANBAXY IP                      ☒023/031

Michael Morris, Esq.
April 6, 2005
Page -22-



(-)-2-(p-methoxyphenyl)-1-methylethylamine

acetic anhydride / pyridine

(R)(+)-N-acetyl-2-(p-methoxyphenyl)-1-methylethylamine

chlorosulfonic acid

NH$_3$(aq) / THF

(R)(+)-N-acetyl-5-[(2-amino-2-methyl)ethyl]-2-methoxybenzenesulfonamide

HCl

(R)(-)-5-[(2-amino-2-methyl)ethyl]-2-methoxybenzenesulfonamide

ethanol

NaOH

(R)(-)-5-[2-[[2-(o-ethoxyphenoxy)ethyl]amino]-2-methylethyl]-2-methoxybenzenesulfonamide

   This synthesis differs from "Process 2" of the '063 Patent in that it uses an optically active starting material and in that the compounds involved in the condensation reaction have different functional groups.  In the '478 Patent, Applicants presented different reaction details *not disclosed in the '063 Patent* in order to enable producing an optically active compound.  The '063 Patent does not disclose the optically active starting materials used in the '478 Patent.  *See*

04/06/2005 17:36 FAX 609 514 9    RANBAXY IP    ☑024/031

Michael Morris, Esq.
April 6, 2005
Page -23-

*In re Hawkins*, 486 F.2d 579, 581 (C.C.P.A. 1973) (upholding an enablement rejection where the specification did not enable those skilled in the art to make the necessary starting materials).

Applicants plainly recognized differences between the '478 Patent and the '063 Patent with respect to optically active compounds. During prosecution of the application that issued as the '478 Patent, the Examiner provisionally rejected claims directed to optically active isomers for double patenting over claims of the '790 Application. In response, Applicants stated, "[a]pplicants respectfully submit, however, that the claims of the present invention would not be obvious over the cited claims of their parent application, since Claims 3-6 of this invention recite optically active compounds." Thus, Applicants argued that Claims 58 and 60 of the '790 Application (became Claims 8 and 10 of the '063 Patent) are not directed to optically active compounds, contrary to the plain language of the claims.

The scope of Claims 8-13 is broad. Claims 8-13 together cover all optically active isomers of the compounds presented in Claim 1 of the '063 Patent. Claim 1, in turn, covers a large number of compounds (up to four stereogenic centers), as illustrated by the asterisks in the structure below:



For each compound having all four stereogenic centers, there may be sixteen different optically active isomers. The disclosure in the '063 Patent (insofar as it relates to optically active isomers) is insufficient to enable the full range of claim scope. Thus, claims 8-13 are invalid for lack of enablement. Further, as claim 8 depends from claim 1, to the extent that claim 1 is read to cover optically active compounds, it also is invalid for lack of enablement.

**Ranbaxy does not infringe Claims 3, 5-7, 9, 12, and 15-19 of the '063 Patent**

Ranbaxy's proposed tamsulosin-containing tablets will contain tamsulosin as the active ingredient, which has the chemical formula (-)-$(R)$-5-[2-[[2-(2-ethoxyphenoxy) ethyl] amino] propyl] -2- methoxybenzenesulfonamide, specifically the optically active (-) isomer thereof. Because the absence of any single claim limitation and its legal equivalent in the Ranbaxy product prevents a finding of infringement of these claims, there is no need to explore further differences between Ranbaxy's product and these patent claims once one limitation is found lacking. Accordingly, by identifying one particular difference between Ranbaxy's product or process and a claim, we do not, in any way, imply that any other differences beyond those discussed are either insignificant or do not exist.

04/06/2005 17:36 FAX  609 514 9. .J        RANBAXY IP                                      ⓐ025/031

Michael Morris, Esq.
April 6, 2005
Page -24-


Claim 3 depends from Claim 1 and specifies that the $R_3$ group is either a lower alkyl group or a lower alkoxy group. The structure of the compounds of Claim 1 is depicted along with the structure of tamsulosin in Exhibit G. As is apparent in Exhibit G, the group in tamsulosin corresponding to the $R_3$ group is a hydrogen atom. Because a hydrogen atom is not a lower alkyl group or a lower alkoxy group, Claim 3 is not literally met by tamsulosin and Ranbaxy's tamsulosin-containing tablets do not literally infringe Claim 3. Similarly Claim 5 depends from Claim 1 and specifies that the $R_3$ group is a lower alkyl group. Accordingly, Ranbaxy's tamsulosin-containing tablets do not literally infringe Claim 5.

Claim 6 depends from Claim 1 and is directed to a racemic compound. Ranbaxy's tamsulosin is optically active, so Ranbaxy's tamsulosin-containing tablets do not literally infringe Claim 6. Claim 7 is directed to a mixture of racemic compounds. Ranbaxy's tamsulosin-containing tablets do not literally infringe Claim 7. Claim 9 is directed to optically active (+) isomers of the compounds of Claim 1. Ranbaxy's tamsulosin-containing tablets do not literally infringe Claim 9. Similarly, Claim 12 depends from Claim 11 and is directed optically active (+) isomers. Claim 12 is directed to (+) isomers. Ranbaxy's tamsulosin is a (-) isomer, so it does not literally infringe Claim 12.

Claims 15-19 are directed to specific compounds of Claim 1. None of these specific compounds is tamsulosin. Ranbaxy's tamsulosin-containing tablets do not literally infringe Claims 15-19.

Further, Ranbaxy's tamsulosin-containing tablets do not infringe Claims 3, 5-7, 9, 12, and 15-19 of the '063 Patent under the doctrine of equivalents. The doctrine of equivalents may not be used to capture subject matter disclosed in the specification but not claimed in the claim at issue. *See Johnson & Johnston Assocs., Inc. v. R.E. Service Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (stating that "when a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates that unclaimed subject matter to the public"). With respect to Claims 6 and 7, which are directed to racemic compounds, the patentee cannot successfully argue that optically active compounds such as tamsulosin are equivalent to racemic compounds because optically active compounds are mentioned in the specification at column 3, lines 3-4 and in Claims 9-13. With respect to Claims 9 and 12, which are directed to (+) isomers, the patentee cannot successfully argue that (-) isomers such as tamsulosin are equivalent to (+) isomers because (-) isomers are specifically claimed in Claims 10 and 13. With respect to Claims 3, 5, and 15-19, which are directed to compounds having chemical formulae that differ from that of tamsulosin, the patentee cannot successfully argue that compounds having the chemical formula of tamsulosin are equivalent to these compounds because the chemical formula corresponding to tamsulosin (with no stereochemistry specified) is disclosed in the specification at column 21, lines 20-49 and in Claim 14. Accordingly, Ranbaxy's tamsulosin-containing tablets do not infringe Claims 3, 5-7, 9, 12, and 15-19 of the '063 Patent under the doctrine of equivalents.

Michael Morris, Esq.
April 6, 2005
Page -25-

### OFFER OF CONFIDENTIAL ACCESS TO APPLICATION

Ranbaxy hereby extends an offer of confidential access to relevant portions of ANDA 77-451 that is in the custody of Ranbaxy. The conditions for confidential access are provided in the attached Confidential Disclosure Agreement ("CDA"). This offer and CDA are provided solely for the purpose of allowing Boehringer Ingelheim and/or Yamanouchi to evaluate whether an action under 35 USC 271(e)(2)(A) should be brought for the filing of ANDA 77-451. This offer and the CDA contains restrictions as to persons entitled to access relevant portions of the ANDA, and on the use and disposition of any information accessed, as would apply if a protective order was entered for the purpose of protecting trade secrets and other confidential business information. Under section 505 of the Food, Drug and Cosmetic Act, a request for access to an application under an offer of confidential access is considered to be acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract.

Please do not hesitate to contact me at (609) 720-5334 if you have any questions.

Very truly yours,

George E. Heibel, PhD
Senior Counsel – Global Intellectual Property

cc:    Jay R. Deshmukh, Esq.
       Vice President – Intellectual Property

       Yuji Watanabe
       Vice President, Intellectual Property
       Yamanouchi Pharmaceutical Co., Ltd.
       3-17-1 Hasune
       Itabashi-ku, Tokyo 174-8612
       Japan
       Facsimile: 011 + 81 + 3-5916-5613

## Offer of Confidential Access to Application

WHEREAS Ranbaxy Laboratories Ltd. ("Ranbaxy") and Boeringer Ingelheim Pharmaceuticals, Inc. ("Boehringer Ingelheim"); and Ranbaxy and Yamanouchi Pharmaceutical Co. Ltd. ("Yamanouchi") compete in the pharmaceutical industry and this Offer of Confidential Access to Application may involve the disclosure of certain documents, things and information in the possession, custody or control of Ranbaxy that constitute or contain trade secrets or other confidential research, development or commercial information within the meaning of Rule 26(c)(7) of the Federal Rules of Civil Procedure; and

WHEREAS such confidential information must be protected in order to preserve the legitimate business interests of Ranbaxy;

THEREFORE, for good cause shown, pursuant to Rule 26(c), all documents and other materials provided by Ranbaxy to Boehringer Ingelheim and/or Yamanouchi shall be provided subject to the following conditions:

1.    This Offer of Confidential Access to Application shall apply to all documents, things, or information that are owned or controlled by Ranbaxy and contain its trade secrets or other confidential research, development, or commercial information, including without limitation documents and things ("Confidential Material").

2.    Ranbaxy shall have the right to designate as Confidential Material and subject to this Offer of Confidential Access to Application any or all of the ANDA and/or Drug Master File referenced in the paragraph IV notification letter. The duty of Boehringer Ingelheim and/or Yamanouchi as bound by this Offer of Confidential Access to Application to maintain the confidentiality of Confidential Material so designated shall commence with such notice.

3.    Ranbaxy hereby designates as Confidential Material all documents and things provided in response to acceptance of this Offer of Confidential Access to Application.

4.      Boehringer Ingelheim and/or Yamanouchi and all other persons bound by the terms of this Offer of Confidential Access to Application shall use any Confidential Material for the sole purpose of evaluating whether to bring a civil action under 35 USC 271(e)(2)(A) and shall not use any Confidential Material for any other purpose.  The attorneys of record for Boehringer Ingelheim and/or Yamanouchi shall exercise reasonable care to insure that the information and documents governed by this Offer of Confidential Access to Application are (a) used only for the purpose specified herein, and (b) disclosed only to authorized persons.

5.      Confidential Material shall be retained by attorneys of record for Boehringer Ingelheim and/or Yamanouchi and may be disclosed only to:

    (a)      Outside Counsel retained by Boehringer Ingelheim and/or Yamanouchi ;

    (b)      Outside experts and consultants retained by Boehringer Ingelheim and/or Yamanouchi or its Outside Counsel to assist in evaluating whether to bring an action under 35 USC 271(e)(2)(A) (and the expert's or consultant's staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials), who are not past or present full-time employees of Boehringer Ingelheim or Yamanouchi, as provided in Paragraph 6., below; and

    (c)      Any other person agreed to by Ranbaxy and Boehringer Ingelheim and/or Yamanouchi.

6.      Before Outside counsel for Boehringer Ingelheim and/or Yamanouchi may disclose Confidential Material to a person described in Paragraph 5.b., above, that counsel shall give advance notice as follows:  Counsel for Boehringer Ingelheim and/or Yamanouchi seeking to make the disclosure shall provide written notice (by facsimile followed by a hard copy sent next business day courier) to counsel for Ranbaxy, of the name, address, business affiliation and curriculum vitae of the person(s) to whom the Confidential Material is to be disclosed, as well as an executed copy of the Offer of Confidential Access to Application.  Ranbaxy shall have seven (7) business days after receiving that notification within which to object to the proposed disclosure; such disclosure shall not occur before the time for any objection by Ranbaxy expires, and, if any such objection is made, before that objection is resolved.  Any such objection shall be made in writing (by facsimile followed by a hard copy sent next business day courier) to the

2

outside counsel for Boehringer Ingelheim and/or Yamanouchi seeking to make the disclosure. If the parties are unable to resolve the objection, the Confidential Material shall not be disclosed.

7.     In no event shall the Confidential Material be disclosed to any person allowed access under Paragraphs 5.a, 5.b, or 5.c until such person has been shown a copy of and executed this Offer of Confidential Access to Application acknowledging and agreeing to be bound by the terms of this Offer of Confidential Access to Application. The Confidential Material shall not be disclosed to any person who refuses to execute the Offer of Confidential Access to Application.

8.     Upon reaching 45 days after receipt of the paragraph IV notification from Ranbaxy, unless otherwise agreed to in writing by Ranbaxy, Boehringer Ingelheim and/or Yamanouchi and its experts, consultants and outside counsel shall within thirty (30) days assemble and return all Confidential Material, including all copies, extracts, and summaries thereof, to Ranbaxy, except that any such materials that contain or constitute attorney work product may be destroyed rather than returned. All counsel of or for Boehringer Ingelheim and/or Yamanouchi shall make certification of compliance herewith and shall deliver the same to Ranbaxy not more than thirty (30) days after the running of the 45 day period mentioned above. In the event that litigation is initiated within the 45-day period, the provision regarding the return or destruction of Confidential Material shall be waived.

9.     No part of the restrictions imposed by this Offer of Confidential Access to Application may be terminated, except by written agreement executed by Ranbaxy.

10.     Notices under this Offer of Confidential Access to Application shall be to Ranbaxy and Boehringer Ingelheim and/or Yamanouchi at the addresses indicted below, unless this provision is modified by the parties in writing:

      (a)     notice to Ranbaxy shall be to George Heibel, Ranbaxy Inc., Suite 2100, College Road East, Princeton NJ 08540, facsimile (609) 514-9779, and

      (b)     notice to Boehringer Ingelheim and/or Yamanouchi shall be to

_____

_____

3

11.    Any violation of this Offer of Confidential Access to Application may constitute unlawful disclosure of trade secrets and/or confidential commercial information and may cause me to be potentially liable in a civil action for damages by Ranbaxy, and may subject Boehringer Ingelheim and/or Yamanouchi to such additional and further remedies as may be available to Ranbaxy.

George E. Heibel, PhD
Senior Counsel – Global Intellectual Property

6 April 2005
Date

4

## CONFIDENTIALITY UNDERTAKING

I, _____, being duly sworn, state that:

(a)    My present residential address is _____

_____.

(b)    My present employer is _____

_____ and the address of my present employer

is _____.

(c)    My present occupation or job description is _____

_____.

(d)    I have received and carefully read the Offer of Confidential Access to Application. I certify that I understand the terms of that Offer of Confidential Access to Application, recognize that I am bound by the terms of that Offer, and agree to comply with those terms. Further, I understand that unauthorized disclosure of any Confidential Material, or its substance, may constitute unlawful disclosure of trade secrets and/or confidential commercial information and may cause me to be potentially liable in a civil action for damages by Ranbaxy.

_____

SUBSCRIBED and SWORN to before me
this _____ day of _____, 200___.

_____

Notary Public
My Commission Expires _____

5

# EXHIBIT 7

Andrew T. Berry (AB 4170)
Richard J. Valladares (RV 7785)
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
Phone: (973) 639-2097
Facsimile: (973) 297-3952
Attorneys for Plaintiffs
Astellas Pharma Inc., and
Boehringer Ingelheim Pharmaceuticals Inc.

Of Counsel:
Robert L. Baechtold (RB 6866)
Simon D. Roberts (SR 3944)
FITZPATRICK, CELLA, HARPER
 & SCINTO
30 Rockefeller Plaza
New York, NY 10112-3801

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
-------------------------------------- X
ASTELLAS PHARMA INC., and BOEHRINGER    :
INGELHEIM PHARMACEUTICALS INC.          :
                                        :
          Plaintiffs,                   :
                                        :
                                        :
      v.                                :   CIVIL ACTION NO.:
                                        :
                                        :
                                        :
RANBAXY INC., RANBAXY PHARMACEUTICALS   :
INC., and  RANBAXY LABORATORIES LTD.    :
                                        :
          Defendants.                   :
-------------------------------------- X
```

## **COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Astellas Pharma Inc. and Boehringer Ingelheim Pharmaceuticals

Inc. (hereinafter collectively "Plaintiffs"), for their Complaint for patent infringement

herein against defendants Ranbaxy Inc., Ranbaxy Pharmaceuticals Inc. and Ranbaxy

Laboratories Ltd. allege as follows:

## PARTIES

1.    Astellas Pharma Inc.("Astellas") is a corporation organized and

existing under the laws of Japan, having a principal place of business at 3-11,

Nihonbashi-Honcho 2-chome, Chuo-ku, Tokyo 103-8411, Japan.

2.    Boehringer Ingelheim Pharmaceuticals Inc. ("BIPI") is a corporation

organized and existing under the laws of Delaware, having a principal place of business at

900 Ridgebury Road, Ridgefield, CT 06877-0368, USA.

3.    On information and belief, Defendant Ranbaxy Inc. is a corporation

incorporated under the laws of the State of Delaware, having its principal place of

business at 600 College Road East, Princeton, New Jersey 08540.

4.    On information and belief, Defendant Ranbaxy Pharmaceuticals Inc.

is a corporation incorporated under the laws of the State of Delaware, having its principal

place of business at 600 College Road East, Princeton, New Jersey 08540.

5.    On information and belief, Defendant Ranbaxy Laboratories Ltd. is a

public limited liability company organized under the laws of India, having its principal

place of business at 25 Nehru Place, New Delhi 110 019, India.

6.      On information and belief, Defendant Ranbaxy Inc. is a subsidiary of
Defendant Ranbaxy Pharmaceuticals Inc.

7.      On information and belief, Defendant Ranbaxy Pharmaceuticals Inc.
is a wholly-owned subsidiary of Ranbaxy [Holdings] UK Ltd., which is a wholly-owned
subsidiary of Ranbaxy Netherlands B.V., which is a wholly-owned subsidiary of
Defendant Ranbaxy Laboratories Ltd.

8.      On information and belief, the acts of Ranbaxy Inc. complained of
herein, were done at the direction of, with the authorization of, and with the cooperation,
participation, and assistance of Ranbaxy Pharmaceuticals Inc. and Ranbaxy Laboratories
Ltd.

9.      Ranbaxy Inc., Ranbaxy Pharmaceuticals Inc., and Ranbaxy
Laboratories Ltd. are referred to hereinafter, collectively, as "Ranbaxy."

## JURISDICTION AND VENUE

10.     This action arises under the patent laws of the United States of
America.  This Court has jurisdiction over the subject matter of this action under
28 U.S.C. §§ 1331 and 1338(a).

11.     Venue is proper in this judicial district pursuant to 28 U.S.C.
§§ 1391(b) and (c), and  28 U.S.C. § 1400(b).

## CLAIM FOR PATENT INFRINGEMENT

12.    Plaintiff BIPI holds an approved new drug application ("NDA") No. 20-579 for Flomax® capsules (0.4 mg), which tablets contain the active ingredient tamsulosin HCl. Flomax® capsules are approved by the United States Food and Drug Administration ("FDA") for the treatment of the signs and symptoms of benign prostatic hyperplasia ("BHP"). Flomax® capsules are sold in the United States by BIPI.

13.    The active ingredient in the Flomax® capsules, tamsulosin HCl, is known chemically as (-)-(R)-5-[2-[[2-(2-ethoxyphenoxy) ethyl]amino]propyl]-2-methoxybenzenesulfonamide, monohydrochloride or (-)-(R)-5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide hydrochloride.

14.    Astellas is the owner of United States Patent No. 4,703,063 ("the '063 patent"). The '063 patent was duly and legally issued on October 27, 1987.

15.    Astellas was formed as a result of the merger of Yamanouchi Pharmaceutical Co., Ltd. ("Yamanouchi") of Tokyo, Japan and Fujisawa Pharmaceutical Co., Ltd. of Osaka, Japan. The '063 patent was initially assigned to Yamanouchi, which subsequently renamed Astellas after the merger.

16.    The '063 patent claims compounds, *inter alia*, tamsulosin and pharmaceutical compositions containing it. A true copy of the '063 patent is attached hereto as Exhibit A.

- 4 -

17. On information and belief, Ranbaxy submitted to the FDA an abbreviated new drug application ("ANDA") under the provisions of 21 U.S.C. § 355(j), seeking approval to engage in the commercial manufacture, use, and sale of tamsulosin HCl 0.4 mg capsules.

18. On information and belief, Ranbaxy submitted its ANDA to the FDA for the purpose of obtaining approval to engage in the commercial manufacture, use, or sale of its tamsulosin HCl 0.4 mg capsules before the expiration of the '063 patent.

19. On information and belief, Ranbaxy made, and included in its ANDA, a certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV") that, in its opinion and to the best of its knowledge, the '063 patent is invalid or will not be infringed.

20. On information and belief, on or about April 6, 2005, Ranbaxy transmitted a facsimile copy of a Notice Letter, purporting to comply with the provisions of 21 U.S.C. § 355(j)(2)(B) and the FDA regulations relating thereto, to Yamanouchi Pharmaceutical Co., Ltd. and Boehringer Ingelheim Corp.

21. The manner in which Ranbaxy purported to serve its Notice Letter did not comply with the applicable FDA regulations and did not constitute effective service under 21 U.S.C. § 355(j)(2)(B).

22. By filing the ANDA under 21 U.S.C. § 355(j) for the purpose of obtaining approval to engage in the commercial manufacture, use, or sale of its proposed tamsulosin HCl 0.4 mg capsules before the expiration of the '063 patent, Ranbaxy has

committed an act of infringement under 35 U.S.C. § 271(e)(2). Further, the commercial manufacture, use, offer for sale, sale and/or importation of tamsulosin, tamsulosin HCl and/or the generic tamsulosin HCl 0.4 mg capsules for which Ranbaxy seeks approval in its ANDA will also infringe one or more claims of the '063 patent.

23. Plaintiffs are entitled to the relief provided by 35 U.S.C. § 271(e)(4), including an Order of this Court that the effective date of any approval of the aforementioned ANDA, relating to Ranbaxy's tamsulosin HCl 0.4 mg capsules, shall be a date which is not earlier than October 27, 2009, the current expiration date of the '063 patent, or any later date of exclusivity to which Plaintiffs are or become entitled. Further, Plaintiffs are entitled to an award of damages for any commercial sale or use of tamsulosin HCl 0.4 mg capsules, and any act committed by Ranbaxy with respect to the subject matter claimed in the '063 patent, which act is not within the limited exclusions of 35 U.S.C. § 271(e)(1).

24. This is an exceptional case and Plaintiffs are entitled to an award of its reasonable attorney fees under 35 U.S.C. § 285.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the following relief:

A. Judgment that Ranbaxy has infringed one or more claims of the '063 patent by filing the aforesaid ANDA relating to Ranbaxy's tamsulosin HCl 0.4 mg capsules;

B. Judgment that Ranbaxy has not complied with the requirements of

21 U.S.C. § 355(j)(2)(A)(vii)(IV), 21 U.S.C. § 355(j)(2)(B)(iv)(II), 21 C.F.R. §314.94

and 21 C.F.R. § 314.95;

      C.    A permanent injunction restraining and enjoining Ranbaxy and its

officers, agents, attorneys and employees, and those acting in privity or concert with it,

from engaging in the commercial manufacture, use, offer to sell, or sale within the United

States, or importation into the United States, of tamsulosin HCl 0.4 mg capsules as

claimed in the '063 patent;

      D.    An order that the effective date of any approval of the

aforementioned ANDA relating to Ranbaxy's tamsulosin HCl 0.4 mg capsules be a date

which is not earlier than the expiration of the '063 patent, or any later date of exclusivity

to which Plaintiffs are or become entitled;

      E.    Damages from Ranbaxy for any commercial activity constituting

infringement of the '063 patent;

      F.    This is an exceptional case under 35 U.S.C. § 285, and Plaintiffs are

entitled to the costs and reasonable attorney fees in this action; and

      G.    Such other and further relief as the Court may deem just and proper.

Dated: May 13, 2005          By:

ABerry@McCarter.com

Andrew T. Berry (AB 4170)
Richard J. Valladares (RV 7785)
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102

Phone: (973) 639-2097
Facsimile: (973) 297-3952
Attorneys for Plaintiffs
Astellas Pharma Inc., and
Boehringer Ingelheim Pharmaceuticals Inc.

Of Counsel:
Robert L. Baechtold (RB 6866)
Simon D. Roberts (SR 3944)
FITZPATRICK, CELLA, HARPER
  & SCINTO
30 Rockefeller Plaza
New York, NY 10112-3801
Phone: (212) 218-2100
Facsimile: (212) 218-2200

NY_MAIN 495035v2

- 8 -

Exhibit A

# United States Patent [19]

Imai et al.

[11] Patent Number: 4,703,063

[45] Date of Patent: Oct. 27, 1987

[54] **SULFAMOYL SUBSTITUTED PHENETHYLAMINE DERIVATIVES AND PROCESS OF PRODUCING THEM**

[75] Inventors: **Kazuo Imai; Kunihiro Niigata; Takashi Fujikura,** all of Saitama; **Shinichi Hashimoto,** Chiba; **Teichi Takenaka,** Tokyo, all of Japan

[73] Assignee: **Yamanouchi Pharmaceutical Co., Ltd.,** Tokyo, Japan

[21] Appl. No.: 756,790

[22] Filed: **Jul. 18, 1985**

### Related U.S. Application Data

[60] Continuation of Ser. No. 632,258, Jul. 18, 1984, Pat. No. 4,558,156, which is a continuation of Ser. No. 403,006, Jul. 29, 1982, abandoned, which is a division of Ser. No. 231,421, Feb. 4, 1981, Pat. No. 4,373,106.

[30] **Foreign Application Priority Data**

Feb. 8, 1980 [JP]    Japan ..................... 55-14382

[51] Int. Cl.⁴ ..................... C07C 143/78; C07C 143/80; A61K 31/18

[52] U.S. Cl. ........................................... 514/603; 564/86

[58] Field of Search ........................ 564/86; 514/603

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,723,524 | 3/1973 | Augstein et al. | 564/86 |
| 3,860,647 | 1/1975 | Colella et al. | 564/86 |
| 4,140,713 | 2/1979 | Oxford et al. | 564/86 |
| 4,217,305 | 8/1980 | Imai et al. | 564/86 |
| 4,373,106 | 2/1983 | Imai et al. | 564/86 |
| 4,558,156 | 12/1985 | Imai et al. | 564/86 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 34432 | 8/1981 | European Pat. Off. | 564/86 |
| 159757 | 10/1982 | Japan | 564/86 |
| 41860 | 3/1983 | Japan | 564/86 |

*Primary Examiner*—Paul F. Shaver
*Attorney, Agent, or Firm*—Burgess, Ryan and Wayne

[57] **ABSTRACT**

Novel sulfamoyl-substituted phenethylamine derivatives which exhibit α-adrenergic blocking action and are useful as an antihypertensive agent and an agent for the treatment of congestive heart failure.

**19 Claims, No Drawings**

4,703,063

1

## SULFAMOYL SUBSTITUTED PHENETHYLAMINE DERIVATIVES AND PROCESS OF PRODUCING THEM

This is a continuation of Ser. No. 632,258, filed July 18, 1984, now U.S. Pat. No. 4,558,156, which is a continuation of Ser. No. 403,006, filed July 29, 1982, now abandoned, which is a division of Ser. No. 231,421, filed Feb. 4, 1981, now U.S. Pat. No. 4,373,106.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to novel sulfamoyl-substituted phenethylamine derivatives and the acid addition salts thereof, and more particularly, to novel sulfamoyl-substituted phenethylamine derivatives and the acid addition salts thereof which exhibit a strong α-adrenergic blocking action and are useful as an antihypertensive agent and a treating agent for congestive heart failure. The invention is further concerned with the process of producing these derivatives and the acid addition salts thereof.

### 2. Description of the Prior Art

British Pat. No. 2,006,772 discloses a series of compounds exhibiting α- and β-adrenergic blocking actions and also the patent discloses that the compound shown by the following formula exhibits strong α- and β-adrenergic blocking actions



U.S. Pat. No. 3,860,647 discloses a series of compounds shown by the following general formula



wherein R represents hydrogen or alkyl having 1–4 carbon atoms; R' represents alkyl having 1–6 carbon atoms, cycloalkyl having 3–6 carbon atoms, $XC_6H_4(CH_2)_2C(CH_3)_2$, $XC_6H_4(CH_2)_2C(CH_3)_2$, $XC_6H_4CH_2CH(CH_3)$, or $XC_6H_4(CH_2)_2CH(CH_3)_2$ (wherein X represents hydrogen, hydroxyl or methoxy); and Y represents hydrogen or hydroxy. It is also described in the patent specification that these compounds exhibit a β-adrenergic blocking action.

British Pat. No. 902,617 discloses a series of compounds shown by the following general formula



wherein R₁ is hydroxyl, methyl, methoxy, etc.; R₂ is hydrogen, methyl, etc.; R₃ is phenyl, benzyl or hydroxy-, methyl-, methoxy-, ethoxy-, chloro- or bromo-substituted phenyl or benzyl radical, etc.; and R₄ is

2

hydrogen, etc. These compounds exhibit an α-adrenergic blocking action (see, "J. Med. Chem."; 9, 812–818 (1966)) and possess an antihypertensive activity.

Also, in "J. Med. Chem."; 9, 812–818 (1966), there is described the phenoxyethylamine-type compounds shown by the following general formula possess an α-adrenergic blocking action;



wherein $R_1$ represents o-OCH₃, etc., and $R_2$ represents o- or p-OCH₃, etc.

## SUMMARY OF THE INVENTION

An object of this invention is to provide the novel sulfamoyl-substituted phenethylamine derivatives shown by following general formula and the acid addition salts thereof which possess a hypotensive activity based on an α-adrenergic blocking action and are useful as an antihypertensive agent, an agent for the treatment of congestive heart failure, etc.

Another object of this invention is to provide the process for producing the above-described pharmaceutically useful compounds.

That is, according to this invention, there are provided the sulfamoyl-substituted phenethylamine derivatives shown by following general formula I and the acid addition salts thereof



wherein $R_1$ represents an amino group or a mono- or di-lower alkylamino group; $R_2$ represents a hydroxyl group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents hydrogen atom, halogen atom, a lower alkyl group, a lower alkoxy group, a phenylthio group, or a phenylsulfinyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$ and $R_9$ each represents, hydrogen atom or a lower alkyl group; $R_{10}$ represents, hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents oxygen atom or a methylene group; said Y being, however, an oxygen atom when $R_2$ is a hydroxyl group.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Now, the term "lower" used in the above-described formula means a straight or branched carbon chain having 1 to 5 carbon atoms. Therefore, for example, a lower alkyl group includes a methyl group, ethyl group, propyl group, butyl group, pentyl group, isobutyl group, etc., and a lower alkoxy group includes a methoxy group, ethoxy group, propoxy group, butoxy group, etc. Also, in the above-described formula, $R_{10}$ which is a substituent of the benzene ring may be disposed at any position of which is ortho, meta or para to the side chain. Furthermore, since the compounds of this invention shown by formula I can readily form the salts thereof and contain asymmetric carbon atom(s),

4,703,063

3

the compounds of this invention include the salts thereof, the racemic compounds thereof, a mixture of the racemic compounds, and each optically active substance.

The compounds of formula I and the acid addition salts thereof provided by the present invention exhibit an $\alpha$-adrenergic blocking action and thus they can be utilized for various treatments. For example, they can be used as useful agents for the treatments of hypertension, congestive heart failure, angina pectoris, lower urinary tract dysfunction, prostatic hypertrophy, pheochromocytoma and peripheral vascular disorders.

The compounds of this invention shown by formula I can be produced by the following processes.

Process 1:

The compounds of formula I are obtained by reacting the compounds shown by general formula II



wherein R represents a hydrogen atom or a lower alkyl group and $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in formula I with a halogenating agent and then, if desired, (a) reducing the halogenated product obtained by the above reaction; or (b) reacting the halogenated product with an alkaline material and then reacting the product thus obtained with hydrogen iodide, a lower alcohol, or thiophenol, and further, if desired, oxidizing the product obtained by the reaction with thiophenol.

Process I is further described in more detail. That is, according to the process, the starting materials shown by formula II described above are reacted with a halogenating agent to provide the compounds shown by general formula $I_1$



wherein X represents, chlorine atom or bromine atom and R, $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as in formula II, and then, if desired, (a) the halogenated compounds shown by formula $I_1$ are reduced to form the compounds shown by formula $I_2$



wherein R, $R_1$, $R_2$, $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described; or (b) the halogenated compounds shown by formula $I_1$ are treated with an alkaline material to form the aziridine compounds shown by the following general formula III

4



wherein $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described, then, the aziridine compounds are reacted with hydrogen iodide, a lower alcohol, or thiophenol to provide the compounds shown by general formula $I_3$



wherein R' represents an iodine atom, a lower alkoxy group or a phenylthio group and $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described and further, when R' of the compounds shown by formula $I_3$ is a phenylthio group, if desired, the compounds of $I_3$ are oxidized to provide the compounds shown by general formula $I_4$



wherein $R_1$, $R_2$, $R_4$, $R_5$, $R_7$, $R_8$, $R_9$, $R_{10}$ and Y have the same significance as above described.

This process is further schematically shown below, wherein the compounds shown by formulae $I_1$, $I_2$, $I_3$ and $I_4$ are the desired compounds of this invention.

4,703,063

5
-continued



I₂



III

Step 4 | HI, lower alcohol
or thiophenol



(in case of R' of
compound I₃ being a
phenylthio group)
Step 5 | Oxidation



I₄

The reaction condition in each step described above is as follows:

Step 1:
The halogenation of the compounds of formula II can be performed in an organic solvent such as toluene, methyl ethyl ketone, acetonitrile, tetrahydrofuran, etc., at room temperature or under heating using a halogenating agent such as thionyl chloride, hydrogen chloride, hydrogen bromide, phosphorus trichloride, phosphorus pentachloride, phosphorus oxychloride, thionyl bromide, etc.

Step 2:
The reduction of the compounds of formula I₁ can be performed in an organic solvent such as methanol, ethanol, toluene, acetonitrile, tetrahydrofuran, etc., under a hydrogen stream, at normal temperature and normal pressure using a catalyst such as platinum oxide, palladium carbon, etc.

Step 3:
The compounds of formula III can be obtained by treating the compounds of formula I₁ (wherein, however, R and R₄ are hydrogen atom) with an alkaline material such as sodium carbonate, metal alcoholate, sodium hydroxide, potassium hydroxide, etc., in an organic solvent such as ethyl acetate, ethanol, dioxane, benzene, etc., at room temperature to 50° C.

Step 4:
(i): The compounds of formula I₃ (wherein, R' is a phenylthio group) can be obtained by reacting the compounds of formula III with thiophenol in an organic solvent such as methanol, chloroform, ethyl acetate, dioxane, benzene, etc., at room temperature.

(ii): The compounds of formula I₃ (wherein, R' is a lower alkoxy group) can be obtained by reacting the

6
compounds of formula III with a lower alcohol in the presence of a BF₃ catalyst under the same condition as in the step (i).

(iii): The compounds of formula I₃ (wherein, R' is an iodine atom) can be obtained by reacting the compounds of formula III with hydroiodic acid in an organic solvent such as dioxane, methanol, etc., at room temperature.

Step 5:
The oxidation of the compounds of formula I₃ (wherein R' is a phenylthio group) can be performed in acetic acid at a temperature of 50°–60° C. using H₂O₂ as the oxidizing agent.

In addition, among the compounds of this invention, the compounds shown by the following general formula I₅



I₅

wherein R'' represents a lower alkoxy group or a phenylthio group and R, R₁, R₂, R₄, R₅, R₆, R₇, R₈, R₉, R₁₀ and Y have the same significance as above described can be obtained by reacting the compounds of formula I₁ directly with a lower alcohol or thiophenol.

The starting materials of formula II (wherein R is hydrogen atom) used in the process of this invention are described in British Pat. No. 2,006,772 and also the starting materials of formula II (wherein R is a lower alkyl group) can be obtained by reacting the compounds of the following formula



described in the aforesaid British patent with a Grignard reagent (lower alkyl-MgX).

Process 2:
Among the compounds of formula I, the compounds of this invention shown by following general formula I₆



I₆

wherein R₁, R₂, R₃, R₄, R₇, R₈, R₉, R₁₀ and Y have the same significance as in the formula I, can be produced by condensing the compound shown by the general formula



IV

4,703,063

7

and the compound shown by the following formula



and then reducing the products thus obtained.

This reaction is performed by condensing the compounds of formula IV and the compounds of formula V in an organic solvent such as methanol, ethanol, toluene, acetonitrile, tetrahydrofuran, etc., and then reducing the products in the presence of a $PtO_2$ catalyst or a Raney nickel catalyst or with $NaBH_4$, $LiAlH_4$, etc.

The isolation and purification of the compounds of this invention shown by general formulae $I_1$–$I_6$ formed by Process 1 and 2 are performed by filtration, extraction with a solvent, separation by column chromatography, recrystallization, etc.

The pharmacological effects of the compounds of this invention were determined by the following experiments. The effects of the typical compounds of this invention were compared with 5-{1-hydroxy-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide (Compound A) which is one of the typical compounds disclosed in British Pat. No. 2,006,722 and phentolamine.

A. α-Adrenergic blocking action:

The blood pressure was measured in the rats anesthetized with urethane and treated with pentolinium. The effects of the test samples (intravenous injection) to antagonize the hypertensive response to phenylephrine (10 μg/Kg i.v.) were measured and the results were shown in Table I.

B. Antihypertensive effects in spontaneously hypertensive rats:

Oral administration: The systolic blood pressure was measured indirectly from the tail cuff method using a programmed electrosphygmanometer (Narco Bio-Systems Inc., PE-300) on spontaneously hypertensive rats having a systolic blood pressure higher than 150 mmHg, the result being shown in Table II.

TABLE I

| Sample | α-Adrenergic blocking action |
|---|---|
| | α-adrenergic blocking $ED_{50}$ (mg/Kg) i.v. |
| Compounds of this invention (Ex. No.) | |
| 4 | 0.00035 |
| 5 | 0.00026 |
| 10 | 0.0039 |
| 11 | 0.012 |
| 12 | 0.0073 |
| 15 | 0.0013 |
| 16 | 0.0008 |
| 20 | 0.00000014 |
| 25 | 0.0012 |
| 26 | 0.004 |
| Known compounds | |
| Compound A | 0.034 |
| Phentolamine | 0.061 |

TABLE II

Antihypertensive effect:

| Sample | Dose (mg/Kg) | Change in systolic blood pressure (mmHg) at stated dose p.o. |
|---|---|---|
| Compounds of this | | |

TABLE II-continued

Antihypertensive effect:

| Sample | Dose (mg/Kg) | Change in systolic blood pressure (mmHg) at stated dose p.o. |
|---|---|---|
| invention (Ex. No.) | | |
| 10 | 10 | −57 ± 5.6 |
| 11 | 30 | −50 ± 4.7 |
| 12 | 10 | −48 ± 2.0 |
| 15 | 10 | −54 ± 6.2 |
| 16 | 10 | −71 ± 11.1 |
| 20 | 3 | −57 ± 4.2 |
| 25 | 10 | −46 ± 3.6 |
| 26 | 10 | −46 ± 4.3 |
| Known compounds | | |
| Compound A | 10 | −35 ± 6.4 |
| Phentolamine | 10 | +7.8 ± 5.0 |
| Phentolamine | 100 | −70 ± 10.1 |

The clinical administration of the compounds of this invention is usually practiced by intravenous injection or orally as the free bases or the acid addition salts thereof (e.g., hydrochlorides, sulfates, maleates, acetates, furarates, lactates, citrates, etc.). It is proper to administer 10 ng–1 mg per ounce of the compound several times per day in case of intravenous administration or 0.1–100 mg of the compound two or three times per day in the case of oral administration.

The compounds of this invention may be formulated into ordinary dosage forms such as, for example, tablets, capsules, pills, solutions, etc., and in these cases, the medicaments can be prepared by conventional methods with conventional pharmaceutical excipients.

Then, the production of the compounds of this invention will be further described in the following examples. In addition, the starting materials used in this invention include novel compounds and the production thereof are shown in the Reference Examples.

REFERENCE EXAMPLE 1



(1) To 250 g of chlorosulfonic acid was added dropwise 50 g of 4-methoxyphenylacetone at 0°–5° C. After stirring the mixture for 4 hours at room temperature, the reaction mixture was poured into 2,500 ml of ice water and extracted three with 500 ml of ethyl acetate. The extract was washed with water and after drying the extract with anhydrous magnesium sulfate, the solvent was distilled off under reduced pressure. The crude crystals obtained were recrystallized from benzene-ether to provide 32 g of 3-chlorosulfonyl-4-methoxyphenylacetone. Melting point: 80°–81° C.

(2) In 26 ml of tetrahydrofuran was dissolved 2.6 g of 3-chlorosulfonyl-4-methoxyphenylacetone and then 1.2 g of 40% methylamine was added dropwise to the solution at a temperature lower than 10° C. After stirring the mixture for one hour at room temperature, the solvent was distilled off under reduced pressure and the residue was extracted with ethyl acetate. The extract was washed with water and after drying with anhydrous magnesium sulfate, the solvent was distilled off under reduced pressure. The crude crystals obtained

4,703,063

**9**

were recrystallized from isopropanol-ether to provide 1.8 g of 4-methoxy-3-N-methylsulfamylphenylacetone. Melting point: 100°–101° C.

## REFERENCE EXAMPLE 2



By reacting 2.6 g of 3-chlorosulfonyl-4-methoxyphenylacetone and 0.6 g of dimethylamine in the same manner as in Reference Example 1-(2), 2.5 g of oily 4-methoxy-3-N,N-dimethylsulfamylphenylacetone was obtained.

Nuclear magnetic resonance spectra (CDCl$_3$):

δ: 2.18 (3H, S, COCH$_3$)

2.82 (6H, S, N(CH$_3$)$_2$)

3.69 (2H, S, CH$_2$CO)

3.90 (3H, S, O—CH$_3$)

## EXAMPLE 1



In 1,000 ml of acetonitrile was suspended 17 g of 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-1-hydroxy-2-methyl-ethyl}-2-methoxybenzenesulfonamide hydrochloride and while stirring the suspension, 9 g of thionyl chloride was added dropwise to the suspension at room temperature, whereby the product was dissolved and then began to crystallize gradually. After stirring the mixture for two days, the crystals formed were recovered by filtration, washed with chloroform and dried to provide 15 g of 5-{1-chloro-2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide hydrochloride.

The product has the following physicochemical properties.

Melting point: 197°–200° C.
Elemental analysis for C$_{20}$H$_{27}$N$_2$O$_5$SCl.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 50.11 | 5.89 | 5.84 |
| Found: | 50.06 | 5.96 | 5.95 |

Nuclear magnetic resonance spectra (CD$_3$OD):

**10**

| Nuclear magnetic resonance spectra (CD$_3$OD) | | |
|---|---|---|
| δ: | 1.30 | (3H, d, CH—CH$_3$) |
| | 1.40 | (3H, t, CH$_2$—CH$_3$) |
| | 3.63 | (2H, t, CH$_2$—CH$_2$—N) |
| | 4.01 | (3H, s, O—CH$_3$) |
| | 4.12 | (2H, q, CH$_2$—CH$_2$—O) |
| | 4.36 | (2H, t, CH$_2$—CH$_2$—O) |
| | 5.30 | (1H, d, Cl—CH) |

The compounds in Examples 2 and 3 were obtained in the same manner as in Example 1.

## EXAMPLE 2



5-{1-Chloro-2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 190°–191° C.
Elemental analysis for C$_{18}$H$_{23}$N$_2$O$_4$SCl.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 49.66 | 5.56 | 6.43 |
| Found: | 49.51 | 5.70 | 6.53 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

δ:

2.61 (3H, s, CH$_3$)

3.64 (3H, s, OCH$_3$)

5.66 (1H, m, CH—Cl)

## EXAMPLE 3



5-{1-Chloro-2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 195°–197° C. (decomposed).
Elemental analysis for C$_{19}$H$_{25}$N$_2$O$_5$SCl.HCl:

4,703,063

**11**

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 49.04 | 5.63 | 6.02 |
| Found: | 49.02 | 5.64 | 6.08 |

Nuclear magnetic resonance spectra ($CD_3OD + d_6$-DMSO):

δ:

1.18 (3H, d, CH—CH₃)

3.80 and 3.95 (3H + 3H, s, —O—CH₃)

5.56 (1H, d, CH—Cl)

### EXAMPLE 4



A mixture of 1.4 g of 4-methoxy-3-N-methylsulfamyl-phenylacetone, 1 g of 2-methoxyphenoxyethylamine, and 30 ml of methanol was refluxed for one hour. After cooling the mixture, 60 mg of a platinum oxide catalyst was added thereto, the reduction was performed at normal temperature and pressure. After absorbing a theoretical amount of hydrogen, the catalyst was filtered away. After the filtrate was acidified with an alcoholic 5% hydrochloric acid, the solvent was distilled off under reduced pressure to form 1.6 g of crystals, which were recovered and recrystallized to provide 1.2 g of the colorless crystals of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-N-methylbenzenesulfonamide hydrochloride.

The product has the following physicochemical properties.

Melting point: 162°–163° C.

Elemental analysis for $C_{20}H_{28}N_2O_5S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 53.99 | 6.57 | 6.30 |
| Found: | 53.85 | 6.70 | 6.27 |

Nuclear magnetic resonance spectra ($d_6$-DMSO):

δ:

1.15 (3H, d, —CHCH₃)

3.76 and 3.88 (3H + 3H, S, O—CH₃)

The product of Example 5 was obtained in the same manner as in Example 4.

**12**

### EXAMPLE 5



2-Methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]-N,N-dimethylbenzenesulfonamide hydrochloride.

Physicochemical properties:

Melting point: 185°–187° C.

Elemental analysis for $C_{21}H_{30}N_2O_5S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 54.95 | 6.81 | 6.10 |
| Found: | 54.73 | 6.88 | 5.85 |

Nuclear magnetic resonance spectra ($d_6$-DMSO):

δ:

1.16 (3H, d, CHOH₃), 2.71 (6H, s, N(CH₃)₂)

3.76 and 3.87 (3H + 3H, s, —O—CH₃)

### REFERENCE EXAMPLE 3



In 50 ml of ethyl acetate was suspended 4.35 g (0.01 mole) of 5-[1-chloro-2-[2-(2-methoxyphenoxy)e-thylamino]ethyl]-2-methylbenzenesulfonamide hydrochloride and then 50 ml of an aqueous 10% sodium carbonate solution was added to the suspension with stirring. After further stirring overnight vigorously, the reaction mixture was recovered by decantation. After removing inorganic materials by passing the ethyl acetate layer thus recovered through a silica gel column (50 ml of silica gel), the reaction product was evaporated to dryness to provide 3.2 g (88%) of colorless resinous 5-[1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl]-2-methylbenzenesulfonamide.

The product has the following physicochemical properties.

Amorphous form.

Elemental analysis for $C_{18}H_{22}N_2O_4S$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 59.65 | 6.12 | 7.73 |
| Found: | 59.37 | 6.12 | 7.61 |

Nuclear magnetic resonance spectra ($CDCl_3$):

4,703,063

**13**

δ: 1.74 and 1.95



(1H + 1H, d,

2.43



(1H, q,

2.55



(3H, s,

4.10



(2H, t, O—CH₂—)

## EXAMPLE 6



In 30 ml of dioxane was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylbenzenesulfonamide and after adding thereto 1 g of concentrated hydroiodic acid, the mixture was stirred overnight. After the reaction was over, the solvent was distilled off under reduced pressure and the residue was washed three with 30 ml of water and then three with 200 ml of ether and crystallized by the addition of ethyl acetate. The crystals were recovered by filtration, washed with water, and dried to provide 1.7 g of 5-{1-iodo-2-[2-(2-methoxyphenoxyethylamino)ethyl]-2-methylbenzenesulfonamide hydroiodide.

The product has the following physicochemical properties.

Melting point: 154°–155° C.

Elemental analysis for $C_{18}H_{23}N_2O_4SLHI$:

|        | C (%) | H (%) | N (%) |
|--------|-------|-------|-------|
| Calcd.: | 34.97 | 3.91  | 4.53  |
| Found:  | 35.07 | 3.98  | 4.39  |

Nuclear magnetic resonance spectra (CD₃OD):

δ:

2.65 (3H, t,  —CH₃)

3.54 (2H, t, —CH₂—N—)

4.30 (2H, t, —CH₂—O)

5.55 (1H, t,  —CH—I)

**14**

## EXAMPLE 7



In 50 ml of methanol was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylbenzenesulfonamide and after adding 1 g of thiophenol to the solution and stirring overnight the mixture at room temperature, methanol was distilled off. The residue was applied to a silica gel column chromatography and the product was eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio) to provide 2.4 g of 5-{2-[2-(2-methoxyphenoxy)ethylamino]-1-phenylthioethyl}-2-methylbenzenesulfonamide as a viscous oily material.

The product has the following physicochemical properties.

Amorphous form.

Elemental analysis for $C_{24}H_{28}N_2O_4S_2$:

|        | C (%) | H (%) | N (%) |
|--------|-------|-------|-------|
| Calcd.: | 60.99 | 5.97  | 5.93  |
| Found:  | 60.72 | 6.11  | 5.71  |

Nuclear magnetic resonance spectra (CDCl₃):

δ:

2.58 (3H, s,  —CH₃)

3.74 (3H, s, O—CH₃)

3.98 (2H, t, —CH₂—O)

4.35 (1H, t,  —CH—S)

## EXAMPLE 8



In 50 ml of methanol was dissolved 2.5 g of 5-{1-[2-(2-methoxyphenoxy)ethyl]aziridin-2-yl}-2-methylbenzenesulfonamide and after adding thereto 2 ml of a boron trifluoride ether complex at room temperature, the mixture was stirred overnight. Thereafter, methanol was distilled off under reduced pressure and the residue was applied to a silica gel column chromatography. The

4,703,063

| 15 | 16 |
|---|---|

product was then eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio), whereby 1.5 g of a colorless viscous oily material was obtained. The product was crystallized by the addition of 5 ml of methanol and several drops of ammonia. The crystals formed were recovered by filtration, washed with water, and dried to provide 1.2 g of 5-[1-methoxy-2-[2-(2-methoxyphenoxy)ethylamino]ethyl]-2-methylbenzenesulfonamide.

The product has the following physicochemical properties.

Melting point: 150°–152° C.

Elemental analysis for $C_{19}H_{26}N_2O_5S$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 57.85 | 6.64 | 7.10 |
| Found | 57.58 | 6.79 | 7.24 |

Nuclear magnetic resonance spectra (CD₃OD):

δ: 2.65 (3H, s, —CH₃)

2.98 (2H, t, —CH₂N)

3.80 (3H, s, —OCH₃)

3.26 (3H, s, CH—OCH₃)

4.10 (2H, t, —CH₂O)

4.40 (1H, q, —CH—O)

EXAMPLE 9

In 20 ml of acetic acid was dissolved 2 g of 5-[2-[2-(2-methoxyphenoxy)ethylamino]-1-phenylthioethyl]-2-methylbenzenesulfonamide and after adding thereto 5 ml of 30% H₂O₂, the mixture was heated to 50°–60° C. for 3 hours. After adding thereto 100 ml of water, the reaction mixture was extracted with 200 ml of ethyl acetate. The ethyl acetate extract was washed with an aqueous 1% sodium carbonate solution and then ethyl acetate was distilled off under reduced pressure. The residue was applied to a silica gel column chromatography, the product was eluted with a mixed solvent of chloroform and methanol (9:1 by volume ratio), and the colorless viscous oily product thus obtained was crys-

tallized by the addition of ethyl acetate. The crystals formed were recovered by filtration to provide 1.3 g of 5-[2-[2-(2-methoxyphenoxy)ethylamino]-1-phenylsulfinylethyl]-2-methylbenzenesulfonamide.

The product has the following physicochemical properties.

Melting point: 139°–141° C.

Elemental analysis for $C_{24}H_{28}N_2O_5S_2$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 59.00 | 5.78 | 5.73 |
| Found: | 58.91 | 5.74 | 5.72 |

EXAMPLE 10

In 150 ml of methanol was dissolved 3.8 g of 5-[1-chloro-2-[2-(2-methoxyphenoxy)ethylamino]ethyl]-2-methoxybenzenesulfonamide hydrochloride and after adding thereto 0.5 g of 10% palladium carbon, it was dechlorinated under a hydrogen stream at normal temperature and pressure. Then, palladium carbon was filtered away and the filtrate was concentrated under reduced pressure to provide 3.1 g of 2-methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]ethyl]benzenesulfonamide hydrochloride, which was recrystallized from 120 ml of a mixture of methanol and ethanol (1:4 by volume ratio) to provide 2.3 g of the colorless crystals thereof.

The product has the following physicochemical properties.

Melting point: 196°–198° C.

Elemental analysis for $C_{18}H_{24}N_2O_5S.HCl$:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calcd.: | 51.86 | 6.04 | 6.72 |
| Found: | 51.72 | 6.23 | 6.68 |

Nuclear magnetic resonance spectra (CD₃OD):

δ: 3.84 and 3.98 (3H + 3H, s, —OCH₃)
4.24 (2H, t, —OCH₂—)

The compounds in Examples 11–29 were obtained in the same manner as in Example 10.

EXAMPLE 11

5-[2-[2-(2-Methoxyphenoxy)ethylamino]ethyl]-2-methylbenzenesulfonamide hydrochloride.

**4,703,063**

**17**

Physicochemical properties:
Melting point: 173°–175° C.
Elemental analysis for $C_{19}H_{24}N_2O_4S.HCl$:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 53.93 | 6.28 | 6.99 |
| Found: | 53.83 | 6.27 | 6.97 |

Nuclear magnetic resonance spectra (CD₃OD):



δ: 2.64 (3H, s,     ), 3.84 (3H, s, —OCH₃)

4.28 (2H, t, —OCH₂—)

**EXAMPLE 12**



5-{2-[2-(2-Ethoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 180°–181.5° C.
Elemental analysis for $C_{19}H_{26}N_2O_4S.HCl$:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.81 | 6.56 | 6.89 |

Nuclear magnetic resonance spectra (CD₃OD):



δ: 1.36 (3H, t, —OCH₂CH₃), 2.64 (3H, s, CH₃—     )

4.10 (2H, q, —OCH₂CH₃), 4.36 (2H, t, —OCH₂—CH₂—)

**EXAMPLE 13**



5-{2-[2-(2-Methoxyphenoxy)-1-methylethylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 169°–171° C.
Elemental analysis for $C_{19}H_{26}N_2O_4S.HCl$:

**18**

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.89 | 6.60 | 6.76 |

Nuclear magnetic resonance spectra (CD₃OD):



δ: 1.15 (3H, d,     CH—CH₃), 2.64 (3H, s, CH₃—     )

3.80 (3H, s, —OCH₃)

**EXAMPLE 14**



5-{2-[3-(2-Methoxyphenyl)-1-methylpropylamino]ethyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 198°–200° C.
Elemental analysis for $C_{20}H_{28}N_2O_3S.HCl$:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 58.17 | 7.08 | 6.78 |
| Found: | 58.09 | 7.01 | 6.62 |

Nuclear magnetic resonance spectra (d₆-DMSO):



δ: 1.35 (3H, d,     CH—CH₃), 2.55 (3H, s, CH₃—     )

3.78 (3H, s, —OCH₃)

**EXAMPLE 15**



2-Hydroxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]ethyl}benzenesulfonamide.
Physicochemical properties:
Melting point: 97°–99° C.
Elemental analysis for $C_{17}H_{22}N_2O_5S.H_2O$:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 53.10 | 6.29 | 7.29 |

4,703,063

**19**

-continued

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Found: | 52.75 | 6.22 | 7.09 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

δ: 3.76 (3H, s, —OCH$_3$)

4.04 (2H, t, —OCH$_2$—)

### EXAMPLE 16



2-Methoxy-5-[2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl]benzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: above 250° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_5$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 52.96 | 6.31 | 6.50 |
| Found: | 52.44 | 6.31 | 6.47 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

δ 1.15 (3H, d, CH—CH$_3$)

3.78 and 3.90 (3H + 3H, s, —OCH$_3$)

4.38 (2H, t, —OCH$_2$—)

### EXAMPLE 17



2-Methyl-5-[2-[2-(2-methoxyphenoxy)-1-methyle-thylamino]ethyl]benzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 183°–185° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_3$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 57.20 | 6.82 | 7.02 |
| Found: | 57.13 | 6.79 | 6.99 |

Nuclear magnetic resonance spectra (CD$_3$OD):

**20**

δ: 1.55 (3H, d, CH—CH$_3$) 2.24 (3H, s, O



2.64 (3H, s, CH$_3$



2.08–2.40 (2H, m, —OCH$_2$—)

### EXAMPLE 18



2-Methyl-5-[2-(2-phenoxyethylamino)ethyl]ben-zenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 208.5°–210° C.
Elemental analysis for C$_{17}$H$_{22}$N$_2$O$_3$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.05 | 6.25 | 7.55 |
| Found: | 54.83 | 6.23 | 7.48 |

Nuclear magnetic resonance spectra (CD$_3$OD):

δ: 2.65 (3H, s, CH$_3$



4.32 (2H, t, —OCH$_2$)

### EXAMPLE 19



5-[2-[2-(2-Methoxyphenoxy)ethylamino]-2,2-dime-thylethyl]-2-methylbenzenesulfonamide   hydrochlo-ride.
Physicochemical properties:
Melting point: 199°–202° C.
Elemental analysis for C$_{20}$H$_{28}$N$_2$O$_4$S.HCl.CH$_3$OH:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 54.71 | 7.21 | 6.08 |

4,703,063

## 21

-continued

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Found: | 54.50 | 7.17 | 6.14 |

Nuclear magnetic resonance spectra (d₆-DMSO):



δ: 1.24 (6H, s, —C—CH₃), 2.56 (3H, s, —CH₃)

3.74 (3H, s, —OCH₃), 4.30 (2H, t, —CH₂—O)

### EXAMPLE 20

CH₃O—[C₆H₃(SO₂NH₂)]—CH₂CHNHCH₂CH₂O—[C₆H₄]—.HCl
                                          |
                                          CH₃
                                    OCH₂CH₃

5-{2-[2-(2-Ethoxyphenoxy)ethylamino]-2-methyle-thyl}-2-methoxybenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 254°–256° C.
Elemental analysis for C₂₀H₂₈N₂O₅S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 53.99 | 6.57 | 6.30 |
| Found: | 53.79 | 6.58 | 6.26 |

Nuclear magnetic resonance spectra (CD₃OD):

δ: 1.28 (3H, d, —CH—CH₃), 1.38 (3H, t, CH₂—CH₃)

3.97 (3H, s, O—CH₂), 4.30 (2H, t, CH₂—CH₂—O)

### EXAMPLE 21

CH₃—[C₆H₃(SO₂NH₂)]—CHCH₂NHCH₂CH₂O—[C₆H₄]—.HCl
                    |
                    CH₃
                                          OCH₃

5-{2-[2-(2-Methoxyphenoxy)ethylamino]-1-methyle-thyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 183°–185° C.
Elemental analysis for C₁₉H₂₆N₂O₄S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |

## 22

-continued

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Found: | 54.76 | 6.56 | 6.74 |

Nuclear magnetic resonance spectra (CD₃OD):



δ: 1.40 (3H, d, —CH—CH₃), 2.64 (3H, s, —CH₃)

3.80 (3H, s, —OCH₃), 4.23 (2H, t, —CH₂—O)

### EXAMPLE 22

CH₃—[C₆H₃(SO₂NH₂)]—CH₂CH₂NHCH₂CHO—[C₆H₄]—.HCl
                                   |
                                   CH₃
                                        OCH₃

5-{2-[2-(2-Methoxyphenoxy)-2-methylethylamino]e-thyl}-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 231°–232° C.
Elemental analysis for C₁₉H₂₆N₂O₄S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.86 | 6.58 | 6.83 |

Nuclear magnetic resonance spectra (CD₃OD):

δ: 1.26 (3H, d, —CH—CH₂), 2.60 (3H, s, —CH₃)

1.76 (3H, s, —OCH₃), 4.42 (1H, m, CH₃—CH—O)

### EXAMPLE 23



5-{2-[2-(2-Methoxyphenoxy)-1,1-dimethyle-thylamino]ethyl}-2-methylbenzenesulfonamide hydro-chloride.
Physicochemical properties:
Melting point: 191°–193° C.
Elemental analysis for C₂₀H₂₈N₂O₄S.HCl:

4,703,063

| 23 | 24 |
|---|---|

**Left column (23):**

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 56.00 | 6.81 | 6.53 |
| Found: | 55.83 | 6.86 | 6.32 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

$\delta$: 1.44 (6H, s, N—C(CH$_3$)$_2$—C), 2.56 (3H, s,



3.66 (3H, s,



OCH$_3$), 4.08 (2H, s, —CH$_2$—O)

**EXAMPLE 24**



5-{2-[N-[2-(2-Methoxyphenoxy)ethyl]-N-methylamino]ethyl]-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 169°–171° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_4$S.HCl:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |
| Found: | 54.88 | 6.51 | 6.64 |

Nuclear magnetic resonance spectra (d$_6$-DMSO):

$\delta$: 2.56 (3H, s,



CH$_3$), 3.68 (3H, s,



OCH$_3$)

4.39 (2H, t, —CH$_2$—O)

**EXAMPLE 25**



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-2-methylethyl]-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 250°–252° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_4$S.HCl:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 55.00 | 6.56 | 6.75 |

**Right column (24):**

-continued

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Found: | 54.68 | 6.49 | 6.58 |

Nuclear magnetic resonance spectra (CDCl$_3$+d$_6$-DMSO+D$_2$O+Na$_2$CO$_3$):

$\delta$: 1.06 (3H, d, CHCH$_3$), 2.61 (3H, s, CH$_2$



)

3.76 (3H, s,



OCH$_3$)

**EXAMPLE 26**



5-{2-[2-(2-Methoxyphenoxy)ethylamino]-2-ethylethyl]-2-methylbenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 198°–200° C.
Elemental analysis for C$_{20}$H$_{28}$N$_2$O$_4$S.HCl:

|  | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 56.00 | 6.81 | 6.53 |
| Found: | 55.76 | 6.88 | 6.51 |

Nuclear magnetic resonance spectra (CDCl$_3$+d$_6$-DMSO+D$_2$O+Na$_2$CO$_3$):

$\delta$: 0.94 (3H, t, CHCH$_2$CH$_3$), 1.22 (2H, m, CHCH$_2$CH$_3$)

2.56 (3H, s, CH$_3$



), 3.76 (3H, s,



OCH$_3$)

**EXAMPLE 27**



2-Hydroxy-5-{2-[2-(4-methoxyphenoxy)ethylamino]ethyl]benzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 237°–241° C. (decomposed).
Elemental analysis for C$_{17}$H$_{22}$N$_2$O$_5$S.HCl:

4,703,063

25                                                        26

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 50.68 | 5.75 | 6.95 |
| Found: | 50.45 | 5.64 | 6.99 |

Nuclear magnetic resonance spectra (CD$_3$OD):

γ: 3.74 (3H, s, O—CH$_3$), 4.22 (2H, t, —CH$_2$—O)

### EXAMPLE 28



2-Hydroxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 211°–214° C.
Elemental analysis for C$_{18}$H$_{24}$N$_2$O$_5$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 51.86 | 6.04 | 6.72 |
| Found: | 51.72 | 6.00 | 6.59 |

Nuclear magnetic resonance (CD$_3$OD):

δ: 1.28 (3H, d, CHCH$_3$), 3.86 (3H, s, —OCH$_3$)

4.30 (2H, t, —CH$_2$—O)

### EXAMPLE 29



5-{2-[2-(2-Ethoxyphenoxy)ethylamino]-2-methyl-ethyl}-2-hydroxybenzenesulfonamide hydrochloride.
Physicochemical properties:
Melting point: 172°–173° C.
Elemental analysis for C$_{19}$H$_{26}$N$_2$O$_5$S.HCl:

| | C (%) | H (%) | N (%) |
|---|---|---|---|
| Calculated: | 52.96 | 6.31 | 6.50 |
| Found: | 52.83 | 6.65 | 6.12 |

Nuclear magnetic resonance spectra (CD$_3$OD):

1.26 (3H, d, CHCH$_3$), 1.36 (3H, t, —CH$_2$CH$_3$)

4.10 (2H, q, —CH$_2$CH$_3$), 4.26 (2H, t, —CH$_2$CH$_2$—O).

The starting materials and the reaction types applied to prepare the products of the above Examples 2, 3, 5 and 11–29 are shown below schematically;

| Exam-ple No. | Starting Material & Reaction Type |
|---|---|
| 2 |  |
| | chlorination of hydroxyl group |
| | the aimed compound |
| 3 |  |
| | chlorination of hydroxyl group |
| | the aimed compound |
| 5 |  |
| | condensation |
| | the aimed compound |
| 11–29 |  |
| | reduction |
| | the aimed compound |

(X represents halogen; R, R$_1$, R$_2$ and R$_4$–R$_{10}$ in the formula represent the same group as the corresponding group of the aimed compound)

What is claimed is:
1. Sulfamoyl-substituted phenethylamine derivatives represented by the general formula



wherein R$_1$ represents an amino group or a mono- or di-lower alkylamino group; R$_2$ represents a hydroxyl

4,703,063

**27**

group, a lower alkyl group, or a lower alkoxy group; $R_3$ represents a hydrogen atom, a lower alkoxy group or a lower alkyl group; $R_4$, $R_5$, $R_6$, $R_7$, $R_8$, and $R_9$ each represents a hydrogen atom or a lower alkyl group; $R_{10}$ represents a hydrogen atom, a lower alkyl group, or a lower alkoxy group; and Y represents an oxygen atom, and the salts thereof.

2. A pharmaceutical composition containing an effective α-adrenergic antagonistic amount of a compound of claim 1 and a pharmaceutically acceptable excipient.

3. The salts of the sulfamoyl-substituted phenethylamine derivatives as claimed in claim 1 wherein $R_3$ is a lower alkyl group or a lower alkoxy group.

4. The compound of claim 1 wherein $R_3$ is a hydrogen atom and the salts thereof.

5. The compound of claim 1 wherein $R_3$ is a lower alkyl group and the salts thereof.

6. The compound of claim 1 which is a racemic compound.

7. The compound of claim 1 which is a mixture of racemic compounds.

8. The compound of claim 1 which is an optically active isomer.

9. The isomer of claim 8 which is the (+) isomer.

**28**

10. The isomer of claim 8 which is the (−) isomer.

11. The optically active isomers of the compound of claim 1.

12. The isomer of claim 11 which is the (+) isomer.

13. The isomer of claim 11 which is the (−) isomer.

14. The compound of claim 1 which is 5-{2-[2-(2-ethoxyphenoxy)ethylamino]-2-methylethyl}-2-methoxybenzenesulfonamide.

15. The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}benzenesulfonamide.

16. The compound of claim 1 which is 5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-2-methylbenzenesulfonamide.

17. The compound of claim 1 which is 5-{2-[2-(2-methoxyphenoxy)ethylamino]ethyl}-2-methylbenzenesulfonamide.

18. The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N-methylbenzenesulfonamide.

19. The compound of claim 1 which is 2-methoxy-5-{2-[2-(2-methoxyphenoxy)ethylamino]-2-methylethyl}-N,N-dimethylbenzenesulfonamide.

* * * * *